UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE Nº  00-6309-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

> *Plaintiff,*

VS.

DAVID MORGENSTERN,

> *Defendant.*

_____/

### DEFENDANT DAVID MORGENSTERN'S
### MOTION FOR CONTINUANCE

Defendant, **DAVID MORGENSTERN,** *pro se,* hereby moves this Honorable Court to continue the trial date in the above styled case, currently scheduled for May 6, 2002, for both medical reasons, and in order to notify the court of ineffective CJA counsel, and as such, in support thereof, states the following:

1.    The Defendant is filing this motion pro se because his CJA counsel, on April 23, 2002, refused to file a Motion that was materially similar to this Motion where CJA Counsel wanted to edit out all references that may challenge the effectiveness of his representation. It is the Defendant's opinion that his editing process would have compromised the Defendant's rights accorded under the Sixth Amendment of the United States Constitution, including the honest and earnest disclosure that CJA's counsel is entirely unprepared for trial, as stated throughout this Motion. Certain further revisions

1

have been made to this Motion from the earlier version in order to emphasize where CJA Counsel cannot possibly become prepared for trial in the twelve calendar days remaining prior to the present trial date, on May 6, 2002.

2. The Defendant is currently set for trial in a fifty-five-count indictment wherein the Defendant is charged in approximately thirty-one counts. This is a complex indictment charging RICO, money laundering, wire fraud and mail fraud. There are other counts charging other defendants with other crimes, which this Defendant is not involved.

3. The Defendant was arrested October 30, 2000. Sometime in December 2000 Defendant was appointed CJA counsel. As the court is aware, problems developed with regard to certain discovery, copies of documents, and among the various attorneys representing some of the defendants.

4. On November 6, 2001, Defendant's original CJA counsel withdrew from further representation of the Defendant. Undersigned counsel was appointed thereafter to represent the Defendant and was advised this case was set for trial for February 11, 2002. Shortly after being appointed, undersigned counsel conferred with original CJA counsel. Counsel further requested that the file be provided to the undersigned forthwith. It was not until December 13, 2001 that the original CJA counsel made the file available.

5. This discovery consisted of approximately 20,000 documents. Some of the documents include pleadings but the majority of the documents are documents relating to the underlying charges of the RICO, money laundering, wire fraud and mail fraud.

6. Approximately one third of the documents were organized in a fashion so that documents could be properly examined. Since December 13, 2001, the Defendant personally, with minimal assistance but sufficient guidance from CJA counsel, has:

2

(a)    Cataloged and organized all of these documents such that they can now be fully examined for use in preparing the defense for the Defendant;

(b)    Indexed and labeled these documents, so as to determine which count(s) of the indictment to which these groups of documents may apply;

(c)    Separated Rule 404(b) evidence that the government intends to use at this trial that was originally mixed with other discovery. Regarding this evidence, CJA Counsel has examined none of these documents to date.

7.    Many of the discovery documents consist of checks, the daily recordings, and depository receipts of check cashing stores in relation to their various banking depositories. Regarding this evidence, CJA Counsel has examined none of these documents to date.

8.    There are also wiretap transcripts. Undersigned counsel has not had an opportunity to determine whether the government complied with the necessary minimization requirements to determine whether there should be litigation over whether the wiretaps should be admissible. This is absolutely critical to the Defendant's defense and must be done in order to render effective representation. Undersigned counsel has not had sufficient time to listen to the wiretaps, review the wiretap transcripts to determine the reliability of the transcripts or if all CD ROMS have been in fact transcribed. Regarding this evidence, CJA Counsel has examined none of these documents to date.

9.    Assistant United States Attorney Brian McCormick informed undersigned counsel during the week of January 14, 2002 that there is new discovery in this case that the government intends to use which originates from the Bahamas. This material was

received by undersigned Counsel on February 8, 2002. Additional discovery was received through to the middle of March 2002. Assistant United States Attorney Brian McCormick indicated that these documents are devastating to the Defendant's case. . Regarding this evidence, CJA Counsel has examined none of these documents to date. Thus, it is unknown as to the relevancy of any of these documents to the government's case or to the Defendant's defense.

10.    The review of documents relating to the money laundering and RICO is very time consuming. Up until January 25, 2002, The Defendant worked almost every day on this case, and CJA Counsel was extremely cooperative, providing guidance and instruction. But on January 25, 2002, the Defendant was admitted to West Boca Medical Center, Boca Raton, Florida for emergency surgery, relating to an infection in a massive blood clot that had formed as the result of an attempt to repair a left shoulder separation on January 10, 2002. The infection led to him contracting Septicemia, a dangerous infection of the blood, a type of blood poisoning caused by pathogenic microorganisms. It causes immune system deficiency, internal bleeding without warning, and other serious complications, including potential damage to, or failure of, vital organs. The Defendant was hospitalized from January 25 through February 1, 2002, then again, February 8 through February 11, 2002, then again April 4 through April 11, 2002. In addition, between these dates, and through to April 17, 2002, the Defendant was an outpatient at North Broward Medical Center for infusion of intravenous antibiotics seven days every week, a process taking anywhere from three to seven hours each day. For clarity, the Defense has attached "Exhibit A – Inpatient and Outpatient Schedule for Patient David

4

A. Morgenstern" in order to illustrate the unavailability of the Defendant to continue to work on this case with CJA Counsel as he did prior to January 25, 2002.

11.     The government has been kept fully informed about the Defendant health issues, both by the Defendant's doctors and by CJA Counsel. The Defendant is still undergoing post-operative care and infectious disease therapy as the result of the unsuccessful surgical repair of a separated left shoulder. He is lethargic and in chronic pain. He requires precise, time-consuming therapy in order to have the opportunity to overcome this disease, including testing his own ability to withstand infection during periods where he is not under medication. Since contracting the disease, the Defendant became ill during his first "test" period beginning March 27, 2002, and relapsed eight days later on April 4, 2002.

12.     On March 26, 2002, the U.S. District Court, Civil Division, in Greenville, South Carolina required the Defendant to attend a "Motion For Show Cause Hearing On Civil Contempt, To Repatriate Funds, For Corporate Records And Other Relief," (the "Motion") in difference to medical advice presented to that Court in a motion to continue the hearing signed by his physician that he was too ill to travel. The motion was denied. The Defendant traveled to South Carolina and met with Prosecutor David Stephens, Mr. Marvin Harrison, special expert witness who will give testimony for the government in the matter before this court, Mr. James R. Pavlock, Trial Attorney, U.S. Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, Washington, DC, and Mr. Paul Jacobs, Special Agent, FBI, under proffer, as opposed to going to the civil contempt hearing, in an attempt to resolve matters out of court, as the Defendant is also

indicted in a criminal case in that District. The Defendant sustained over 20 hours of interrogation over the period of only two and half days. On March 29, 2002, he then returned to South Florida where he met with Prosecutor Brian McCormick, and Mr. McCormick's team of five other interrogators on April 2 and 3, 2002. The Defendant was having difficulty in the interview on April 3, 2002, both understanding the questions, and responding to them in a way that was satisfying and apologized openly for his lack of mental acuity. The Defendant then asked if he could excuse himself from the proffer until such time as the GI bleeding, lethargy and chronic pain that was plaguing him could be abated. Thus, during the nine days from March 27 through April 4, 2002, where the Defendant was supposed to be resting and thus strengthening his immune system and ability to fight his disease without the infusion of IV antibiotics he spent two days traveling, four days in proffers, and three days at rest. During the early morning hours of April 4, 2002, the Defendant relapsed into another sepsis episode and was re-admitted to North Broward Medical Center. When a sepsis patient relapses, the only available treatment is a progressively stronger intravenous antibiotic that is inherently more toxic. These therapies tend to make the patient actually sicker, weaker and mentally depressed for a while, similar to chemotherapy in cancer patients. The Defendant is in the middle of this treatment regimen. While he is currently in a cycle of no antibiotic medication at this date, he is not cured. He is very susceptible to relapse. He remains physically exhausted and mentally despaired. The Defense has attached Exhibit "B" - Doctor's Letters Concerning David A. Morgenstern's Current Health Condition," all of which has been made available to Assistant United States Attorney Brian McCormick for verification.

6

The Defense simply has not had the time in the last three months due to the Defendant's medical circumstances, to materially work on this case more than only a few hours, and even then, the work completed has been predominantly clerical matters.

13.    There are at least seventy boxes of documents and perhaps more from the so-called "South Carolina investment fraud." CJA Counsel and the Defendant did have the opportunity to separate from these boxes at the Ft. Lauderdale, FL Courthouse approximately eleven boxes of materials are of importance to the Defense. CJA Counsel has never able to return to examine these documents with the Defendant sufficient to request copies from the government due to the Defendant's medical condition. These "carved out" documents are extremely important to the Defense. They need to be reviewed by the Defendant and CJA Counsel. The Defendant believes these documents show conclusively that he is not mentioned in the South Carolina investment fraud. They contain omissions concluding that David Morgenstern had no knowledge, involvement or participation with the South Carolina investment fraud. The Defendant, not CJA Counsel, has divided these documents out. They must be copied and properly examined. In spite of the Defndant's efforts, CJA Counsel has examined none of these documents to date.

11.    Due to the Defendant's illness, the Defense needs additional time to assess which expert witnesses are necessary for the presentation of the defense. The Defendant intends to present a defense in this case. The Defendant wishes to present testimony and evidence that support his belief that his business fell within ordinary and customary practices permissible abroad. The defense must engage these expert witnesses who are in the area of management of offshore international, trust and business undertakings, as well

as certain inter- and intra-jurisdictional issues, since the Defendant did little business in the U.S. but operated throughout Europe and elsewhere. Expert testimony is necessary to opine on corporate matters which permit taking advantage of opportunities while still being in compliance with the business, banking and accounting laws of a diverse set of nations. In sum, expert testimony is necessary to determine the following:

a)    Whether any of the corporations, whether formed by the Defendant or not, which operated under the laws of other nations, in fact did so in full compliance with the laws of that land.

b)    Whether there is any conflict between foreign laws and the laws of the U.S. and if these corporations in fact operated in compliance with the laws of the country of formation, how such rightful operation could be wrongly interpreted under U.S. laws.

c)    Whether the Defendant and these certain foreign corporations followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and thus further complied with governing law associated with their business.

d)    Whether the diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from U.S. States laws and whether compliance by non-U.S. entities as required under the laws of these foreign nations may be in opposition to U.S. laws.

e)    Whether the Defendant's actions in non-U.S. entities was consistent with banking, trading, investment, fiduciary and trustee practices in each country

including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

13.   It is impossible to prepare a defense at this point before examining all documents of discovery in this case, in order to determine which documents are relevant to various allegations in the indictment. Counsel has had part of the file for approximately four months, but other parts of the discovery have been available for only a few weeks.  It has been impossible to review all the documents to determine which documents apply to which allegation in the indictment without the input of the Defendant who has been aterially unavailable since the last continuance due to illness.  It has been impossible for CJA Counsel to determine how some documents are relevant.

14.   Again, many documents involve check-cashing stores. These stores appear to have been legally permissible state-licensed check accepting and cash or cash equivalent, meaning money orders, cashier's checks and wire transfers, tendering depositories acting "as banks" for thousands of clients over the course of many years, at least back into 1996. Expert testimony is necessary to determine the usual course and conduct of check cashing stores. It appears that from the documents reviewed thus far, these check-cashing stores were conducting legitimate business activities. However, without reviewing all the documents it is impossible to make a final conclusion.

15.   Again, with respect to the RICO allegations, regarding the Defendant, in the limited amount of discovery CJA Counsel examined, CJA Couinsel has only been able to ascertain that the Defendant relied upon the receipt of funds duly and legally processed

through FDIC-insured, Federal Reserve-licensed banks, always receiving the funds in the form of Federal Reserve-generated wire transfers and never in the form of any checks for deposit. This appears to be a legal action. CJA Counsel has not reviewed enough documents to ascertain any illegality with respect to this matter.

16.    Documents have not been examined by a defense forensic accounting expert and cannot be until we review all the documents to determine which documents need to be reviewed by an expert witness. Moreover, CJA approval is necessary before the hiring of an expert witness. No approval has yet been sought by CJA Counsel.

17.    The following must be done to render effective representation of the Defendant:

a)    There are foreign documents from several countries that need to be examined. This is a particularly sensitive request from the defense. While the Defendant is now in possession of some of these documents, CJA Counsel has examined none of them.

b)    There are actual witnesses that the defense needs time to assemble including expert witnesses and witnesses to refute allegations brought forth by the government. Many of these potential witnesses are outside the United States. CJA Counsel has contacted none of these witnesses, nor interviewed any of them, in order to determine whether these witnesses are willing to return to the United States to testify. These witnesses, in addition to some located in the United States, some are located in foreign countries. . Regarding expert witnesses, CJA Counsel has done nothing to acquire such experts to date.

c)    CJA Counsel has not conferred with the Defendant to determine which of the specific witnesses need to interviewed versus which will be actually called at the trial to testify, nor has CJA Counsel conferred with any of these witnesses as the primary emphasis

has been placed on reviewing documents to determine which documents apply to which counts of the indictment and to prepare and understand how the government is going to prove the various counts of the indictment.

18.    This motion is made in good faith and not for purpose of delay.

19.    The Defendant moves the court to set a status conference so the parties may discuss these issues with the court, sufficient for CJA Counsel to honestly admit to his un-preparedness and the further capacity to prepare in twelve calendar days.

**WHEREFORE,** the Defendant respectfully prays that this Honorable Court will grant the relief sought herein.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished to Assistant United States Attorneys Diana Fernandez and Brian McCormick, via fax and U.S. Mail, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33394, William Norris, Esquire, Attorney for Fred Morgenstern, 7685 Southwest 104th Street, Suite 104, Miami, Florida 33156, and Emanuel Perez, Esquire, Attorney for Joseph Silvestri, 2121 Ponce de Leon Boulevard, Suite 920, Coral Gables, Florida 33144, and Philip Horowitz, Esquire, Attorney for Mark Weiss, 12651 South Dixie Highway, Suite 328, Miami, Florida 33156, on this 23th day of April, 2002.

Respectfully submitted,

David A. Morgenstern, *pro se*
7534 Estrella Circle
Boca Raton, FL 33433

By:

David A. Morgenstern

11

**"Exhibit A – Inpatient and Outpatient Schedule
for Patient David A. Morgenstern"**

**"Exhibit A – Inpatient and Outpatient Schedule for Patient David A. Morgenstern"**

| January 2002 | | | | | | |
|---|---|---|---|---|---|---|
| SUN | MON | TUE | WED | THU | FRI | SAT |
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |  |  |

| February 2002 | | | | | | |
|---|---|---|---|---|---|---|
| SUN | MON | TUE | WED | THU | FRI | SAT |
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 |  |  |

| March 2002 | | | | | | |
|---|---|---|---|---|---|---|
| SUN | MON | TUE | WED | THU | FRI | SAT |
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |  |  |  |  |  |  |

| April 2002 | | | | | | |
|---|---|---|---|---|---|---|
| SUN | MON | TUE | WED | THU | FRI | SAT |
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |  |  |  |  |

**Key**

| | | | |
|---|---|---|---|
| Defendant Hospitalized | 3 hrs/day Outpatient | Defendant's Case Work | Discovery Rec'd 12.13.01 |
| 7 hrs/day Outpatient | Proffers w/ Government | Sakin Appointed 11.8.01 | 48 Hr Test Period |

**Exhibit "B" - Doctor's Letters Concerning David A. Morgenstern's Current Health Condition"**

**North Broward Community Health Center Inc.**
3773 North Federal Highway
Pompano Beach, Florida 33064
(954) 941-8866 • (954) 941-9950

Mr. Scott W. Sakin, Attorney at Law
1411 NW North River Drive
Miami, Florida 33125

BY FAX: 305.233.8781 and HAND DELIVERED

April 19, 2002

Re: Patient David Morgenstern

Dear Sir:

As a physician, it is my opinion that Mr. Morgenstern is not well enough to begin trial on May 6, 2002, given his present health crisis that has consumed almost all of his time and attention for the past three months. After examining him today, I cannot see any reasonable way that he could be expected to fully address or properly comprehend, the intricacy of a trial.

This Patient is still in extreme pain managed by heavy narcotics. The January 10, 2002 surgery on his shoulder has failed, and he is now a sepsis patient. He is subject to cramps, nausea, disorientation, headaches, irritability and depression, among other symptoms. The Patient simply is not mentally acute enough or completely cognitive, due to both his physical and mental condition, but also due to the high level of medication that he is required to take.

Mr. Morgenstern is in the middle of his treatment regimen. He is not cured. He is very susceptible to relapse. To bring his prognosis current, I address the specifically:

He is still on heavy medication, including *Oxycontin,* a time-release narcotic pain reliever that affects mental acuity; *Percocet,* a *narcotic* a pain reliever affecting mental acuity; *Prevacid,* a proton-pump inhibitor maintain healing in the stomach, that causes headache, abdominal pain, and tiredness; *Norvasc,* a calcium channel blocker that causes dizziness and anxiety, and *Zestril,* a angiotension-converting enzyme (ACE) inhibitor, that causes drowsiness and fatigue. If needed, he would re-start Vancomyocin IV treatment again, 1,250 mg twice a day, 12 hours apart, which requires about seven hours per day of outpatient time. This antibiotic is toxic, causing nausea, gastric distress, kidney pain and fatigue.

Mr. Morgenstern is not mentally cleared for trial at this date. A reasonable continuance in the proceedings should be accorded for medical reasons. Please contact me as you require.

Sincerely,

John D. Sortino, MD

## North Broward Community Health Center Inc.
3773 North Federal Highway
Pompano Beach, Florida 33064
(954) 941-8866 ● (954) 941-9950

The Honorable G. Ross Anderson, Jr.
US District Court Judge
315 South McDuffie St.
Anderson, SC 29624

March 18, 2002

Re: Patient David Morgenstern

Dear Sir:

I understand from my Patient, David Morgenstern, who has had an office visit today, that there is a matter before your honorable court in Greenville, South Carolina requiring his appearance on March 28, 2002. He has also told me that Mr. Steven W. Sumner is his attorney representing him, and that Mr. Sumner, requires him to be in South Carolina beginning Saturday, March 23, 2002, in order to prepare adequately for this hearing.

Mr. Morgenstern is undergoing post-operative care and infectious disease therapy as the result of an unsuccessful surgical repair of a separated left shoulder. He is lethargic, with little energy and in chronic pain.

Today's office visit was to prescribe a blood test, that will be done today at North Broward Medical Center, Pompano Beach, Florida, which is in addition to his weekly blood test taken each Monday that monitors his progress towards defeating both a condition of anemia caused by internal bleeding in the GI tract, and sepsis, a severe infection of the blood.

The additional tests include a blood culture, a routine procedure at this point in his therapy, in order to determine the progress and the effectiveness to date of his daily intravenous antibiotics treatment that have been underway since February 1, 2002.

It will be determined as to whether the date of March 26, 2002 will in fact be the last day of his IV therapy, which cannot be abated or interrupted prior to that date. For this reason alone, and there are others, as I have said in my last letter (attached), he cannot travel on March 22 or 23, 2002 to meet with his attorney in Greenville, South Carolina.

Page 2

In addition, the Patient is also actively GI bleeding from an unknown source. He is scheduled to undergo upper and lower endoscopies with DR. Harold Rosen, a GI specialist. Until the source of bleeding is known, it is not medically safe for him to travel.

I have made it clear in my past letter (attached) to Mr. Scott W. Sakin, Esq. who asked me to prepare a letter for the court in South Florida, that this Patient is not able to travel until after March 26, 2002, and I now add, not immediately after as he must be monitored for at least 48 hours thereafter for any fever.

Later this week, after we receive the results of his tests as discussed above. I will endeavor to provide a date certain for Mr. Morgenstern to be able to travel as soon as I can, but such travel dates will not be the 22nd, 23rd, or the 27th of March, 2002.

I would ask the Court to respect the imperative orders I have given for this Patient as a licensed physician. I cannot endorse any action where Mr. Morgenstern, as a Patient acts, or is required to act, outside of my recommended Standard of Care.

Please contact me, as you may require.

Sincerely,

John D. Sortino, MD

BEFORE ME, appeared Dr. John D. Sortino, MD, in his offices, 3773 N. Federal Highway, Pompano Beach, Florida 33064, after being duly sworn, did personally sign this two (2) page letter as addressed to the Honorable Judge G. Ross Anderson, Greenville, South Carolina.

Notary Public    3/18/02

Ann Marie Rosser
MY COMMISSION # DD14735 EXPIRES
September 16, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

*Sent in care of:*

Mr. Steve W. Sumner, Attorney at Law
114 Manly Street,
Greenville, SC 29601

BY FAX: 864.233.8781 and FEDEX overnight

**North Broward Community Health Center Inc.**

3773 North Federal Highway
Pompano Beach, Florida 33064
(954) 941-8866 • Fax (954) 941-9950

Mr. Scott W. Sakin,
Attorney at Law
Scott W. Sakin, P.A.
1411 N.W. North River Drive
Miami, Florida 33125

February 22, 2002

Re: Patient David Morgenstern

Dear Mr. Sakin:

I have attached the "Discussion of Surgery, Emergency Surgery And Aftercare Requirements for David Morgenstern" which you asked to be sent to you. It summarizes his condition at this date.

Mr. Morgenstern is my patient for post-operative care and infectious disease therapy. He is unable to travel until after March 26, 2002, as he requires daily intravenous antibiotics treatment through to that date. It is best for his recovery for him to continue his rehabilitation at home, in order to complete his regimen of 7-day per week, uninterrupted medical treatments.

Mr. Morgenstern has authorized the release of this discussion, as well as his unabridged medical and hospital records to you, subject to your instructions.

Please contact me, as you may require.

Sincerely,

John D. Sortino, MD

**Discussion of Surgery, Emergency Surgery and
Aftercare Requirements for David Morgenstern**

Page 1

### 1. What was the initial surgery for?

In July 2001, David Morgenstern (the "Patient"), came to me, John D. Sortino, MD, as his primary physician. He reported a fall from his roof, which aggravated an old ski accident. He was diagnosed with Grade III shoulder separation. He wanted to avoid surgery. He reported immobility and pain to Robert W. Baylis, MD, of Orthopædic Associates USA. The Patient delayed surgery for personal reasons, until January 10, 2002.

From post-operative examination of the Patient, Dr. Baylis performed an incision surgery and arthroscopic surgery. Another tendon was grafted to replace the main tendon that connects the arm bone to the shoulder structure. The arthroscopy ("scope") surgery corrected wear and tear in the joint and rotor cup caused by improper position of the bone.

### 2. What happened after the initial operation?

I did not see the Patient until February 9, 2002, the day after I admitted him at North Broward Medical Center on February 8, 2002, for continued intravenous antibiotic treatments to intervene for symptoms of infection and to control his high blood pressure. The Patient did report to me that he continued to have post-operation appointments with Dr. Baylis, MD, which is routine.

On January 14, 2002, he reported a blood clot under the sutures line to Dr. Baylis, who at the time prescribed "Naproxen," 375 mg, an anti-inflammatory. The Patient reports that his next appointment was for January 21, 2002, where on that date, the Patient reported the blood clot being the size of an orange cut in half. Two days' later, January 23rd, Dr. Baylis ordered a blood test for January 24th, which showed infection. On January 25th, Dr. Baylis, MD ordered emergency surgery at West Boca Medical Center to clean out the site, and to treat the infection with intravenous antibiotics.

### 3. What happened to create Patient's present medical condition?

The Patient reports that on January 26, 2002, while hospitalized, routine blood work showed he had anemia. Susan Saxe, MD, an infectious, travel and tropical disease specialist, called in by Dr. Baylis to treat the Patient's infection, called Dr. Semel, an internist, about the anemia. Dr. Semel believed that the Naproxen might be causing bleeding in the Patient's upper gastrointestinal ("GI") tract, so he ordered two units of whole blood to be administered immediately.

On January 27, 2002, Dr. Abitbol a gastrointestinal (GI) specialist performed an endoscopy and found ulcers bleeding in the stomach and the duodenum. Dr. Semel ordered a third unit of blood to be given in the early morning hours on the 28th, and a fourth one to be given on the 30th.

On January 30, 2002, Dr. Saxe reports that the bacterium was identified as being a type found in the colon, thus the GI bleed probably passed sepsis-infected blood throughout the patient's body.

The Patient was discharged February 1, 2002 from West Boca Medical Center, but re-admitted by me to North Broward Medical Center on February 8th, where I dealt with insurance issues, adjusted his medications, and set the date for his outpatient intravenous antibiotic treatment through March 26, 2002 .

On February 11th, I discharged him from North Broward Medical Center and I am currently monitoring his inflection, elevated blood pressure and post-operative discharge procedures initiated by Dr. Saxe, Dr. Semel and Dr. Abitbol. Surgical aftercare for his shoulder remains with Orthopædics Associates USA.

**4.    *What medication is the Patient taking? In what dosages, and affects?***

The Patient is taking this regimen of medication for several interventions:

**For Pain (short-term, up to 10 weeks):**

- *Oxycontin* —40 mg - 2x daily (by Dr. Sortino) - a narcotic "background" pain reliever that affects mental acuity. Can cause sleepiness, dizziness, light-headedness, and depression.

- *Percocet* - 5/325mg - 1,2, every 4,6 hrs, as needed (by Sortino) - a narcotic (5mg) and analgesic (325 mg) "breakthrough" pain reliever combination - it affects mental acuity. Can cause sleepiness, dizziness, light-headedness and depression.

**For Ulcers: (short-term, 2 to 10 weeks):**

- *Sucralfate (Carafate)* - 1 gm 4x times a day (by Dr. Abitbol) - short-term (2-3 weeks) prescription. Allows ulcers to heal naturally. Can cause dry mouth, upset stomach, back pain, dizziness, and sleepiness.

- *Prevacid (Omeprazole)* - 30 mg 2x daily (by Dr. Abitbol) - short-term (8,10 weeks - a proton-pump inhibitor. Stops production of stomach acid; used to maintain healing. Can cause headache, abdominal pain, and tiredness.

**For Infection: (short-term, 6 to 8 weeks):**

- Rocephin (Cephaloporins) – 2 gms, 1x daily (by Dr. Saxe/Sortino) – short-term (6,8 weeks) IV antibiotic for sepsis. Can cause cramps, blood clotting problems, secondary infection not susceptible to the antibiotic.

- Tecquin, 500mg 1x daily (by Dr. Sortino) - fluoroquinolone - anti-infective; targets bone, joints. Kills organisms that traditional antibiotics cannot. Can cause dizziness, abdominal pain and headaches.

**For High Blood Pressure (potentially long-term):**

- *Norvasc* - 5 mg 2x daily (by Dr. Sortino) - calcium channel blocker that can cause headache light-headedness dizziness and anxiety.

- *Zestril* - 20 mg 1x daily (by Dr. Sortino) - angiotensin-converting enzyme (ACE) inhibitor, which can cause headache, drowsiness and fatigue.

5.   ***What on-going treatment is the Patient receiving now?***

The Patient has a surgically inserted "Groshong" central catheter into the major vein at the right shoulder threaded down internally into the heart which enables him to receive on-going antibiotic treatment and provide blood samples, without the use of needled syringes.

In addition to the daily regimen of medications stated in No.4 above, the Patient receives on-going treatment for medical reasons and rehabilitative concerns:

**(1) Medical Reasons**
*The Patient requires:*

- Daily intravenous Rocephin therapy, administered at North Broward Medical Center, outpatient basis, through March 26, 2002;

- Weekly blood tests to monitor the Patient's infection intervention, and to determine whether his medications require adjusting;

- Bi-Weekly orthopædic appointments, in order to evaluate healing of the left shoulder from surgery, and to determine, following the curing of the infection, when Patient will be able to start physical therapy on his shoulder.

Discussion of Surgery, Emergency Surgery and Aftercare Requirements for David Morgenstern

### (2) Rehabilitative Concerns

*The Patient requires:*

- Infection Intervention - After the Patient's antibiotic intervention is completed, of concern is the potential for secondary inflections of the respiratory and/or urinary tracts, or elsewhere.

- Physical Therapy - To gain mobility in the repaired shoulder requires approximately 6 weeks of three times per week professionally guided physical therapy to rebuild strength through weight training and nutrition. Significant musculature atrophy has occurred in the shoulder, back and biceps, on the Patient's left side.

- Narcotics Withdrawal - This type of surgery requires medications for pain for a lengthy period of time managed by heavy narcotics. The Patient could experience withdrawal from his pain medication, including cramps and nausea, disorientation and headaches, irritability and depression, among other symptoms. These events have to be closely monitored and be mitigated. Even so, the Patient cannot be expected to be either comfortable or completely cognitive during any period of withdrawal.

### 6. *What is the nature of long-term treatment – and for how long is it?*

Long-term recovery is dependant upon the Patient, and how well his muscular weakness, immune system deficiencies and elevated blood pressure, among other conditions, respond to on-going treatment. Long-term treatment for the shoulder's rehabilitation should be discussed with Dr. Baylis. For elevated blood pressure, ulcers and sepsis, long-term treatment requires diet considerations, nutritional vitamins and supplements, jogging and aerobics.

### 7. What is the affect of the Patient's condition - physical and mental?

The Patient is fighting a combination of serious health debilitations. For the time being, he is essentially disabled. This patient is able to achieve a full recovery. For now, he needs continual care.

Respectfully submitted,

John D. Sortino, MD