## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**     **CASE NO. 00-6309-CR-DIMITROULEAS**

          **Plaintiff,**                **CASE NO. 00-6309-CR-DIMITROULEAS**

**vs.**

**FRED MORGENSTERN and**

**DAVID MORGENSTERN,**

          **Defendants.**

_____/

### DEFENDANT DAVID A. MORGENSTERN'S AFFIDAVIT IN SUPPORT OF INVOLUNTARY PLEAS OF GUILTY

I, Defendant David A. Morgenstern, am fifty-four years of age. I am competent to testify. I make this Affidavit relying on my own knowledge, my records, and an examination of transcripts and discovery and such similar materials in the form of any relevancy, from Cases No. 8:00-27-CR, 8:00-697-CR and 6:00-236-13-CIV, (Anderson) in the District of South Carolina, Anderson Division.

The conclusions that I draw are also the result of my recollection of events and the examination of circumstances associated with them, both before the date and after the date of my pleas of guilty as accepted by this court on May 21, 2002, in Cases No. 00-6309-CR and No. 02-60101-CR (Dimitrouleas), in the US District Court for the South District of Florida. If I were called upon to testify under oath in any court of competent jurisdiction, I would testify these same facts as stated herein.

1



To begin, in the plea colloquy, this Court, in accepting the Defendant's guilty pleas, sought to exhaust various subjects relevant to the matter of whether Defendant understood that, in making his guilty pleas, he was doing so void of the court committing any omission of critical core principles, such that, if any such factor was omitted, it could be considered no more than a harmless error.

The Defendant is also aware that the court attempted to exhaust the three core principles that must be addressed by the court in accepting a guilty plea, to wit: (1) That the guilty plea must be free from coercion; (2) That the Defendant must understand the nature of the charges; and (3) That the Defendant must know and understand the consequences of his guilty plea.

Even to the extent that in the plea colloquy, the court may have adequately informed the Defendant of nature of charges against him, such that the court identified to the Defendant the nature of the crimes, and even to the extent that the court attempted to make sure whether or not the Defendant had discussed the indictment with his attorney, this being for the purpose of setting the stage for the Defendant to have an opportunity to ask questions of the court, including during that time after the prosecution identified the conduct that gave rise to offenses, the Defendant still believes that he was coerced to involuntarily plead guilty.

2

At that time, whether or not the court received assurance that the Defendant had: (1) Sufficient education to understand the proceedings; (2) No mental impairments, it is a fact that he was forced, or coerced, to plead guilty after being intimidated to do so. This intimidation was present and immediate. It was of such a force and nature that it, among other factors, induced a reasonable and well-founded fear in the Defendant that any opportunity for a fair trial had become entirely hopeless.

The legal definition of intimidated "coercion" is either "positive" or "direct," where the Defendant would have had to be threatened physically or with certain death, or it is "presumed." Coercion in any form is a "constraint placed upon a person, a compulsion to act or being forced to submit in an event against their will. "Presumed" coercion is where a person is legally under subjection to another and is induced, in consequence of such subjection, to do an act that is contrary to his will.

The Defendant hereafter in this Affidavit fully supports this assertion of claim: That his pleas of guilty were induced by force against his will, such that the process was not free of coercion. Thus his pleas were involuntary, because he had no reasonable opportunity to escape coercion. If he refused, he faced a present and immediate unjust trial. If he did not, he was thrust into a situation where further coercion was inevitable. This fact – the use of coercion – and the inability to escape it - thus relieves the responsibility of the Defendant with respect to his pleas of guilty.

3

This is not all of the factors and circumstances that contributed to the Defendant's pleas being involuntary. This just means that point one of the essential core principles for this court to accept the Defendant's guilty pleas - That the court must accept pleas of guilty from criminal defendants free of coercion, was never achieved.

To continue, the court during the plea colloquy made many statements and posed a substantial number of questions in order to entice answers from the Defendant so that the court could resolve whether or not to accept the pleas of guilty. Yet the court was well aware of the deficiencies faced by the Defendant, both in terms of ineffective of counsel and the impossibility of the Defendant receiving a fair trial.

Thus, while the Defendant was in legal subjection to this court, legally subject to his attorney, Mr. Sakin, as the sole person who could speak for him, the Defendant was intimidated both by duly appointed counsel and directly by this court's demand to set off all essential due process in favor by bench denials of due process, demanding that the Defendant either "plea or else." This order was not reserved for the Defense: The government was also ordered to "just do it." Thus, both counsel and this court induced, in consequence of such subjection, the Defendant to plead guilty, an act that was contrary to his will.

4

Obviously, attempts will be made to refute what I have asserted. For instance, in the plea colloquy, the court makes this statement to the Defendant: (Quote): *You can't come back tomorrow, next week or next year and say, Judge, I made a mistake, I didn't know what I was doing on May 21st, my lawyer was no good, or any one of a number of other reasons. Are you making a decision today that you are willing to live by, David Morgenstern?*

To wit, this Affidavit is not about the Defendant "making a mistake" that day. Nor is it about the Defendant "not knowing what he was doing on May 21, 2002." And it is definitely not about my lawyer being "no good," whatever that is supposed to mean. What it is about is exposing how the acceptance of the pleas by this court was not free of coercion, among other errors, including providing the Defendant with no real way to escape the coercion, except of course, being subjected to stand trial while having ineffective counsel.

Thus, this Affidavit may be about targeting how the rights of due process were denied a criminal Defendant, but it is definitely about the court system and the government making decisions that have failed. A decision implies making a choice after weighing a set of reasonable options. I had no reasonable escape but to live by *what was happening* on May 21, 2002, but I should not have to be forced to live *by what has happened* as the result of it.

5

The court goes on to say: *And do you understand by pleading guilty here today, you may not be giving your lawyer a chance to finish any investigation that he might have otherwise wanted to have conducted? Is this what you want to do, plead guilty here today and finish up the case here today, except for sentencing in August, David Morgenstern?"*

While I answered, "Yes" to this, I was coerced to do so, by the very fact that the question itself is contradictory to this court's own ruling by denial on the same day at the earlier session, that if I didn't plea guilty that day, I'd be in trial the next. Thus my counsel could not possibly have had any chance to *"finish any investigation that he might have otherwise wanted to have conducted."* The question mocks the reality of the circumstances. The court was fully aware that Mr. Sakin was in no way prepared for a trial the next day, but forced the Defendant – and the government for that matter – to create a plea agreement on May 21, 2002, or face trial the next day, something to which Mr. Sakin, who I was forced to be in subjection to, refused to object to. I would ask the court to forget the record. I could not speak except for what my attorney required me to say, because at my pro se motion hearing I was told to sit down and let Mr. Sakin represent me. Under the circumstances, I had little courage but to fall into place behind Mr. Sakin's subjective, as opposed to objective, representation.

Therefore, the entire context of my answer as stated above, breaks down against this fatal flaw of the proceeding itself and thus the plea process. The constraint placed upon me – that I had to plea right then or stand trial the next day with the court knowing my counsel was not prepared for that trial - was a compulsion to act, a force to submit, induced in consequence of being under subjection, to do an act contrary to my will.

Elsewhere, the court says: (<u>underline</u> emphasis added) "Okay. *Unless* the South Carolina Judge *declines the transfer*, *I won't be seeing you guys again*. If he *should decline* the transfer, *then we will be back here* August 1st at 9:30 and 10:00 o'clock respectively. This circumstance, that the South Carolina Judge declined the transfer, in fact never happened. The reverse is true. There is an acceptance of the Rule 20 by south Carolina by there is no record of a decline of transfer. Yet we are seeing Judge Dimitrouleas in this court again, and it not August 1st, 2002. Thus this statement, as made by this court, which cannot be styled as harmless error, is false.

While the court found that the Defendant understood the nature of the charges against him and that the Defendant appreciated the consequences of pleading guilty on May 21, 2002, and further, that the Defendant said that he understood by pleading guilty he waived certain rights of a Defendant as mentioned in the plea colloquy, and that he knowingly, intelligently and voluntarily waived

those rights, such that the Court was able to accept the pleas of guilty, the court failed to frame anything in the subject matter concerning the fact the acceptance of the Rule 20 motion by South Carolina could be reversed to this District if he did not plead guilty to the South Carolina case. No such disclosure exists anywhere in the plea agreement or colloquy, *except statements and questions to the exact contrary.*

This situation becomes especially difficult because in the plea colloquy, the court went to great lengths to warn me the Defendant that the South Carolina case was *not able to influence the guilty pleas* in this District and that the South Florida cases and pleas *did not bear* on the South Carolina matter, and visa versa. To wit:

During the plea colloquy, the Court asks the direct question: (quote, *italics* emphasis added): "Do you (Defendant David Morgenstern) also understand that if for some reason *something should happen and you decide not to plead guilty* in South Carolina, the negotiations fall through and either because you want to go to trial or the prosecutors up there want to go to trial or the South Carolina Judge won't accept some plea, that that's a chance you take by your open plea *on these cases* and it would not be a ground to withdraw your guilty plea *on these two charges*? Do you understand that? (I answered: "Yes")

8

The Court goes on: "In other words, *these pleas are not contingent* on the pleas happening in South Carolina." *Do you understand that, David Morgenstern?* (I answered, "Yes, I do). While the court made this clarification, the court fails to clarify that if in fact *no plea was achieved* for the South Carolina case, then the Defendant's sentencing, at first entirely acceptable under Rule 20 by that District, could possibly be returned to this District. This ties materially the disposition of these pleas to the contingency of me pleading guilty in the South Carolina case. In fact, Mr. Stephen's *ex parte* letter, accepted by the South Carolina court as the unchallenged "statement of fact" for why the Rule 20 was reversed, says that the specific cause for the return was "judicial economy" arising out of my "failure" to plead "guilty as charged" in the South Carolina case.

It is not "harmless error" that by omitting that the Defendant's decisions regarding what to do in the other indictment would effect the conditions under which he would be sentenced, once the cases were accepted by South Carolina.

The Defendant could live with the fact that South Carolina may not accept his Rule 20. But the Defendant cannot acquiesce to the fact that the condition under which his sentencing was to occur has been inexorably changed merely because at a moment in time, the government chose attempt to force "a certain conclusion" to a yet to be adjudicated case.

9

This creates difficulty about the fate of each and every reasonable expectation as to why a Defendant enters into a plea agreement: That it could be dashed if he cannot bring himself to plead guilty when he believes in his innocence.

While the Defendant was under proffer, cooperating with the government, giving "good information," as Mr. Stephens calls it, contributing substantial assistance for investigations and for trials, nothing in the plea colloquy disclosed or contemplated the return of the Rule 20 to this, forwarding jurisdiction for this cause. In fact, the coercion is made complete if this court supports the receiving District and their insistence that the Defendant plea guilty to another case or his on-going substantial assistance will be revoked.

Again, the Defendant did nothing to frustrate the process of his sentencing. But now, by examining the circumstances as they have unfolded, it is clear that only by coercion could a situation like this have resulted. The court in South Carolina has already replaced the Defendant's counsel there for not even being present in the proffer sessions and trying to entice the Defendant through what can only be defined as coercion. Thus, one side of this matter has already been resolved by a court order in support of the Defendant having ineffective counsel.

10

The return of the Rule 20 was not, and is not, a refusal or a rejection by one US District Court objecting to that transfer from another. It is a reversal of a final decision made and then entered into the record by the accepting District to proceed in this matter for the single and solitary reason that the Defendant would not do what the accepting District prosecutor wanted him to do *in another case*.

By collapsing the resolve of this case into this other case, the Defendant is now put into a position not materially different from double jeopardy – essentially being condemned in this case by having his reasonable expectations for substantial assistance torn away because he felt he was not "guilty as charged" in another case.

The court here is faced with a dilemma: While this court attempted to exhaust its disclosure with reference to the three core principles that must be addressed by the court in accepting a guilty plea, the process failed the Defendant on the first point: That the guilty plea must be free from coercion. and it failed on the third point: The Defendant must know and understand the consequences of his guilty plea. The Defendant was never informed, nor could not he possibly have known and therefore could not have possibly understood that the one consequence of his plea was that he had to plead guilty in another case.

11

The only reason why this case is in South Florida and now, all of that is left for the Defendant, is to face sentencing, after depending upon persons in positions of control and authority, to watch out for and protect his constitutional rights.

Nothing in this court's questions prepared the Defendant – or prepared this court for that matter – for the South Carolina court to act without any precedence of law, and reverse its acceptance of these cases under Rule 20. The government acknowledges in writing (Mr. Stephens letter) the Defendant's substantial assistance, yet Mr. McCormick, the South Florida prosecutor refuses to even consider the Defendant's efforts. This would mean that the Defendant is to be penalized by this court in direct contradiction to disclosures in the plea colloquy, essentially voiding the reasonable expectations of a Defendant for good faith acceptances of substantial assistance. What is its proper definition for this? Is it not "Bad Faith?"

Simple logic says that if I answered the question "Yes" during the plea colloquy that the South Carolina plea or not plea would not affect what happened in South Florida – then why has it? I was absolutely sure that the two cases could not be collapsed into the same domain by what this court had disclosed to me during the plea colloquy – not under any circumstance. Yes, I declared my innocence to conspiring to steal "$60 million" (never possible) from the government's cooperating witness in concert with Mr. MacEnroe.

12

But does this court, which declared me mentally capable to understand the proceedings, think that somehow I became so mentally incapable that I would just blow my sentence reduction? Why would I prejudice my on-going, continued cooperation and substantial assistance if I thought for a minute that the two matters were connected only by a plea of "guilty as charged"? Am I crazy?

If I was to answer, "Yes" – as I did – in the plea colloquy – that I understood the South Florida and the South Carolina matters to be unrelated, why is the government not governed by the same core principle as id the Defendant, free of coercion?

There is no precedent of law for this court to accept the return of a Rule 20 motion, *once that case has been accepted* by another District Court, certainly not for "judicial economy," certainly not where the receiving court reverses itself because it perceives that suddenly the whole matter is going to "cost too much," and certainly not because a Defendant fails to "plead guilty as charged" in another case.

There are other matters that are not free of coercion as exposed in Mr. Stephens in his ex parte letter as well. He says that the Defendant had "several confusions" about why he was in South Carolina with regards to the Florida cases. How all of a sudden does the government not understand rule 20 the procedure and who is in charge of gauging substantial assistence?

13

If the Defendant had "several confusions," the government clearly did too. I also cannot fathom what this court's meaning was with reference to *"for some reason"* in the plea colloquy. Is it really in the interest of *juris prudence* that this Court will now rule that such a phrase as *"for some reason"* can mean "anything" – resolving that *"for some reason"* means *"something beyond the improbable?"* Or perhaps, could it mean something even more coercive and sinister, such as *"How about we get David Morgenstern to plead guilty as charged to in our case up here in South Carolina and if he doesn't do exactly what we want him to do, we'll just ruin the break he thought he'd get by him going to all the trouble to plead guilty in Florida? Hey, yeah, let's try that!"*

Yet even under these circumstances, I tried to cooperate. I offered Mr. Stephens a plea of guilty to some kind of Information – something that would not prejudice my future use as a witness in testimony for the government. But he refused. It was a similar circumstance as on May 321, 2002 in this court: Either pleas guilty as charged or you get nothing. With what seemed to be an act of vindictive prejudice, he then writes his *ex parte* letter dashes my reasonable expectations of a sentence reduction, however "nothing promised" they are, strikes my cooperative value, and sends me back to this court, in a jurisdiction where I never at any time assisted any investigation, or ever any cooperative value to Mr. McCormick. .

What cannot be ignored is that two separate attorneys undertook the process of the Rule 20, Mr. Sumner in South Carolina on the receiving end, who has already been found by the court to have acted woefully ineffective as counsel in the matter, and Mr. Sakin on the sending end, here in South Florida.

After the finding of fact that led to the dismissal of Mr. Sumner, the court in South Carolina appointed two new CJA attorneys to replacing him. I was granted two new attorneys to work _on these cases_ up there after Mr. Sumner was found ineffective. I needed those attorneys. I worked with them and we had made substantial positive progress. Yet now, have I been out-maneuvered by the government? I had representation by counsels of choice _for these cases,_ in South Carolina. For possible purpose except to prejudice what happens to me, were my cases sent back to this court?

It is difficult to face that the omission by this court to disclose that South Carolina could first accept the transfer, and then choose to send them back due to matters associated with another case now has me this exposed.  I do not think the omission can be grouped under the phrase "_or any one of a number of other reasons_" since such an event, even in the tenure of Judge Dimitrouleas, has ever happened. But the fact that it has never happened should not permit it to be called "harmless error."

15

Nor can this sequence of questions then answers. The court asked in the plea colloquy: *"And you patched up any differences you had with Mr. Sakin, David Morgenstern?* I say. Yes, sir. *"You are okay with him?"* asks the court. I respond, "We have (pause) no problem, sir. But let's put these answers in perspective: When I said this, that "we" had "no problem" because "he" was not "my problem" anymore – in that, he was not going to be my attorney. This answer cannot erase the fact that the court knew full well that Mr. Sakin's performance for me was deficient or the question could not possibly have been poised that way by the court. To wit:

This court ruled on a pro se motion filed by me on April 23, 2002, for a continuance, where the motion was so voluminous, so accurate and detailed, that it left nothing to conjecture about what Mr.Sakin had done and what he had failed to do, not because he was "no good," but because he had "no time" to prepare this case. The motion made in abundantly clear, that Mr. Sakin was totally unprepared for trial.

He had made errors, such as refusing to even file the motion, which is why I had to do it *pro se*, so serious that as counsel he was not even functioning as the "counsel" guaranteed me as a criminal Defendant, by the Sixth Amendment.

Mr. Sakin's deficient performance prejudiced my defense and this court knew it on April 23, 2002. Yet it gave him a two-week continuance, during which the

16

entire time he had a capital murder trial. Under the subjection of this court, under the subjection of counsel in a court where I was told to sit down and be quiet and thus not speak, I was forced to act against my will. This court gave such a short continuance in spite of what the motion disclosed that it was impossible for me to receive a fair trial, a trial whose result, based upon the circumstances, was reliable.

My statements here are not in conflict with my answers to questions during my plea colloquy. Mr. Sakin coerced me to answer all questions in a fashion "to get out of Florida or your choice is to be in trial tomorrow- and we'll lose." He reminded me that he was entirely unprepared for any such trial, that it was a shock to him for this court to force a Defendant to plea one day or go to trial the next, denying a motion to continue enjoined by the government and the Defense. He told me I was facing 30 years in jail and we could not win. Put simply, he said: "Answer yes, don't say anything else. Stop your talking. The judge will hang you." That is what he said.

We had no witnesses, no affidavits, no exhibits prepared to enter into evidence, no accounting completed, no charts, no objections to evidence to be entered into the record, no motions to strike filed, we had no record prepared for appeal, in effect, we had no defense.

Mr. Sakin also did not bear me a vivid description of what was about to happen to my family. He said if I pled at least they wouldn't be homeless. He said if I didn't, under the circumstances my wife and children would be weeping in the hallway and there would be nothing anyone could do for them or me, certainly if we went to trial that next day. By his own admissions, especially in our continuances, he was not prepared for this trial yet he brought nothing of protest before the court. Under the circumstances, my pleas were an act of desperate convenience. As a Defendant, I really had no choice. My counsel was not functioning as the "counsel" guaranteed me as a criminal Defendant, by the Sixth Amendment.

By going to South Carolina, I believed that at least *I had a chance* to continue to cooperate with the government; a chance denied me in South Florida. I had been under proffer there since March 23, 2002. I signed a proffer here on April 2, 2002, but due to my illness, I was unable to provide any substantial assistance in this District. On May 21, 2002, both sides of this case – the government and the defense - sought to continue the negotiations that were underway towards a favorable plea agreement.

If we failed, both sides knew that we would have to prepare for trial. This court denied that process, and the government gained insurmountable odds to change the plea agreement from what was being negotiated to essentially whatever they wanted it to be.

18

While in all fairness to the government, there was a genuine attempt to memorialize as much as the negotiations as we both could in the shortness of time, many things were omitted, or worse, they were left so unclear and at times, so confusing that during the plea colloquy, parts made no sense and in fact, this court undertook to clarify them.

But despite all of these earnest efforts, of principal omission was any statement that I would have to plead guilty for the Rule 20 and thus my sentencing in South Carolina to hold up. This omission has turned out to be of primary issue. It is a deficiency that cannot be explained away.

There is a test for plain error review for error at the trial court level that appellate courts examined, and they should be disclosed here: These four areas must be satisfied: There must be (1) error, (2) the error must be plain, and (3) the error must affect substantial rights, and then if all of these three conditions are met, the court is to exercise its discretion to notice forfeited error, but only if (4) the error seriously affects fairness, integrity, or public reputation of judicial proceedings.

Number 1: <u>There was error</u>: To demand by a denial to the contrary, that the Defendants and the government had to develop in two short hours a suitable and acceptable plea agreement or *be forced to face trial* the very next day is judicial error. Number 2: <u>It is plain error</u> and because it is so obvious: The defendant was legally

under subjection to the court, and coercion was induced in consequence of such subjection, and as such, the Defendant was forced to plea contrary to his will. Number 3: <u>The error affected</u> - perhaps irreparably - <u>the substantial rights of criminal Defendants</u> to expect reasonable due process, including the prospect of a fair trial – forcing them to choose what can only be defined as "the lesser of two evils." There was no time given for the Defendant and the government to create a strategy to develop their intended "package to end all matters" that had been the imperative of all our negotiations.

It was impossible to coordinate the two districts, even with James Pavlock of the US Justice Department acting as the coordinator, to clear up how and who was to be responsible for evaluating substantial assistance, where it was to occur and who was the lead person in it, as disclosed in Mr. Stephen's *ex parte* letter. The very fact that this case was sent back to this district after being accepted under Rule 20 transfer by another district – a precedence of confusion in itself – speaks volumes to the occurrence of error. The test in Numbers 1 through 3 is thus present: Number 4 then applies: <u>This error seriously affects the fairness, integrity, and public reputation of judicial proceedings.</u>

Here's why. Under legal commentary as read and understood by the Defendant, with regards to a criminal Defendant's Sixth Amendment rights, it states

20

that the trial judge must not only refrain from *creating a situation* of ineffective assistance, which is coercion, but the trial judge may well be obligated under certain circumstances to *inquire specifically* as to whether Defendant's counsel, because of a possible conflict of interest or otherwise, is rendering or may render ineffective assistance. Simply asking a scared and sick Defendant in a plea colloquy while he is suffering under the burden of subjection to ineffective assistance cannot possibly be what the appellate courts have in mind about making such an inquiry.

In fact, there are two components to this test: deficient attorney performance and resulting prejudice to the defense as being so serious as to bring the outcome of the proceeding into question. Although the gauge of effective attorney performance is an objective standard of reasonableness, the judicial scrutiny of counsel's performance must be highly deferential. Strategic choices concerning the issue of ineffective must be made *after a thorough investigation of the relevant law and facts* in order to make the issue "virtually unchallengeable," as will be the "reasonable decisions." Only then can the trial court suggest that the *process of investigation* as followed would virtually make any further investigation unnecessary.

Posing questions to a desperate Defendant during a plea colloquy where his counsel was not functioning as "counsel" under the Sixth Amendment definition cannot possibly qualify as the required "thorough investigation" test to be put forth by the trial

judge in order to undertake what the appellate court as a requirement in this context expressed.

To go from judicial error to attorney error, the Defendant has come to understand that, in order to establish prejudice resulting from attorney error, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." In other words, this would seem to mean that a test is required that would not only show that a different result would have been probable because of attorney performance, but that the result which did occur was fundamentally unfair or unreliable. The question then arises: *Did the trial judge refrain from creating a situation of ineffective assistance by insisting that the procedure for entering a plea be done at that very moment or else the trial would begin the very next day?* Did Mr. Sakin, by making no objection to the proceedings in this court, by providing the Defendant with no recommendation except this object threat: "Don't talk. Answer yes. Say anything else and go to jail." Is this how to overcome ineffectiveness or to target judicial error?

Given the trial judge's obligation to inquire specifically as to whether Defendant's counsel, because of a possible conflict of interest or otherwise, is rendering or may render ineffective assistance, did the trial judge achieve this test by

22

asking the Defendant merely if he had settled his differences with counsel, whether thing were "Okay" between them?

What was the Defendant to say? If "no," then by the advise of counsel, the Defendant would be on trial the next day, with the Defendant bearing the awesome burden of having in effect, no attorney at all, in that Mr. Sakin was not even in the least prepared. If "Yes," would the ineffective counsel be dismissed from representing the Defendant? If "Yes" meant that the Defendant could buy time to get past the next day, and be able to take his chances in the jurisdiction where he had already returned over $17.7 million in proceeds from a specified unlawful activity, namely the "South Carolina investment fraud," an action in itself that had shown substantial assistance in that District, an event that occurred ten months before the Defendant was even indicted.

By this courts action, what the Defendant heard and saw was a clear and present danger to him, unable to be misinterpreted: "Plea now or else." The Defendant was placed in an impossible lose-lose situation with no escape, no advisor, and no "counsel" – with nothing and no one standing to protect his rights under the Sixth Amendment.

Why did the trial judge fail to ask Mr. Sakin, the more appropriate person to answer the question on the record, if counsel felt he was rendering effective assistance

while the court was demanding a plea or insisting that trial begin the next day? Why did the court not seek to protect the Defendant without prejudice under fact and law? Specifically, with reference to the Defendant's Sixth Amendment rights, knowing that – by it's question the court certainly knew – that the Defendant might just be being coerced by Mr. Sakin, a "counsel" determined to protect himself. It was more than obvious that the Defendant was the center of counsel's conflict of interest. No escape. The trial court knew that the Defendant was wrestling with desperate uncertainly with regards to Mr. Sakin's representation because the Defendant filed the motion to continue just week's before *pro se*.

Mr. Sakin, at all times ineffective, in conflict, coercive, protecting his license to practice law, trying to find favor for himself with the court, was the Defendant's only protector. The court covered over what it already knew by asking a couple of leading questions to the Defendant. The Defendant stalled in his answer, because courage failed him at the time to protect, to object. Why did the court not step in to clarify thoroughly this difficult and prejudicial situation with something more than just a couple of yes-no questions to a desperate, physically sick fresh out of almost three months in the hospital still on heavy medication and frightened to the quick? At the same time, the trial judge exhaustively undertook to explain what the Defendant could not do while providing no life preserver about what remedies he might to save himself in a hopeless situation.

For instance, the court spent no time ferreting out why the Defendant would file a pro se motion for a continuance that spelled out all of Mr. Sakin's assertions that "it is impossible for the Defendant to receive a fair trial under these circumstances" but rather chose to simply undertake a forced march proceeding without any inquiry whatsoever. What changed that the Defendant fighting back with pro se motion weeks earlier now caved into a plea? How about being forced to go to trial the very next day with your only advocate being Mr. Sakin as your counsel? He was not functioning as the "counsel" guaranteed me as a criminal Defendant, by the Sixth Amendment.

And on that day, I was getting terrified. I was ill. I did not think I could stand to physically bear the pressure of a trial the next day, in my condition. I needed rest. I was suffering from a failed surgical procedure and the aftershock of a serious blood infection that almost killed me. While my doctor had informed the court in writing that after he examined me, I was clinically able to stand trial, no one contemplated that such an arduous event would begin abruptly on May 22, 2002. I had been out of the hospital barely over a month after being in hospitalized almost continuously since January 25, 2002. I had lost over 50 lbs. I was in great pain, taking a prescribed 80 mg of Oxycontin plus 30 mg of generic oxycodone a day just to walk around. I was still very sick. Mr. Sakin was unprepared.

Even though the influence of the prescribed narcotics made me euphoric, Mr. Sakin told me I'd be in jail immediately when we lost – and he assured me we would lose. I was convinced I would die in jail if I went in a week. At this point it actually began to feel like I was being threatened with bodily harm if I did not plea.

I tried to quill my anxiety by recalling the good repore that had developed with Mr. James Pavlock, US Justice Department, and with Mr. David Stephens, AUSDA in District of South Carolina, in advance of that day. Since I was fresh out of the hospital, and Mr. Sakin had not worked on my case, I believed I should explore a plea, which would allow me to keep working on the recovery of more money. I have never stopped trying to mitigate losses to the investor/victims of the South Carolina investment fraud scheme commanded by Virgil Womack that happened on my watch. I wanted to cooperate, to do the right thing, to prove more money could be recovered, to stop the swindle of so-called "High Yield Investment Programs."

Mr. Pavlock would have to say what I am saying if this court called him to testify. So would Mr. David Stephens, who told me not to worry about the results in South Florida, to come to South Carolina, and I would be taken care of. I thus had reasonable expectations in South Carolina for a sentencing reduction in this case for my substantial assistance, reasonable expectations provided to me by men in positions of great authority.

My attorneys were not present during these discussions but neither of my attorneys chose to stay with me in these negotiations, and especially during parts of my proffer. I thought this was normal. I realize what my answers are in the plea colloquy. I know that these men were not making promises. But I also believed they were making their statements in good faith relevant to this case. I have never cooperated in the Southern District of Florida, not because I did not want to, or refused to, but because I was not in the organized crime counts in the Indictment. Mr. McCormick expressed little or no interest in my cooperation.

My sentencing was accepted under Rule 20 where I had been providing substantial assistance under proffer for months. That is why it was sent there and that is why it was accepted there. This Affidavit is far from some attempt to "wiggle out" of my pleas. I believe this Court needs to examine why I was forced to make these pleas by an unprepared advocate, why this court made it clear in the plea colloquy that these cases were not collapsed together as the result of my pleas, why this process under law, where a Defendant's plea, as an undertaking to accomplish a cooperation agreement, why under law these methods are designed to extract acceptance of responsibility; and why in this matter, this process has been seriously compromised.

This Affidavit has nothing to do with being "upset" with how my PSI guidelines have turned out, since it is not conclusive. The return of my case to this

District following both cases *being accepted* for sentencing, is so extraordinary that this Court has entered into the record that such has never happened before.

This fact should give rise to question as to how such an anomaly in fact could arise, what procedures were in error, who is responsible, what is the adverse effect on the Defendant as to the confusion between the Districts as to who in fact was to value the substantial assistance reduction as it was provided by the Defendant, was it to be Mr. Stephens, which is what the Defendant was told, or Mr. McCormick, which is what Mr. Stephens believed, as he stated in his *ex parte* letter?

What caused these irregularities? Was it ineffective counsel, or two ineffective counsels, one in each District? Was it coercion? Was it judicial error? Other error? Something happened here. Something prejudicial to the Defendant – something the Defendant did not cause with respect to any action relevant to this case.   Such matter was never presented or clarified in the plea colloquy. The Defendant could expect and could not expect concerning the Rule 20 decision, a pivotal reason why the pleas of guilty were even a consideration.

I requested, *pro se*, that new CJA counsel be appointed when this case was returned to this court. This court granted that request. I refused to be represented by Mr. Sakin and for good reason, reasons that are germane to why my South Florida pleas

were in fact materially involuntary because he was my counsel, which was materially relevant during the plea colloquy because he would only be my attorney for a "just a little bit longer."

Mr. Sakin had done no work on my case since January 25, 2002, over a year ago on the date that the case was returned to this court from South Carolina. More important, Mr. Sakin had not worked on this case since January 25, 2002 through to May 21, 2002, the date of my plea. On May 2, 2002, this court granted a continuance in this case as the result of my April 23, 2002 filing of another *pro se* motion, one week after being released from the hospital again, hospitals where I spent nearly every day, with a few notable exceptions, since January 25, 2002.

I moved this Court on that date to continue the trial date for this case, which was scheduled for May 6, 2002, for both medical reasons, and in order to notify the court of ineffective CJA counsel. For the record, recanted from that motion, nothing is materially changed in what has not been done on my cases, nor has the opinion of what needs to be accomplished to have a fair trial changed. These are the following facts clear to this court in the April 23, 2002 Motion, as accepted by this court, on that date, where these same facts that are of record:

29

1. The Defendant filed that motion *pro se* because his CJA counsel, Mr. Scott W. Sakin, on April 23, 2002, refused to file a Motion that was materially similar to my pro se motion that I did file. Mr. Sakin wanted to edit out all references that might have challenge the effectiveness of his representation. It was the Defendant's opinion at that time – and now even more so - that Mr. Sakin's editing process would have compromised my rights under the Sixth Amendment of the United States Constitution, including the honest and earnest disclosure that Mr. Sakin was unprepared for trial on April 23, 2002, on May 6, and then on May 21, 2002.

2. Certain further revisions were made to that Motion from an earlier version in order to emphasize where Mr. Sakin could not possibly represent that he could become prepared for trial in what was then 12-calendar days remaining prior to the May 6th 2002 trial date.

3. The Defendant was set for trial in a fifty-five-count indictment wherein the Defendant is charged in approximately thirty-one counts. This is a complex indictment charging RICO, money laundering, wire fraud and mail fraud. There are other counts charging other Defendants with other crimes, which this Defendant is not involved.

4. The Defendant was arrested October 30, 2000. Sometime in December 2000 Defendant was appointed CJA counsel. As the court is aware, problems developed with regard to certain discovery, copies of documents, and among the various attorneys representing some of the Defendants.

5. On November 6, 2001, Defendant's original CJA counsel withdrew from further representation of the Defendant. Undersigned counsel was appointed thereafter to represent the Defendant and was advised this case was set for trial for February 11, 2002. Shortly after being appointed, undersigned counsel conferred with original CJA counsel. Counsel further requested that the file be provided to the undersigned forthwith. It was not until December 13, 2001 that the original CJA counsel made the file available.

6. This discovery consisted of approximately 20,000 documents. Some of the documents include pleadings but the majority of the documents are documents relating to the underlying charges of the RICO, money laundering, wire fraud and mail fraud.

7. Approximately one third of the documents were organized in a fashion so that documents could be properly examined. Since December 13, 2001 (through

January 25, 2002) the Defendant personally, with minimal assistance but sufficient guidance from Mr. Sakin, had:

(a)    Cataloged and organized all of these documents such that they could be fully examined for use in preparing the defense for the Defendant;

(b)    Indexed and labeled these documents, so as to determine which count(s) of the indictment to which these groups of documents may apply;

(c)    Separated Rule 404(b) evidence that the government intends to use at this trial that was originally mixed with other discovery. Regarding this evidence, Mr. Sakin never examined these documents.

7.   Many of the discovery documents consist of checks, the daily recordings, and depository receipts of check cashing stores in relation to their various banking depositories. Regarding this evidence, Mr. Sakin never examined these documents.

8.   There are also wiretap transcripts. No counsel for the defense has ever had an opportunity to determine whether the government complied with the necessary minimization requirements to determine whether there should be litigation over whether the wiretaps should be admissible. This was considered absolutely critical to the Defendant's defense and was asserted by Mr. Sakin "it must be done in order to render effective representation." Mr. Sakin admitted that he never had sufficient time to listen to the wiretaps, review the wiretap transcripts to determine

the reliability of the transcripts or if all CD ROMS have been in fact transcribed. Regarding this evidence, Mr. Sakin never examined these documents.

9. Assistant United States Attorney Brian McCormick informed Mr. Sakin during the week of January 14, 2002 that there was new discovery in this case that the government intends to use which originates from the Bahamas. This material was received by Mr. Sakin on February 8, 2002.

Mr. Sakin received through additional discovery to the middle of March 2002. Assistant United States Attorney Brian McCormick indicated that these documents were "devastating" to the Defendant's case. Regarding this evidence, Thus, it was unknown by any counsel what the relevancy of any of these documents were to the government's case or to the Defendant's defense. Mr. Sakin never examined these documents.

10. The review of documents relating to the money laundering and RICO was declared, "very time consuming" by Mr. Sakin. Up until January 25, 2002, The Defendant worked almost every day on this case, and CJA Counsel was extremely cooperative, providing guidance and instruction. But on January 25, 2002, the Defendant was admitted to West Boca Medical Center, Boca Raton, Florida for emergency surgery, relating to an infection in a massive blood clot that had formed as the result of an attempt to repair a left shoulder separation on January 10, 2002.

The infection led to him contracting Septicemia, a dangerous infection of the blood, a type of blood poisoning caused by pathogenic microorganisms. It causes immune system deficiency, internal bleeding without warning, and other serious complications, including potential damage to, or failure of, vital organs.

The Defendant was hospitalized from January 25 through February 1, 2002, then again, February 8 through February 11, 2002, then again April 4 through April 11, 2002. In addition, between these dates, and through to April 17, 2002, the Defendant was an outpatient at North Broward Medical Center for infusion of intravenous antibiotics seven days every week, a process taking anywhere from three to seven hours each day. Patient David A. Morgenstern was entirely unavailable to continue to work on this case with Mr. Sakin as he did prior to January 25, 2002.

11. The government was been kept fully informed about the Defendant health issues, both by the Defendant's doctors and by Mr. Sakin. Since contracting the disease, the Defendant became ill during his first "test" period beginning March 27, 2002, and relapsed eight days later on April 4, 2002.

12. On March 26, 2002, the U.S. District Court, Civil Division, in Greenville, South Carolina required the Defendant to attend a "Motion For Show Cause Hearing On Civil Contempt, To Repatriate Funds, For Corporate Records And Other Relief," (the "Motion") in difference to medical advice presented to that Court in a motion to

continue the hearing signed by his physician that he was too ill to travel. The motion was denied. The Defendant traveled to South Carolina and met with Prosecutor David Stephens, Mr. Marvin Harrison, special expert witness who will give testimony for the government in the matter before this court, Mr. James R. Pavlock, Trial Attorney, U.S. Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, Washington, DC, and Mr. Paul Jacobs, Special Agent, FBI, under proffer, as opposed to going to the civil contempt hearing, in an attempt to resolve matters out of court, as the Defendant is also indicted in a criminal case in that District. The Defendant sustained over 20 hours of interrogation over the period of only two and half days.

On March 29, 2002, he then returned to South Florida where he met with Prosecutor Brian McCormick, and Mr. McCormick's team of five other interrogators on April 2 and 3, 2002. The Defendant was having difficulty in the interview on April 3, 2002, both understanding the questions, and responding to them in a way that was satisfying and apologized openly for his lack of mental acuity. The Defendant then asked if he could excuse himself from the proffer until such time as the GI bleeding, lethargy and chronic pain that was plaguing him could be abated.

Thus, during the nine days from March 27 through April 4, 2002, where the Defendant was supposed to be resting and thus strengthening his immune system and ability to fight his disease without the infusion of IV antibiotics he spent two

days traveling, four days in proffers, and three days at rest. During the early morning hours of April 4, 2002, the Defendant relapsed into another sepsis episode and was re-admitted to North Broward Medical Center.

When a sepsis patient relapses, the only available treatment is a progressively stronger intravenous antibiotic that is inherently more toxic. These therapies tend to make the patient actually sicker, weaker and mentally depressed for a while, similar to chemotherapy in cancer patients. All of this information has been made available to Assistant United States Attorney Brian McCormick for verification.

13. There are at least seventy boxes of documents and perhaps more from the so-called "South Carolina investment fraud." Mr. Sakin and the Defendant did have the opportunity to separate from these boxes at the Ft. Lauderdale, FL Courthouse approximately eleven boxes of materials of importance to the Defense, where the Defendant personal copies them, but Mr. Sakin never returned to examine them.

These "carved out" documents are extremely important to the Defense. They needed to be reviewed by the Defendant and his Counsel. The Defendant believes these documents show conclusively that he is not mentioned in the South Carolina investment fraud. They contain omissions concluding that David Morgenstern had no knowledge, involvement or participation with the South Carolina investment

fraud. In spite of the Defendant's efforts, Mr. Sakin never examined any of these documents.

14. The Defense needed additional time to assess which expert witnesses are necessary for the presentation of the defense. The Defense needed to engage these expert witnesses who are in the area of management of offshore international, trust and business undertakings, as well as certain inter- and intra-jurisdictional issues, since the Defendant did little business in the U.S. but operated throughout Europe and elsewhere.

Expert testimony is necessary to opine on corporate matters which permit taking advantage of opportunities while still being in compliance with the business, banking and accounting laws of a diverse set of nations. In sum, expert testimony is necessary to determine the following:

a).  Whether any of the corporations, whether formed by the Defendant or not, which operated under the laws of other nations, in fact did so in full compliance with the laws of that land.

b). Whether there is any conflict between foreign laws and the laws of the U.S. and if these corporations in fact operated in compliance with the laws of the country of formation, how such rightful operation could be wrongly interpreted under U.S. laws.

c). Whether the Defendant and these certain foreign corporations followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and thus further complied with governing law associated with their business.

d). Whether the diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from U.S. States laws and whether compliance by non-U.S. entities as required under the laws of these foreign nations may be in opposition to U.S. laws.

e). Whether the Defendant's actions in non-U.S. entities was consistent with banking, trading, investment, fiduciary and trustee practices in each country including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

14. Mr. Sakin agreed that it was "impossible to prepare a defense before examining all documents of discovery in this case," in order to determine which documents are relevant to various allegations in the indictment.

He said it "was impossible to review all the documents" to determine which documents apply to which allegation in the indictment without the input of the

Defendant who has been materially unavailable since the last continuance (January, 2002) due to illness. Mr. Sakin said that "it has been impossible" for CJA Counsel to determine how some documents are relevant.

15. Again, many documents involve check-cashing stores. These stores appear to have been legally permissible state-licensed check accepting and cash or cash equivalent, meaning money orders, cashier's checks and wire transfers, tendering depositories acting "as banks" for thousands of clients over the course of many years, at least back into 1996.

Expert testimony is necessary to determine the usual course and conduct of check cashing stores. It appears that from the documents reviewed thus far, these check-cashing stores were conducting legitimate business activities. However, without reviewing all the documents, Mr. Sakin agreed, "it is impossible to make a final conclusion."

16. Again, with respect to the RICO allegations, regarding the Defendant, in the limited amount of discovery CJA Counsel examined, CJA Counsel only was able to ascertain that the Defendant relied upon the receipt of funds duly and legally processed through FDIC-insured, Federal Reserve-licensed banks, always receiving the funds in the form of Federal Reserve-generated wire transfers and never in the

form of any checks for deposit. This appears to be a legal action. Mr. Sakin agreed "CJA Counsel has not reviewed enough documents to ascertain any illegality with respect to this matter."

17. Documents have not been examined by a defense forensic accounting expert and cannot be until we review all the documents to determine which documents need to be reviewed by an expert witness. Moreover, CJA approval is necessary before the hiring of an expert witness. No approval was ever sought by Mr. Sakin.

18.  Mr. Sakin also agreed that the following must be done to render effective representation of the Defendant:

a) There are foreign documents from several countries that need to be examined. This is a particularly sensitive request from the defense.
While the Defendant is now in possession of some of these documents, Mr. Sakin had never examined any of them.

b) There are actual witnesses that the defense needs time to assemble including expert witnesses and witnesses to refute allegations brought forth by the government.  Many of these potential witnesses are outside the United States. CJA Counsel has contacted none of these witnesses, nor interviewed any of them, in order to determine whether these witnesses are willing to

return to the United States to testify. These witnesses, in addition to some located in the United States, others are located in various foreign countries. Regarding expert witnesses, Mr. Sakin did nothing to acquire such experts.

c) Mr. Sakin never conferred with the Defendant to determine which of the specific witnesses need to be interviewed versus which will be actually called at the trial to testify, nor has he conferred with any of these witnesses as the primary emphasis has been placed on reviewing documents to determine which documents apply to which counts of the indictment and to prepare and understand how the government is going to prove the various counts of the indictment.

Recanting the Motion to Continue as the Defendant has just done, it should be obvious that "much was left still to do" by Mr. Sakin for the Defendant to receive a fair trial. This court also granted this motion on May 2, 2002,. It is presumed this court reviewed and understood the necessities presented, and the detailed, complex and otherwise voluminous requirements that Mr. Sakin either had not yet completed or in fact had not even started, in order to prepare a defense. The continuance was for two weeks. The exact requirements to create a defenses were the same as they were on January 24, 2002. This continuance was for approximately three months. Irrespective of this disparity, Mr. Sakin was entirely unavailable during those two weeks to even

undertake what he already declared before the court to be "impossible," that is, to effectively prepare a defense. This court granted that a two week continence and then refused to extend it. This court did so knowing therefore, that the prospect was "impossible" for the Defendant to receive a fair trial.

A significant part of this dilemma is the fact that I wrote a Memorandum to Mr. Sakin dated January 25, 2002 regarding this case when at the time it was styled as Case No.00-6309-CR-SEITZ (S)(S). The Memorandum, entitled "*Notes Referencing Inadequacy Of Counsel, Should The 24 Jan 02-Filed Unopposed Motion For Continuance Be Denied*" contained certain other specificities in it expanded past the Motion but most of it paralleled if not in form certainly in substance the language used in the Unopposed Motion filed that day, a Motion that was granted by the Court.

I composed the Memorandum with Mr. Sakin's full support – as a Defendant and an attorney concerned about the capacity to have sufficient time to prepare for trial. The Memorandum's express purpose was to memorialize the reasons why the Defendant and Mr. Sakin – both of us - felt that if the trial was to go forward on February 11, 2002, the Defendant, with the prior agreement of Mr. Sakin, would use the Memorandum, to challenge the government for not giving sufficient time to prepare for trial, violating my Sixth Amendment rights, including issues regarding inadequacy of counsel.

42

This Memorandum is crucial. It exposes the primary reasons why my pleas were coerced, what they are thus involuntary. It set forth well in advance of May 21, 2002 (Janaury 25, 2002) the foundation for my argument with regards to ineffectiveness of counsel, and it was agreed to by that counsel to be both accurate and legally persuasive.

In this Memorandum, which Mr. Sakin helped write, it contains admissions – very similar to those in the motions to continue - as to why he was then and thus in no way ever, prepared for trial, whether it was schedule to be in February or in May 2002.

Of particular relevance to my assertion of coercion is, in the Memorandum, the discussion concerning Count 14, from which, as contained in it, the USC Code Section 1957 portion the Defendant's guilty plea was derived. It was Mr. Sakin's position that with regard to the discovery he had examined through January 25, 2002, it did not show that the Defendant engaged in money laundering. This was his conclusion. The Memorandum goes on to state other conclusions of innocence as drawn. Then there is the section where it says: "*Mr. Sakin has not filed motions as yet to uncover in advance of trial the government's prejudice,*" where I say: " *I hope he will, as soon as time permits him to do so, among other motions to remain undisclosed at this time.*" He never filed any of these motions. There was a significant witness list made part of the Memorandum, describing the kind of collaborative testimony expected, stating who the people were,

what we believed they would say, and how this was to be relevant to our defense. There was an approximate 36 persons on that list. He never contacted a single one of them.

The January 24, 2002 Unopposed Motion for a Continuance was granted, resetting the trial for May 6, 2002. On January 25, 2002, in the late afternoon, after spending the time with Mr. Sakin to finish the Memorandum, I was rushed to the hospital for Emergency surgery. It was the last day I would ever spend with Mr. Sakin on my case prior to May 21, 2002, the day of the guilty pleas. It would be April 17th 2002 before I was free of being in the hospital, whether as an inpatient, or as an outpatient, every single day except those as required by the US courts. It is that fact that brings to bear the greatest reasons why I seek to have my pleas declared involuntary.

Yes, in April 2002, I filed my pro se motion to move this Honorable Court to continue the then-set trial date from May 6, 2002 forward into time. It was essentially the same content as the January 24, 2002 Unopposed Motion, only this time the government opposed it, but it was much the same, albeit somewhat less confidential and abridged, then the content in the Memorandum. I filed that *pro se* motion to inform the court of my protracted medical condition that prevented my attorney in part, to be prepared for trial, but also to notify the court of the ineffectiveness of counsel. I filed it pro se because Mr. Sakin, as I have said, on April 23, 2002, refused to file it in the form that it was. As I have said, he wanted to edit out all references that would challenge his

own effectiveness as my counsel. To this day I do not know why he chose to do this, also in light of the January 25, 2002 Memorandum - because it was the whole truth. Why suddenly did he not want to be honest that he was entirely unprepared for my trial, that his representation had been ineffective? I said as much throughout my April 2002 motion to this Court for a continuance which this court granted.

While this Court accepted that Motion, <u>it was never heard</u>. In that hearing, I was asked by this court if I had a problem with my attorney. I answered honestly. "No," that it was not so much <u>a problem with my attorney</u> as it was <u>with the time</u> for my attorney <u>to prepare</u> for a trial. What I meant was, I certainly had nothing against him personally. Mr. Sakin is a good man. It is not that he is "no good." At that point, this court told me to then sit down, to keep quiet, and let Mr. Sakin represent me. But Mr. Sakin did not represent me. He misrepresented the entire set of circumstances as set forth within my motion. The continuance granted by this court at the time – for two weeks - was therefore woefully inadequate. It was a token, a jester, and nothing more.

What else could it be? Mr. Sakin presented no argument. He objected to noting. He said nothing. He could not possibly become prepared for trial in the twelve calendar days that remained prior to the trial date of May 6, 2002, nor could he during the two-week continuance this Court had just given him. And he said nothing!

During that two-week extension to time, Mr. Sakin never even looked at the trial materials or any discovery whatsoever. He had disclosed previously in the continuances – and then vicariously, by standing up in open court and taking over my pro se motion, that "it was impossible for the defense to prepare sufficiently for trial to assure this Defendant a fairness guaranteed him under the Sixth Amendment of the US Constitution."

That is not what he said, but he is exactly what he is <u>mandated to do</u> under law if in fact it is the truth – and it was - and he did not do it. There was no possible way he could have prepared for that trial date. All the documents and discovery <u>remained in my possession during that period,</u> in fact, since my second admission to the hospital in February 2002. <u>I repeat, he did not even have the case file, not one page of evidence or discovery, except for perhaps a few pages of personal notes.</u> He never wrote to a single witness, he never produced one page of research of law; he did absolutely nothing from January 25 through May 21, 2002 on my case. Period.

Let's look at the circumstances, the facts, the coercion: This Court set a trial date for two weeks hence to a CJA attorney in a capital murder trial where the court knew full well that this counsel could not possibly assure the court that his defense was either prepared adequately, if at all. This court knew "counsel" was entirely ineffective if not remiss by conflict of interest, in that he was protecting himself in difference to the

protecting the Defendant's Sixth Amendment rights. This court knew the Defendant had no effective counsel as now preceding on May 21, 2002 to deny the Defendant the rights to have a fair trial, a Judge who had told me to sit down and basically shut up and let my attorney represent me at my status hearing on my *pro se* motion to continue, and then let that attorney walk away with a two week continuance. Then, this court in the same mood on May 21, 2002, deploys this same intimidation, orders me to either develop a plea agreement with the government or be in trial the next day?

Under this kind of intimidation, which part of the definition of coercion is missing from the plea colloquy? This court ordered the government and the defense to conclude plea negotiations in two hours or else. By the time the plea colloquy came around, I was so intimidated, so in shock by "juris prudence," so sick, so beaten up by the court that I thought was required to assure me a fair trial – and all this happening like a burr after I was told by Mr. Sakin to answer the questions – every one of them "yes" or else – or else I'd find myself in dead-end-for sure-certain trial, the very next day, the "you're headed straight to jail" kind of procedure that every Defendant fears like death itself.    There was a series of questions that I wish this court had asked on this subject. They would have been answered as I am stating in this Affidavit.

Mr. Sakin sought to protect his reputation before this court that day rather than to protect his client, the Defendant. The time from January to May might as just as well

have never happened as far a preparation for this case is concerned, due to my days in the hospital alone. Nothing still has changed since January 25, 2002 with regards to mounting a defense for a fair trial.

When Mr. Sakin failed me; the hope I had was lost. I sought out Mr. Stephens and Mr. Pavlock because I knew I had no attorney at the time to help me – and I didn't have any deal in South Florida, although I had been under proffer since March 2002 in South Carolina. Those discussions during those two weeks with the prosecution – not Mr. McCormick at any time by the way, proved productive - but then the worst occurred.

When the prosecution came to this Court and said that a plea was imminent the day before trial and the trial should therefore be continued, you said to both sides – It's not happening – the trial would start in the morning. You gave Mr. McCormick and Mr. Pavlock less than two and half hours to prepare the guilty plea and then you gave me just 15 minutes without effective counsel to agree to it. We then entered into the colloquy phase.

My statements made in this Affidavit remain in the context of the answers given during the Plea colloquy. Yet there is a competent explanation for what each of my answers meant to me as a Defendant, when I responded to direct questions as they

were styled, and then there is the perspective of the Defense versus the perspective of the government, To wit:

In the plea colloquy, the Government claimed it would prove the following to establish the defendants' guilt as to count 14 in the Indictment, which charges that the defendants conspired to commit money laundering in violation of Title 18, United States Code, Section 1956 (h). The Government's proof would consist of testimonial evidence of various witnesses, T-III interceptions conducted in early 2000, evidence obtained through search warrants at Gold Coast Check Cashing and Check Cashing Unlimited II in Margate, Florida, and the offices of Virgil Womack in South Carolina, among other locations, as well as evidence obtained through subpoenas and legal assistance treaty requests from various financial institutions located in South Florida, the Bahamas and the United Kingdom. The evidence would show the following: As set forth in the Indictment, the instant matter concerns criminal activity involving David and Fred Morgenstern, Joseph Silvestri and their coconspirators who were involved in numerous fraudulent schemes.

Specifically, beginning in or about November 1998, and continuing through January 2000, the defendants' coconspirators Virgil and Charlotte Womack and several other individuals operated a business in Seneca, South Carolina, to facilitate the marketing and sale of fraudulent guaranteed high-yield investment opportunities. Their

business was known by several "Trust" names, such as Alliance Trust and Chemical Trust"—collectively referred to here as the "Chemical Trust"—which were created to lend an appearance of legitimacy and to defraud investors.

In connection with the operation of the business, Womack opened a number of bank accounts under these various trust names in the Southern District of Florida and in South Carolina for the purpose of depositing investor checks and transferring funds. After creating Chemical Trust and opening bank accounts, Womack solicited insurance agents and other investment brokers across the country to convince their investor clients to purchase their investments.

Womack and his coconspirators created manuals for the investment salesmen, and made certain representations in the manuals related to their experience and to the nature of these investments. Womack promised high rates of return that were guaranteed. All of these representations were false.

Womack also falsely represented that the Chemical Trust investments were completely secured by a multi-billion dollar corporation known as U.S. Guarantee of Scottsdale, Arizona, which, in reality, was a complete sham. Defendant Joseph Silvestri introduced Womack to the principals of U.S. Guarantee, and assisted Womack in opening Florida bank accounts in the name of Chemical and Alliance Trust in order to

deposit investment checks. Typically, after an investor's check was forwarded by the agent to Womack's office in South Carolina, Womack would issue a laminated bond issued by U.S. Guarantee, which was forwarded to the unsuspecting investor. These bonds were worthless.

Defendant Silvestri received commissions from U.S. Guarantee, which were nothing more than the original investor funds, in return for his facilitating the transfer of investor funds to U.S. Guarantee's accounts in Arizona. Over several months in late 1999 and early 2000, the Womacks and other coconspirators defrauded over 1,200 victims, many of whom were elderly, and took in over $50,000,000 in fraud proceeds.

That actually went on in the better part of 1999 and increased in volume toward the later part of 1999. In the summer of 1999, Joseph Silvestri introduced Fred Morgenstern to Virgil Womack in West Palm Beach, Florida, and in August, 1999, Womack began to transfer millions of Chemical Trust fraud proceeds to defendants Fred and David Morgenstern. Initially, 2.8 million dollars in Chemical Trust fraud proceeds was transferred from Womack's Alliance Trust account at Admiralty Bank in Florida to the Morgensterns' account in the Bahamas.

Thereafter, Womack began to courier daily bundles of Chemical Trust investor checks to defendant Fred Morgenstern's office in Florida, where defendant Fred

Morgenstern would deposit them into local Florida bank accounts, including those in the name of Gold Coast Check Cashing, Americas Resource Corporation and the Bahamian bank of Americas International Bank Corp., Ltd., at which the defendant David Morgenstern maintained accounts.

From these Florida and Bahamian bank accounts, defendants Fred and David Morgenstern made further transfers of the Chemical Trust funds and used millions of dollars of such funds to pay settlements in litigation initiated by investors in other fraud schemes, pay personal expenses and transfer funds to overseas bank accounts under their control.

Defendant Fred Morgenstern also assisted Virgil Womack in establishing a Florida corporation and opening various bank accounts in the name of "Prestige Accounting Services" out of which Womack would make purported interest payments and pay agent commissions and operating expenses.

In total, approximately $31,000,000 in Chemical Trust fraud proceeds were transferred on a number of occasions through bank accounts controlled by Fred and David Morgenstern in the Southern District of Florida, the Bahamas and the United Kingdom. The Government would prove that the defendants Fred and David Morgenstern during the conspiracy were aware that the proceeds were derived from a

mail and wire fraud scheme that was based in South Carolina, effected control over these funds, and that the transfer of the money involved financial institutions either insured by FDIC or were in commercial banks.

As to the single count Information charging David Morgenstern with using and causing to be used a facility in interstate and foreign commerce in violation of Title 18, United States Code, Section 1952, the Government would be prepared to prove the following: That on or about August 9, 1999, David Morgenstern, in the Southern District of Florida, caused an outgoing wire transfer of 2.8 million dollars from Admiralty Bank to Barclays Bank, New York, for the account of Americas International Bank Corporation, Limited, at Barclays Bank, the Bahamas.

These monies were the laundered proceeds of the Chemical Trust fraud and were used by the defendant David Morgenstern for his own benefit to settle a civil fraud claim brought by Charles Finch-Knightley, the Lord Guernsey, in England.

While the government presented the above perspective, this is the Defendant's testimony by Affidavit:

In accordance with a review of the indictment, under the heading "General Allegations," Number 1 through 6 are omitted in this Affidavit because they are not relevant to me as a Defendant. Number 7 says "*At times material to each count of this*

*Indictment, Americas International Bank Corporation, Limited (AIBC) was a bank registered to do business in the Bahamas, which was located in Nassau, Bahamas."*

This Americas International Bank Corporation, Limited (AIBC) reference is mentioned only this one time in the Second Superseding Indictment and never is it or anyone associated with it styled as a co-Defendant, co-conspirator, etc. This said, AIBC played a significant role in the receipt of approximately $13 million of an approximate total of $30 million in proceeds from The Womack matter. Of this approximate $13 million, $2.0 million was loaned to a unrelated company known as International Trust Consulting Corporation, (ITCC), a Bahamian IBC, controlled by Goes Damiao (a Brazilian) and Barry Denison (a US citizen living in the Bahamas) who were trustee owners of 50% of AIBC.

Their legal representative going back prior to 1998 was Christie, Davis & Co., Attorneys at law, in the Bahamas, where the Honorable Perry Christie, the firms lead name, is now the Prime Minister of the Bahamas. Prior to this $2 million loan, funds not relevant to the Womack Matter, were also loaned to Damaio and Denison by Americas Fidelity Capital Management, Ltd., a Bahamas IBC, (AFCM) that helped them initially capitalize AIBC with loans of $500,000 in early 1999, and going back to 1998 and before, a total of $800,000 for these parties to buy out the former AIBC owners who were citizens of Paraguay.

Gary Christie, Perry Christie's brother, was the Managing Director of AIBC, and used as an operating technique, certain Powers of Attorney signed by me, which were given to him for entirely other purposes, to use as his license to regularly, and without my permission, to deposit funds into, and withdraw funds out of, amongst making loans to third parties, from accounts that I was responsible for. He also took another $500,000 from AFCM's account and credited it to a Marvin Bernholtz to make him the "other 50%" shareholder of AIBC.

My understanding is that AIBC is in voluntary liquidation. Thus all these moneys – the Womack $2.0 million, and AFCM's $1.8 million, are likely lost. Of the $11 million in Womack funds that remained credited, in the ordinary course of my business, two sides of the accounting story must be told.

Approximately $3,200,000 (includes legal fees) settled accounts of AFCM with Lord Guernsey in August 1999, (in England), approximately $3,100,000 (includes legal fees) to 5-Star Global in Wisconsin, in November of 1999, or a total of $6,300,000. The remaining $4,700,000 was spent on various on-going projects ($4,400,000) and administrative expenses ($300,000). I have the exact accounting for these expenditures.

That is the Debit (Withdrawal) side of the transaction while the Credit (Deposit) side on AFCM's books and records shows a total amount of $11.4 million Debited from

AFAC and Credited (thus becoming due and owing on the books and records of the company) to AFCM's "Eurobank Projects," to be earned from commissions on project investment contracts that were to be operated by Gabriel MacEnroe, Commercial Capital Establishment (CCE), St. Gallen, Switzerland. Mr. MacEnroe became a co-Defendant with me in the "reverse sting" South Carolina Indictment, while we were trying to negotiate the return of a remaining sum of approximately $13.5 million to Beatty Ashmore, the Womack Matter duly appointed Receiver.

I believed that these financing investment contracts from CCE would produce sufficient returns from on-going earnings. I did not "Rob Peter to pay Paul." I did what any fund manager that operates in the capital markets has to do everyday with every transaction.

Our stock exchanges, let alone the world's entire financial system, could not operate without the principle of anticipated receipts and the fungible nature of deposited money. I believed in Mr. MacEnroe's promises and authority, and I have the evidence I relied upon to make my decisions to pay out funds in the Bahamas against anticipated receipts in England and Switzerland. I have copies of these contracts from CCE.

MacEnroe has, as a personal incentive, to make good on these contracts, as he is a co-Defendant with me in the South Carolina case. This was a principle area, a critical contribution, for my cooperation, which was well underway. The recovery of further

funds and ferreting out of deceptive persons and bankers in Europe was the fertile area for my sentence reduction. It is only because of the government's bad faith with regards to keeping their part of the bargain that I am now constrained from delivering on my promises.

Count 1 of the Indictment

Under the title "THE ENTERPRISE," where Number 1 through 4 have been omitted in this Affidavit because they are irrelevant to me as the Defendant because I am not mentioned in them. Number 5 says: *"At all times relevant to this Indictment, in the Southern District of Florida and elsewhere, Defendants JOHN MAMONE, JOSEPH RUSSO, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BUCCINNA, DAVID BELL, JOHN O'SULLIVAN, MARK CARATTINI, ANSON KLINGER, and MARK WEISS and other persons constituted an enterprise within the meaning of Title 18, United States Code, Section 1961 (4), that is, 'a group of individuals associated in fact...' Where the purpose of the enterprise was to enrich its members through various criminal activities, including the making and collecting of extortionate loans, interference of commerce by threats of violence, money laundering, obstruction of state and local law enforcement, the operation of illegal gambling businesses, bank fraud, mail and wire fraud, the sale and receipt of stolen goods, interstate and foreign travel in aid of racketeering, obstruction of justice and through the collection of unlawful debt."*

I am innocent of Count 1. At no time did I have any involvement whatsoever with anyone named in Number 5, recanted above, except in the form of the receipt of proceeds, almost entirely in the form of wire transfers from three major banks, where only a portion of these funds even came from what Fred E. Morgenstern claimed to be entirely legitimate (albeit in large volumes) cashing of checks. He has always maintained that these events of transfer occurred in a matter consistent with the Gold Coast Check Cashing store's State of Florida licensing to so do, among other due diligence duties required check-cashiers, such as proper escrows established, etc., by the State of Florida and I think, the filling out of certain forms as required by the Internal Revenue Service and certain other State and Federal laws that govern business advisory or consulting firms that function as escrow agents for formation and subsequent operation of escrow accounts for third parties.

At all times, I relied on FDIC-Federal Reserve Board-licensed (FRB) banks, that is, Admiralty Bank, Citibank and I think Barclays' also has this same FRB status, for the receipt of any funds sent into my care as an offshore or foreign fiduciary fund manager, always in the form of Fed-wire transfers, always received by me into accounts for the benefit of, and in the name of, Chemical Trust, as owner of these funds and as the sender.

At no time was this done without a properly recorded paper trail or was it operated in any manner that would disguise Chemical Trust's ownership of these funds or frustrate law enforcement in their tracing of it. I never took one check from any Chemical Trust investor, nor did I receive any monetary sums from anyone except Chemical Trust, certainly no funds from any of the parties named in Count 1, Number 5, at any time. Funds received by me were always in the form of deposits for the credit to, and for the benefit of, Chemical Trust into legitimate bank accounts where I was the entirely disclosed authorized signatory approved by these institutions to be thus.

Since all funds came through wire transfers from FRB banks, and I relied upon these institution's due diligence in them sending me "clear, clean funds, of non-criminal origin," as this is the standard for release of such funds from FRB banks for them to so forward them. Further, all of the money is also accounted for that I inadvertently received from the Womack Matter, this total NEVER BEING CONCEALED. There also continues to be an entire lack of acknowledgment for the proof that I was innocent in this matter, being that I am the one who sent the approximate $17.7 million back to the Womack's/Chemical Trust's Receiver, a full ten months before I was ever indicted, an action which I am sure the prosecution failed to inform the grand jury of, when they had the indictment returned.

The sum of Womack funds was never more than approximately $13.5 million

that I was allegedly responsible for, because the $17.7 million was sent back voluntarily, representing my innocence in this matter. This action on my part, relevant to the recovery of these funds has consistently been "blown off," or diminished as to its value by the prosecution, yet it is the most dramatic illustration in this whole case of a person substantially cooperating with the investigation and recovery process to restore funds to the victims of Womack's crimes – by far and away the largest reduction of losses to the victims was the result of my entirely voluntary action to so do. Therefore, this amount of money could not possibly have enriched me in any manner whatsoever.

Under the title "THE CONSPIRACY," where Number 1 through 5, 8, 10 through 21, and 26 there under, have been omitted in this Affidavit because they are irrelevant to Defendant, Number 6 says: *"From in or about 1995, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including the date of the return of the Indictment, in the Southern District of Florida and elsewhere, the Defendants, DAVID MORGENSTERN, together with others, being persons employed by and associated with the enterprise described in paragraph 5 of this Count, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally did combine, conspire, confederate, and agree together, and with each other, and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and*

60

participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as defined by Title 18, United States Code, Sections 1961(1) and (5) as set forth in paragraph 7 below.

The above being said in the Indictment, I am innocent of ever being employed by or being associated with, the alleged enterprise as described in the Paragraph, Numbered "5."

Under the title "PATTERN OF RACKETEERING ACTIVITY," Number 6 states that *"The pattern of racketeering activity that the Defendants agreed would be committed in the conduct of affairs of enterprise consisted of multiple acts involving violations of the following laws: (where A, D, and F have been omitted in this Affidavit for irrelevancy to the Defendant):*

B. *Engaging in monetary transactions in property derived from specified unlawful activity and conspiracy to do so, in violation of and indictable under Title 18, United States Code, Sections 1956 and 1957;*

C. *Laundering of monetary instruments and conspiracy to do so, in violation of and indictable under Title 18, United States Code, Section 1956;*

E. *Interstate travel or transportation in aid of racketeering enterprises, in violation of and indictable under Title 18, United States Code, Section 1952;*

G. *Bank fraud, in violation of, indictable under, Title 18, United States Code, Section*

61

*1344;*

H. *Mail fraud, in violation of, indictable under, Title 18, United States Code, Section 1341;*

I. *Wire fraud, in violation of, indictable under Title 18, United States Code, Section 1343.*

Under the title "MANNER AND MEANS OF THE CONSPIRACY," It states under Number 9: *"It was part of the conspiracy that <u>each Defendant agreed</u> that a conspirator would commit at <u>least two racketeering acts,</u> or participate in the collection of at least one unlawful debt, in conducting the affairs of the enterprise"*(<u>underline added</u> for emphasis.)

I am innocent of this Number 9 statement above. I never agreed with anyone at anytime to commit at least two racketeering acts, which I presume are what is recanted as "B,C,G,H and I" above, relevant to me as the Defendant, nor did I ever participate in the collection of at least one unlawful debt, in conducting the affairs of the alleged enterprise.

Then, Number 22 states that *"it was part of the conspiracy that Defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BUCCINNA, DAVID BELL, MARK WEISS and other*

*coconspirators would assist a criminal group operating in South Carolina, which engaged in an investment fraud scheme involving mail and wire fraud <u>in return for a share of the illegal proceeds obtained from investor/victims</u>.* (Underline emphasis added).

I am innocent of this Number 22 statement above. I never assisted in any manner a criminal group operating in South Carolina (presumed to be the Womack Matter), which engaged in an investment fraud scheme involving mail and wire fraud <u>in return for a share of the illegal proceeds obtained from investor/victims</u>. I never received any such share of the proceeds in return for anything, nor does any agreement exist that permitted or even contemplated such a thing as me to receive any such portion of proceeds.

I was acting as a fiduciary Trustee for Chemical Trust's funds in two foreign countries, namely the Bahamas and in England, as the authorized signatory on right and properly opened bank accounts, duly authorized and fully disclosed to Chemical Trust to act with full discretion on such a capacity. I invested Chemical Trusts funds in the form that I saw fit, having the full authority to do so.

All US Dollars are fungible, and double entry (Debit/Credit accounting) between multinational jurisdictions is ordinary and customary business. It is the standard norm of all modern business, to debit one account in favor of crediting

63

another, especially across state lines, bank to bank down the street, between third party companies for deliveries of goods or services rendered, in anticipation of full payment under contract, whether written or verbal, in the form of accounts payable on the one side of the transaction and accounts receivable on the other, especially across international borders.

As stated before, I sent back approximately $17.7 million of these funds in advance of any indictment to the Womack Matter's duly appointed Receiver, in January 2000 from Barclays Bank, London, as released by Falcon Trust (England) without any requirement of any court to so do, but rather entirely in the spirit of proper business and the intent to cooperate as an innocent business that received tainted funds. No evidence exists that I was involved in any manner with the Womack investment fraud in South Carolina. In fact, the evidence clearly and conclusively shows that I was materially - if not entirely - absent from the whole matter and at all times, remaining entirely an outside, unrelated third party to the South Carolina investment fraud, not to mention I was obviously not part of John Mamone's alleged racketeering enterprises since I was never even charged in those counts in the Second Superseding Indictment.

I never assisted Womack or anyone else in either raising any funds from investors or in the conversion of any investor's checks as written to Chemical Trust,

into clean, cleared funds available for wire transfer from major banks to accounts that were beneficially held for him, never having any artifice to conceal these funds as Chemical Trust's funds. To the contrary, I received deposits solely by wire transfer from Chemical Trust for the benefit of Chemical Trust, into right and proper corporate accounts controlled by Americas Fidelity Assurance Company, Ltd (AFAC) I in the Bahamas, and by the Falcon Trust in England.

Both of these accounts were never disguised in any fashion whatever to conceal its ownership nor in any fashion frustrate law enforcement or any banking authority that might be seeking after it, and as such, and were fully protecting the beneficial interest of Chemical Trust of these selfsame funds.

Paragraph 23 says *"It was further part of the conspiracy that the criminal group from South Carolina would send and transport personal checks in an aggregate amount exceeding $30,000,000 in criminally derived property obtained from defrauded investor/victims throughout the United States to Defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, MICHAEL BUCCINNA and other coconspirators for the purpose of promoting the investment fraud scheme and concealing the location of the criminally derived proceeds for the benefit of the enterprise."*(Underline emphasis added).

I am innocent of this claim. I never promoted Womack's investment fraud scheme to anyone or in any form whatsoever, at any time or anywhere on the planet. Never did I ever receive any personal checks from any such defrauded investor/victims nor, in the case of funds my company accounts received via Fed-wire transfer, did I ever conceal the location of where any of these alleged "criminally derived proceeds" from anyone, or in any form whatsoever, or anywhere and such never for the benefit of any such enterprise.

Such Fed-wire transferred proceeds, which is all I ever handled, remained to Chemical Trust's beneficial accounts with major banks, or they were invested in accordance with my sole and lawful best efforts discretion, since I was the these fund's lawfully designated fiduciary Trustee.

Whether I was a unique fund manager - and thus sustained no losses of capital - ever, or I was a typical fund manager who sustains a combination of gains and losses of capital - has absolutely nothing whatever to do with any criminal enterprise, or does the loss of funds, or gains thereon, properly recorded on the books and records of the company as debited and then credited, constitute a scheme or artifice to "defraud investor/victims."

To the contrary, the Receiver received approximately $17.7 million as the direct result of my efforts as a fiduciary, and I have always taken responsible to

restore losses sustained by my decisions to every client, including Chemical Trust in the ordinary course of business and have always claimed there are investments underway that are sufficient to restore these proceeds in full, subject to the possibility of further recovery is possible through Mr. MacEnroe's project financing. In fact, I have never deviated from this cooperative spirit since Womack's arrest on January 6, 2000. To this day, I maintain the possibility of this resolve as my sole position.

Number 24, says: *"It was further part of the conspiracy that Defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BUCCINNA, MARK WEISS and other coconspirators would further assist the criminal group from South Carolina by causing the depositing of personal checks from investor/victims into accounts maintained by the enterprise's check cashing stores.*

I am entirely innocent of this statement. I never had any involvement whatsoever with the check cashing stores sufficient to "<u>cause the deposit of personal checks</u> from the investor/victims into accounts maintained by the enterprise's check cashing stores" or from anyone else for that matter. The reverse is true and is entirely borne out in the evidence that exists as the discovery under this case.

Number 25, states that: *"It was further part of the conspiracy that Defendants FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI and other*

67

*coconspirators would assist the criminal group from South Carolina by transferring the illegally derived funds through various financial institutions in South Florida to bank accounts in the Bahamas, England and Switzerland. Said Defendants were involved in these transactions <u>for the purpose of promoting the investment fraud scheme and concealing the location of the criminally derived proceeds from the victim/investors and law enforcement for the benefit of the enterprise</u>.* (Underline emphasis added).

I am innocent of this statement. I never transferred one dime of "illegally derived funds through various financial institutions in South Florida to bank accounts in the Bahamas, England and Switzerland" for the purpose of promoting the investment fraud scheme and concealing the location of the criminally derived proceeds from the victim/investors and law enforcement for the benefit of the enterprise. To the contrary, I received clear, clean funds from major banks by totally recorded "follow the money" wire transfers always for the account of Chemical Trust, for their sole benefit, and as such, I also never initiated one single transfer of funds from Chemical Trust through any such financial institution in South Florida.

Number 27, states: *"It was further part of the conspiracy that coconspirators would take <u>all steps necessary</u> to prevent the detection by law enforcement of the criminal activities <u>for the benefit of the enterprise</u>*. (Underline emphasis added).

I am entirely innocent of this statement. There were no such "steps necessary." All wire transfers by their very nature and act, leave an indelible footprint in the worldwide banking system. It is patently ridiculous to imply that wire transfer can somehow be concealed, erased or altered in any fashion whatsoever, sufficient to prevent their detection by law enforcement. These records exist, they are entirely producible, and they trace every penny down to the penny. To claim these indelible proofs do not exist or can somehow be compromised undermines the absolute accuracy of the entire debit/credit accountancy of the global banking system.

This part ends with the phrase *"All in violation of Title 18, United States Code, Section 1962 (d)."*

I am innocent of every count and accusation poised above, referent to myself as a Defendant, under this part of that statue.

For the purpose of this Affidavit, COUNT 14 is the next count relevant to the Defendant David Morgenstern. As such, Count 2 through 13, and 15 has been omitted in this summary for irrelevancy to this Defendant.

Under Count 14, it says: *"From in or about July 1999, and continuing thereafter up to and including in or about November 2000, at Broward County, in the*

*Southern District of Florida and elsewhere, the Defendants, DAVID MORGENSTERN, did <u>knowingly and intentionally conspire, confederate, and agree with each other</u> and with other persons known and unknown to the Grand Jury to commit offenses against the United States, that is, to violate Title 18, United States Code, Sections 1956 (a) (1) (A) (i) and (B) (i) and 1957.*" (Underline emphasis added).

I am innocent of this statement. I never *knowingly and intentionally conspired, confederated and agreed with* anyone to commit a criminal offense or to violate Title 18, United States Code, *Sections 1956 (a) (1) (A) (i) and (B) (i) and 1957.*

Under the title: "THE PURPOSE AND OBJECTS OF THE CONSPIRACY, " Number 1 has been omitted in this Affidavit for irrelevancy to Defendant), it states in Number 2: "It was a purpose and object of the conspiracy *<u>to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is the cashing of checks obtained from a South Carolina based investment fraud,</u>* which involved the proceeds of specified unlawful activity, *<u>specifically, mail fraud,</u>* in violation of Title 18, United States Code, Section 1341, *and wire fraud,* in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of said specified unlawful activities, and *knowing the transactions were designed in whole or <u>in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of</u>* said specified unlawful

activities and _knowing that the property involved represented the proceeds of some form of unlawful activity._ (Underline emphasis added).

While I DID knowingly and willfully conduct financial transactions affecting interstate and foreign commerce, with funds derived from the cashing of checks obtained from a South Carolina based investment fraud, I DID NOT KNOW Womack was perpetrating a fraud.   Further, I DID NOT _conceal and disguise the nature, location, source, ownership and control of the proceeds at anytime, NOR DID I KNOW that the property involved represented the proceeds of some form of unlawful activity._

Number 3 states that: _"It was also a purpose and object of the conspiracy to knowingly and willfully engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, which was derived from specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, which property was obtained from a South Carolina based investment fraud._

I am innocent of this accusation because I did not know Wolmack's proceeds

were criminally derived property."

……. All in violation of Title 18, United States Code, Section 1956 (h)

I am innocent of every count and accusation poised above, referent to myself as a Defendant, under this part of that statue.

In COUNTS 16   - 45, it states: *Paragraph 1. On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida, and elsewhere, the Defendants, DAVID MORGENSTERN, and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was obtained from a South Carolina based investment fraud.*

While I DID knowingly engage, counsel, induce, and procure funds from the following monetary transactions in various amounts, by, through and to a financial institution, affecting interstate and foreign commerce, I DID NOT KNOW it was *criminally derived property, and while I did not* deposit, withdraw, and transfer of funds, I DID NOT KNOW such property was derived from specified unlawful activity, until after Wolmack was arrested, at which time I did the right thing and returned $17 million of these funds VOLUNTARILY prior to any order to do so, or indictment, and then I waited to see if Bruce Udolf could negotiate the return of the rest, which he failed to do. In the attempt to return the funds, the South Carolina reverse sting case was birthed.

## MONETARY RECONCILATION OF COUNTS 16- 45
### Table 1 - TABLE OF COUNTS 16 - 45

| CNT | DATE | AMOUNT | TYPE | DESCRIPTION OF MONETARY TRANSACTION<br>TRANSFER: OUT (DEBIT) = OUTGOING  IN (CREDIT) = DEPOSIT  W/T = WIRE TRANSFER<br>C/T = Chemical Trust |
|---|---|---|---|---|
| 16 | 08.09. 99 | $2,800,000.00 | Debit | W/T Admiralty to Barclays, NY: for AIBC at Barclays, the Bahamas. |
| 17 | 09.29.99 | $ 261,914.21 | Credit | C/T Checks into Gold Coast Admiralty Bank, account #300139047 |
| 18 | 10.05.99 | $ 577,296.94 | Credit | C/T Checks into Gold Coast Admiralty Bank, account #300139047 |
| 19 | 10.12.99 | $ 297,000.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 20 | 10.12.99 | $ 449,578.26 | Credit | C/T Checks into Gold Coast - Admiralty Bank, account #300139047 |
| 21 | 10.12.99 | $ 262,259.16 | Credit | C/T Checks into Gold Coast -Admiralty Bank, account #300139047 |
| 22 | 10.12.99 | $ 250,940.77 | Credit | C/T Checks into Gold Coast - Admiralty Bank, account #300139047 |
| 23 | 10.20.99 | $ 425,000.00 | Debit | W/T Citibank to Falcon Trust, Barclays London, account #63772677 |
| 24 | 10.22.99 | $ 266,602.02 | Credit | C/T Checks into Gold Coast - Admiralty Bank, account #300139047 |
| 25 | 10.28.99 | $ 233,294.52 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 26 | 11.03.99 | $ 550,000.00 | Debit | W/T Citibank to Falcon Trust, Barclays London, account #63772677 |
| 27 | 11.04.99 | $1,000,000.00 | Debit | W/T Citibank to Falcon Trust, Barclays London, account #63772677 |
| 28 | 11.05.99 | $ 500,000.00 | Credit | Withdrawal by check drawn Americas Resource Citibank |
| 29 | 11.1599 | $1,000,000.00 | Debit | W/T Citibank to Falcon Trust, Barclays London, account #63772677 |
| 30 | 11.1599 | $ 402,137.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 31 | 11.16.99 | $ 292,244.32 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 32 | 11.17.99 | $ 350,000.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 33 | 11.18.99 | $ 500,000.00 | Credit | Withdrawal by check drawn on Americas Resource Citibank |
| 34 | 12.01.99 | $ 374,180.24 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 35 | 12.07.99 | $1,250,174.70 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 36 | 12.15.99 | $ 258,654.13 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 37 | 12.17.99 | $ 500,000.00 | Debit | W/T Citibank to Falcon Trust, Barclays London, account #63772677 |
| 38 | 12.20.99 | $ 500,000.00 | Credit | Withdrawal by check drawn Americas Resource Citibank |
| 39 | 12.21.99 | $ 651,567.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 40 | 12.21.99 | $ 598,990.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 41 | 12.22.99 | $ 827,689.00 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 42 | 12.23.99 | $ 300,358.99 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 43 | 12.28.99 | $ 622,159.55 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 44 | 12.29.99 | $ 297,019.68 | Credit | C/T Checks into Americas Resource Citibank, account #3200395518 |
| 45 | 12.31.99 | $ 500,000.00 | Debit | Withdrawal by check drawn Americas Resource Citibank |

…….. All violation of Title 18, United States Code, Sections 1957 and 2.

**Note: The Total Dollar Amount of Monetary Transactions in Counts 16 through 45 Aggregates $17,099,060.49 Not $35,000,00.00 As claimed in the S/S Indictment**

## MONETARY RECONCILATION OF COUNTS 16- 45 (CONTINUED)
## Table 2 - Applied Accounting Principles (Debits/Credits) for Counts 16 through 45:

### ADMIRALTY BANK

| Credits (Deposits) | | | Debits (Withdrawals) | | |
|---|---|---|---|---|---|
| C/T Checks into Gold Coast Account #300139047 | | | W/T to Barclays, NY: For AIBC at Barclays, the Bahamas. | | |
| COUNT | DATE | AMOUNT | COUNT | DATE | AMOUNT |
| 17 | 09.29.99 | $ 261,914.21 | 16 | 08.09.99 | $2,800,000.00 |
| 18 | 10.05.99 | 577,296.94 | | | |
| 20 | 10.12.99 | 449,578.26 | | | |
| 21 | 10.12.99 | 262,259.16 | | | |
| 22 | 10.12.99 | 250,940.77 | | | |
| 24 | 10.2299 | 266,602.02 | | | |
| | | | | | |
| | Total | $2,068,591.36 | | | $2,800,000.00 |
| | | | | OVERDRAFT | ($ 731,408.64) |

Note: From Generally Accepted Accounting Practices, Count 17, 18, 20, 21, 22, 24 and Count 16 are erroneous proofs: The August 9, 1999 date for Count 16 Monetary Transaction: an "Out: Debit: WITHDRAWAL" precedes the dates of all the "In: Credit: DEPOSITS, thus this accounting does not foot (equal) either in its time sequencing or in the amount of funds utilized. This would mean that the source of funds for Count 16 is not stated in the indictment, nor is it relevant to the source of funds counts. This is plain error.

### CITIBANK

| Credits (Deposits) | | | Debits (Withdrawals) | | |
|---|---|---|---|---|---|
| C/T Checks into Gold Coast account #300139047 | | | W/T Citibank to Falcon Trust, Barclays London, #63772677 | | |
| COUNT | DATE | AMOUNT | COUNT | DATE | AMOUNT |
| 19 | 10.12.99 | $ 297,000.00 | 23 | 10.20.99 | $ 425,000.00 |
| 25 | 10.28.99 | 233,294.52 | 26 | 11.03.99 | 550,000.00 |
| 30 | 11.15.99 | 402,137.00 | 27 | 11.04.99 | 1,000,000.00 |
| 31 | 11.16.99 | 292,244.32 | 28 | 11.05.99 | 500,000.00 |
| 32 | 11.17.99 | 350,000.00 | 29 | 11.15.99 | 1,000,000.00 |
| 34 | 12.01.99 | 374,180.24 | 33 | 11.18.99 | 500,000.00 |
| 35 | 12.07.99 | 1,250,174.70 | 37 | 12.17.99 | 500,000.00 |
| 36 | 12.15.99 | 258,654.13 | 38 | 12.20.99 | 500,000.00 |
| 39 | 12.21.99 | 651,567.00 | 45 | 12.31.99 | 500,000.00 |
| 40 | 12.21.99 | 598,990.00 | | | |
| 41 | 12.22.99 | 827,689.00 | | | |
| 42 | 12.23.99 | 300,358.99 | | | |
| 43 | 12.28.99 | 622,159.55 | | | |
| 44 | 12.29.99 | 297,019.68 | | | |
| | | $6,755,469.13 | | | $5,475,000.00 |
| | | | | BALANCE | 1,280,469.13 |

Note: From Generally Accepted Accounting Practices, Count 19,25,30,31,32,34,35,36,39,40,41, 42,43,44 and Count 23,26,27,28,29,33,37,38,45 are erroneous proofs: The funds utilized for the Monetary Transactions stated cannot be these same funds because the time sequencing does not foot. The money to effect the outbound transactions cannot all be these funds and shown to be sourced. This is plain error.

74

To conclude then, this expose discussion on Counts 16 through 45 from the standpoint of Generally Accepted Accounting Practices, in the case of Admiralty bank, the total funds <u>deposited</u> are shown to be $2,068,591.36, while the total funds <u>withdrawn</u> are $2,800,000. Not only does this number of withdrawals exceed the funds deposits, which would have created an overdraft if in fact there were not other funds irrelevant to the indictment in this account, the funds that were withdrawn, was done <u>before any of the deposits</u> in the Counts were ever made.

In the case of Citibank, the total funds <u>deposited</u> are $6,755,469.13, while the total funds <u>withdrawn</u> are $5,475,000. To the extent that this <u>balance</u> of $1,280,469.13 in funds remained, when this is added to the total of funds returned to the Receiver by the actions of the Defendants from Falcon Trust Barclays' London on or about January 31, 2000, in the amount of $16,665,000, ten months before they were indicted, the total funds available to return to the Receiver on January 31, 2000, added to $17,945,469.13. The government acknowledges this fact in materially similar terms in the plea colloquy, a sum of $17,769,346.22, which is materially the same as this $17,945,469.13, which was returned by the Defendants in advance of ever being indicted, a point which the Defendant is certain was prejudicially omitted when the government presented this case to the grand jury in order to have the indictment returned, but nevertheless both Defendants had reasonable expectations that finally this action would count for credit towards substantial assistance.

75

Clearly the $17,665,000 was returned entirely voluntarily by the action of Defendant David Morgenstern as no order existed in January 2000 compelling him to do so. Thus, 10 months prior to this indictment being returned, every penny in it was returned to the Womack Receiver. In fact, to the extent that the Total Monetary Transactions as shown in Count 16 through 45 are in part Debits and in part Credits, In the Table 1: Table of Counts, Total Credits (Deposits) equal $8,824,060.49 while Total Debits (Withdrawals) are $8,275,000.00. The Defendant notes for the record that the total funds cited in this table can never add to more that $8,824,060.49, nothing even close to the purported $35 million cited in the indictment. Even if you do add this together, the amount still only approximates $17.1 million, still an amount LESS THAN the sums acknowledged to have been returned by the Defendants prior to the return of the indictment.

The source for the Information, to which Defendant pled guilty, in order to accommodate a five-year count, is from Count 16 above, where the Information charges that on or about August 9th of 1999, the Defendant, in the Southern District of Florida, and elsewhere, used and caused to be used a facility in interstate and foreign commerce with the intent to distribute the proceeds of an unlawful activity, that is, proceeds derived from Title 18, United States Code, Section 1952 (a) (1) but not - Section 1956. This would be the outgoing (Debit) wire transfer of 2.8 million dollars

from Admiralty Bank to Barclays Bank in New York, for the account of Americas International Bank Corporation, Ltd., in Barclays Bank, the Bahamas.

While I DID use and cause to be used a facility in interstate and foreign commerce, I DID NOT do it with the intent to distribute the proceeds of an unlawful activity. I am innocent of this Information.

The Defendant admits receiving funds into legitimately opened Trust accounts in various branches of Barclays Bank in the ordinary course of business. The Defendant recorded an exact paper trail on the incoming and outgoing of these funds. The Defendant never concealed the source of any of these funds nor their use. The beneficial owner of the funds was never changed on the books and records of the company and funds were always considered beneficially owned by a third party and the capital to be managed for investment purposes.

The Defendant received the funds cited in the Indictment by Fed-wire transfers of clear, clean funds from major banks from a fully disclosed client, Chemical Trust, such that sending and receiving banks were fully appraised of the funds' ultimate owner never at any time sent under an artifice or ruse to conceal this fact.

77

The Defendant when his client Virgil Womack was arrested, returned $17,665,000 to the Womack Receiver from Barclays' Falcon Trust account in London, England, an account that only he had the sole signatory control over, and then there was the dual signatory power as a subset to this control, with his brother, James H. Morgenstern. Again, these funds were returned as an act of voluntary assistance, not as a person compelled to do so under court order.

**(Counts 46 through 55 have been omitted for irrelevancy to Defendant)**

Proceeding to a conclusion, in the South Carolina sting case discovery, this court would hear how I tried to return the remaining money, cited in the plea colloquy as $13,503,927.36, and how I tried to work with what I thought was a representative of the Receiver on a method to do so. Bruce Udolf, Esq., an attorney here in South Florida, was paid $40,000 plus expenses to travel to Europe to confirm legitimacy of my dealings with Mr. Gabriel MacEnroe and then to negotiate a full return of all funds plus interest. That was my intent and it still is. It's right on the tapes and videos. So is all the information about how I ran my companies and how Mr. MacEnroe operated, at least with me.

With regard to the South Carolina investment fraud, according to Virgil Womack's South Carolina forfeiture, as imposed by Judge Anderson's court, he raised $56,190,232.57 (100%) from over 1,200 investors, which by his guilty plea, defines the

"specified unlawful activity" as set forth in my plea. I was not part of Womack's fund raising scheme in any way whatsoever and the evidence that Mr. Howes got into trouble over, the incident that cost me my first CJA attorney, Ms. Ana Jhones, shows conclusively this fact.

Fred Morgenstern did arrange the capital or cash flow conduits in the United States in the ordinary course of his business. I was not part of any these conduits, including the principle ones, namely Admiralty Bank, U.S. Guarantee and The Americas Recourse Corp. (TARC), the latter being Fred E. Morgenstern's company. TARC operated Admiralty Bank and Citibank escrow accounts in South Florida to clear investor checks and wire transfers while also maintaining various check-cashing relationships under signed contract with Womack, including Gold Coast Check Cashing (Peggy Preston), in Margate, FL, and Check Cashing Unlimited, (Irving Weiss) in Ft. Lauderdale, FL, all in the ordinary course of business.

With regard to the check cashing stores, they were somehow supposedly connected to John Mamone, a co-Defendant in this case who pled guilty to RICO in the South Florida case, and is allegedly part of the Trafficante crime family. I have never had any contact with this man or his connections in any manner. I welcome his testimony. It cannot possibly be to the contrary.

79

With regard to the South Carolina investment fraud, I received what I believed to be legitimately earned funds for commercial purposes being managed in a trust, in this matter, Chemical Trust. All funds were received either directly or indirectly by wire-transfer, in good, clean clear Fed- funds, that amounted to $31,273,273.58, which was 55.6% of the approximate $56.2 million raised by Womack. This means that a total of $24,916,958.99, 44.4% of the total funds raised by Womack was never handled or controlled by me at any time. I have no idea what happened to this capital.

With regard to the approximate $31.3 million, these funds were received into legitimate managed fund accounts by corporations in good standing in either the jurisdiction of the Bahamas or in Great Britain in the ordinary course of business. None of these on-going business activities overseas were fraudulent.

With regard to the approximate $31.3 million, like all funds under my management, my intention was to invest it to produce acceptable rates of return. Approximately $17.6 million of the $31.3 million did earn $169,346.22 in interest based upon an annualized rate of $15.87% paid by Barclays' Bank London for the period of time those funds were held in the Falcon Trust account there. When this $17,769,346.22 (56.8% of the total $31.3 million) was returned to the Receiver, Mr. Beattie Ashmore, for Chemical Trust in January 2000, it had never been concealed as to its ownership, it had never been in any form other than cash and cash equivalents, fully vested in Barclays'

Bank-operated US Treasury Managed Fund. It had never been used for any other purposes, or moved from that investment account to any other account at any time.

With regard to the remaining culpable sum of $13,503,927.36, 43.2% of the total $31.3 million, this is where my problems started and ended with respect to Chemical Trust and Mr. Womack's fraud and wrongdoing. I used the majority of this $13.5 million to buy out certain "participation interests" in commission income that I believed was, or would be due to me from Commercial Capital Establishment, (CCE) based upon my on-going business relationship with them, and the fact that I had paid CCE very substantial commitment fees to generate income from project finance investment contracts that I genuinely expected to come to fruition. I have over 3000 pages of day-to-day business communications, received in the ordinary course of business, beginning in mid-1998 that prove out exactly what I say.

Further, as a licensed financial intermediary under the laws of the European Union, Americas Fidelity, and thus myself as Managing Director, had fiduciary responsibility to protect investor funds from adverse risk. While I may have failed, I never knew that Womack was paying agents exorbitant commissions, or that a large group of unsuspecting investor/victims was enticed to invest their retirement savings under the protection of a surety bond that turned out to be fraudulent. Nor was I aware until the case brewed that the victims were being paid entirely contrived-by-Womack rates of return

back through the conduit of fund raising agents with capital sourced from still more unsuspecting victims. Nor was I aware that these same agents were encouraged to negotiate away from the investor a percentage of these returns for themselves, based upon whatever they could keep from the investor's rate of return entitlements. This method apparently served to entice these agents to more aggressively raise funds, to "say whatever it took," to acquire still more capital by fraud. I think this is tragic, but I was not part of it, not ever.

Put simply, I may have failed to protect the approximate $13.5 million with the same level of voracity as I did the approximate $17.7million portion that was held in Barclays' Bank London, England, but I certainly didn't steal it. I have always taken responsibility for all of the funds that were managed by me to be returned, to be recovered, and to be paid back with interest and I am sorry I have failed to make it a 100% thus far. I have never stopped trying. I will always be remorseful about it. I will always believe that my efforts to return investor proceeds represent a "greater good" to provide a better, more palatable resolution for everyone, including the government.

Yes, I should have been a better, more careful less reckless fiduciary. What I did that brought this case into an indictment was not intentional. I regret terribly, how poorly and how tragically I served this client. I have pled guilty before this court, but those pleas were coerced. I also did not understand that the consequence of my plea

would be that I had to plead guilty to the South Carolina indictment. I have accepted complete responsibility for my actions but what I did was business mistakes made by a man who failed to gauge his limitations. My family is suffering immeasurably due to my actions and I acknowledge that other innocent persons are also suffering. I want to right these wrongs to the fullest extent of my ability. I have humiliated my wife and children. I have had to explain to my five children, two who are teenagers, and three who are eleven and under, that what I have done will affect them the rest of their lives. I trust the court will consider that I am still trying doing the right thing, but my pleas were coerced and involuntary.

I sign this Affidavit freely and voluntarily and after consultation and review by my attorney, Mr. Brian McComb, who sought to rather have me file this in my own words.

David A. Morgenstern,
Defendant

Signature Affirmed, Witnessed:

Before me, appeared David A. Morgenstern, 7534 Estrella Circle, boa Raton, FL 33433, who presented his State of Florida Driver's License, number M625-161-48-388-0, as suitable identification in accordance with State of Florida law, and then did sign this Affidavit in my presence on this the 14th day of March, 2003.

Notary Public

BRIAN R. McCOMB
MY COMMISSION # CC 982692
EXPIRES: Dec 15, 2004
FL Notary Service & Bonding, Inc.
1-800-3-NOTARY

83