UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6309-CR-DIMITROULEAS ✓
and 02-60101-CR-DIMITROULEAS

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
DAVID MORGENSTERN,                  )
                                    )
            Defendant.              )
_____)

# DEFENDANT DAVID A. MORGENSTERN'S MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA REQUEST FOR EVIDENTIARY HEARING AND INCORPORATED MEMORANDUM OF LAW

COMES NOW the Defendant, David A. Morgenstern, by and through his undersigned attorney, pursuant to Rules 11(d)(2)(B) and 32 of the Federal Rules of Criminal Procedure, and respectfully requests that this Honorable Court enter its Order granting the Defendant a rehearing on his previously filed Motion to Withdraw Plea and affording the Defendant an evidentiary hearing on said Motion. As grounds in support of said Motion the Defendant would state as follows:

1. The Court has entered its Order dated March 20, 2003 (DE 1310) denying the



*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 2

Defendant's motion seeking to withdraw his pleas of guilty in this matter. While the

Defendant recognizes that the Court has generally cited the applicable law with regard

to the issues presented, it is respectfully submitted that the Court has misapplied this

law with respect to the instant motion and has likewise made certain factual findings

which are erroneous and in contravention of the facts that are present in this case.

These errors by the Court have substantially affected the Defendant's Constitutional

Rights as provided for by the Fifth, Sixth and Fourteenth Amendments to the United

States Constitution and are also in contravention of the Defendant's right to have rule

32 liberally construed in his favor.

3. The Defendant further submits that he has established in the previous affidavit

filed with this court and the corrected affidavit that is filed herewith that he has

established sufficient grounds and a "fair and just reason" as contemplated by Rules 11

and 32 to compel the granting of the relief sought herein. Of course, the Court must

construe the rule liberally in favor of the Defendant, *U.S. v. Jones,* 168 F.3d 1217 (10th

Cir. 2000) and must also treat a motion made prior to sentencing more liberally than

one made after sentencing. *U.S. v. Embrey,* 250 F.3d 1181 (8th Cir. 2001).

The Court in footnote one of the Order noted that although the Defendant's

signature is notarized that the jurat was "insufficient to warrant this statement being

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 3

considered to be an affidavit". The Rules do not require that the Motion be sworn to or

accompanied by an affidavit. Again, the rule must be liberally construed. *Jones,*

*Embrey, supra.* Further, the record evidence[1] indicates that the Defendant was placed

in the position of "plea today or go to trial tomorrow" is much more than a

"contradictory statement"[2] by the Defendant disputing the plea colloquy in an effort to

get his plea withdrawn.[3] Rather, the total record in this case indicates that the

Defendant was placed in the untenable position of proceeding to trial with counsel who

was unprepared due to the illness of the Defendant, the failure of the Government to

timely disclose discovery and the fact that counsel had been in a prolonged murder trial

---

[1] This case was ultimately set for trial on May 21, 2002. The Court gave the Government two hours to prepare a plea agreement and the Defendants fifteen minutes to review it and advise the Court whether or not they would accept the plea. The alternative was to begin the trial the following day. The setting of the trial on May 20th was the result of a continuance that was sought by the Defendant *pro se* by virtue of his Motion dated April 26, 2002. (DE 961) The Clerk's Minutes for the Calendar Call of May 17th indicate that Mr. Sakin, the Defendant's court-appointed attorney was still in trial as of that time. On the 21st of May the parties appeared in court and advised that plea negotiations were underway. As further evidence of the coercion brought to bare on the Defendant, the Court would not let case go to South Carolina for plea and sentencing, just for sentencing, again, forcing the Defendant to either plead guilty that day or begin the trial the next. Fifteen minutes was simply insufficient time for the Defendant to decide whether or not he wanted to go to trial on a case of this nature and of this magnitude or to enter a plea of guilty.

[2] *U.S. v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992); *U.S. v. Torres,* 129 F.3d 710), 715 (2nd Cir. 1997).

[3] *Torres, supra,* and cases cited therein teach us that such bald allegations are insufficient. The Defendant's affidavit, his *pro se* pleadings and the record before this Court establish much more.

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 4

and therefore unable to prepare for this trial. This is a matter and the dilemma then

facing the Defendant was a much more complex and compelling situation than the mere

unpreparedness of counsel. This was a situation where the free will of the Defendant

was replaced by expediency of a prompt determination of an extremely complex case.

There was nothing occurring at the time of the ruling of the court on the question of a

continuance that would have prohibited the court or the Government in granting the

Defendant and his counsel time to be provided with the discovery and to prepare the

case for trial.

3. The Defendant submits that the pleas that were entered in this case were the

product of coercion and events and circumstances beyond the Defendant's control

including but not limited to the following:

a) the Government's intentional withholding of substantial amounts of

exculpatory evidence which, if it had been provided to the Defendant in a timely

and orderly manner, i.e., when the request for the entry of the Standing

Discovery Order was made at the time of the arraignments in this case, that the

Defendant and competent counsel could have reviewed said materials and

prepared a successful defense to the charges that were brought to bear against

the Defendant. The failure of the Government to disclose this information in a

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 5

timely manner and actually to fail to disclose it at all resulted in the Defendant's

being placed in a "Hobson's Choice" of either going to trial without the ability

and opportunity to know what the evidence was against him or to enter a plea of

so as to avoid going to trial without knowing what the evidence was against him.

Clearly this constitutes coercion through the actions of the Government in

failing to make this material available.

b)  the fact that the Defendant had been seriously ill for a considerable

period of time just prior to the scheduled trial date in this case and was

recovering from complicated surgery during which recovery the Defendant was

forced to take large quantities of narcotic drugs to combat the pain and

complications associated with the surgery.  During the early stages of the

Defendant's recovery from the surgery he attempted to meet with his

court-appointed attorney, Scott Sakin, however Mr. Sakin refused to see the

Defendant, claiming he was made ill by the site of the apparatus attached to the

Defendant's arm which was essential to the proper healing of the surgery.

Therefore, the Defendant, thorough no fault of his own, was isolated from his

attorney at a critical time in the preparation of this case for trial.

c)  The Defendant was hospitalized or incapacitated due to surgery and/or

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 6

recovery during the vast majority of the time between the last continuance

granted by the Court and the scheduled trial date.   Specifically, the Defendant

was unable to prepare for the trial of this cause during the following periods for

the following reasons:

    i.   January 25, 2002 through February 1, 2002 – Defendant hospitalized;[4]

    ii.  February 2, 2002 through February 7, 2002 – receiving home nursing care;

    iii. February 8, 2002 through February 11, 2002 – readmitted to hospital for

       sepsis relapse;

---

[4]As evidenced by the extensive presentation included in the Defendant's *pro se* Motion for Continuance (DE 956), the Defendant was prescribed, among other narcotics 1) Oxycontin, 2) Percocet, 3) Prevacid, 4) Norvasc, and 5) Zestril. See Exhibit B, letter from Dr. John D. Sortino, MD to Scott Sakin dated April 19, 2002.  These medications are described therein and the side effects of the taking of said medications is also described.  It is clear from these descriptions that the Defendant was not physically or mentally able to prepare this extremely complex case for trial during this extended period of time.  As stated by Dr. Sortino in his letter: "The Patient simply is not mentally acute enough or completely cognitive, due to both his physical and mental condition, but also due to the high level of medication that he is required to take."

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 7

      iv.  February 12, 2002 through March 17, 2002 – Outpatient treatment;[5]

      v.  April 4, 2002, through April 10, 2002 – readmitted for hospital for sepsis relapse.

      vi.  April 11, 2002 through April 18, 2002 – Outpatient treatment.

These circumstances, as set out in subparagraphs "b" and "c" constitute coercion in that the Defendant was not able to prepare his case for trial due to his unavailability, both mental and physical. It cannot fairly be concluded that during this time period that the Defendant was able to assist his counsel and prepare his case. What then occurred when the Court ordered him to trial without the opportunity to prepare himself by reviewing the documents and then preparing his counsel for trial. Obviously, due to the voluminous nature of the documents involved and the complexity of the charges against the Defendant, counsel could only understand the documents and their implications with the input of the Defendant.

    4.  The coercion and circumstances beyond the Defendant's control (some of which occurred in spite of tremendous personal efforts on the part of the Defendant to

---

[5]The outpatient treatment that the Defendant was receiving was also rigorous, the Defendant spending approximately seven hours a day in rehabilitation.

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 8

correct) was further exacerbated by the unpreparedness of court-appointed counsel.

For example, it was no fault of the Defendant, and in contravention of his efforts

that the Government withheld the heart of the discovery materials that were in its sole

possession. Then, when the discovery was finally made available, defense counsel was

occupied by another trial and was unable to view these documents and prepare the case

for trial. The complexities of the transactions involved in this case mandated that the

Defendant and counsel spend a considerable amount of time sifting through these

documents, digesting and cataloguing them in order that a proper defense could be

raised. Further, it was through no fault of the Defendant that his counsel was consumed

with a lengthy trial retrial of the murder case in state court. The Record in this case

clearly establishes that counsel was occupied by and preoccupied with another trial.

For example, on the date of the last calendar call, held on May 17, 2002, Mr. Sakin

was <u>still</u> in his capital murder case as indicated by the Criminal Minutes filed by the

clerk. (DE 986) Clearly he had not had the time of complete the discovery and prepare

the case for trial.

In the Defendant's *pro se* Motion for Continuance dated April 23, 2002 (DE

956) he set forth the following matters that need to be undertaken before a trial of this

case could be a fair and impartial trial undertaken with the effective assistance of

*U.S. v. David Morgenstern*, Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 9

competent counsel.  Those items were:

a) Review more than 20,000 documents that were received from former counsel;

b) Obtain and review wire tap recordings and also transcripts of intercepted communications;

c) Review the additional documents that the Government turned over in March 2002, including but not limited to documents from the Bahamas which purportedly involved bank transactions directly involving the Defendant;

d) Review the roughly seventy boxes of materials that were originally seized in Fort Lauderdale but were then sent and kept in South Carolina[6],[7];

e) Determine which expert witnesses were available and obtain those expert witnesses to testify concerning the fact that the Defendant's practices fell within the  ordinary and customary business practices permissible abroad;

f) Secure expert witnesses in the area of management of offshore international

---

[6]The Defendant, a layman unschooled in the law, determined at least eleven of those boxes of materials were germane to the case against him individually.  Of course, the Defendant was not versed in the applicable principals of federal law dealing with vicarious liability of the acts of codefendants and coconspirators.

[7]The Order under consideration incorrectly indicates that " . . . there is no serious contention that the Defendant is innocent of this crime."  Order at 6.  The Defendant disputes this finding.  In fact, as set forth in the *pro se* Motion for Continuance, the Defendant stated that these documents would show that he was not involved in the investment fraud from South Carolina, thereby absolving him of guilt in the present case.

trust and business undertakings and in the area of the need to take prompt action with respect to certain business opportunities in a variety of countries while maintaining compliance with the business practices, accounting methods and laws of the various countries including:

i.   whether the corporations with which the Defendant did business conformed to the laws of the countries where they were incorporated and/or did business;

ii.  whether there was a conflict between these foreign laws and the laws of the United States and, if these corporations were in compliance with the laws of foreign nations the impact on conflicts with United States laws for foreign corporations operating outside of the United States;

iii.   whether the Defendant and these corporations complied with generally accepted accounting practices in the respective countries of operation as well as cross-jurisdictional principals dealing with international business dealings;

iv.  whether the bank secrecy laws and money laundering statues in these foreign jurisdictions were materially similar to the law in the United States and the consequences of a foreign corporation not being in compliance

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 11

with the laws of the United States; and

v. whether the Defendant's actions with non-U.S. entities was consistent

with the banking, trading, investment, fiduciary, and trustee practices in

each of the foreign countries in which he did business and whether or not

he conducted his business in conformity with the obligations and

responsibilities for such an operation under the laws of these foreign

countries.

g) Secure the services of expert witnesses to help counsel prepare to cross-

examine the experts that will be called by the Government and to contradict the

testimony and opinions that the Government has announced that these experts

will express;

h) to identify, investigate and interview the numerous witnesses that the

Government will call to testify on its behalf; and

i) to subpoena and secure the presence of any witnesses to testify on behalf of

the Defendant in this case.

The failure of counsel to undertake these steps and perform these services resulted in

Defendant being placed in the unenviable position that he was placed in with respect to

plea or trial. This combination of his counsel not being given the opportunity to

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 12

prepare for trial and then counsel's not taking the steps necessary to compel witnesses

and present a defense resulted in violations of the Defendant's Constitutional Rights to

Due Process, a Fair Trial, to the compulsory process of witnesses as well as to the

effective assistance of counsel.

5. The Order states in part the grounds upon which the Motion was made,

specifically the ineffective assistance of court-appointed counsel, Mr. Sakin. However,

this is only part of a much larger problem that confronted the Defendant on May 21,

2002. The Defendant, just having been released from the hospital and post-

hospitalization care, was still taking at least two prescribed narcotic drugs, Percocet

and Oxycotin. This fact was known to the Government and addressed to the Court in

the Government's Motion to Strike Pro Se Pleadings, Etc. it attached as an exhibit a

letter from the Defendant's treating physician indicating that the Defendant was still

taking substantial quantities of these narcotics on a daily basis.[8] The effect of the

ingestion of these substances, particularly over a long period of time is both an

addiction to the substances and a feeling of euphoria. The Court, knowing full well that

the Defendant was prescribed and taking such medication failed to inquire about their

---

[8]The letter from Dr. Sortino stated that the Defendant's medication was "decreased" to
"Percocet 5/325 mg to 2 pills twice a day" and "Oxycotin to 20 mg , 1 pill twice a day."

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 13

effects upon the reasoning and cognitive capabilities at the time of the entry of the plea.

Considering the fact that the Court gave the Government two hours to piece together a plea agreement and the Defendant fifteen minutes to either accept or reject it, the Court was duty bound to make a sufficient inquiry as to the effects that these substances had on the Defendant under these extremely stressful and coercive circumstances. *U.S. v. Parra-Ibanez,* 936 F.2d 588 (1st Cir. 1991)

6. As this Court recognized, a coerced plea is a fair and just reason to withdraw a plea. *U.S. v. Gwiazdzinski,* 141 F.3d 784 (7th Cir. 1998). That is precisely what occurred here. As the court pointed out there, it is duty of counsel to (1) <u>learn all of the facts of the case the case</u> and (2) communicate the results of his analysis of the case to the defendant and (3) this scrutiny must be undertaken in good faith. Such work was not done in this case as pointed out in the factual presentation set forth herein and as established in the record of these proceedings. The granting of the continuance sought by the Defendant in this case in order to permit his counsel to adequately prepare for trial would have had a substantial impact on the case, the Defendant's chances for success and the voluntariness of a plea. To deny the continuance in this case amounted to an abuse of discretion on the part of the Court. The Defendant in his *pro se* Motion had set forth in great detail the matters that needed to be addressed by counsel before

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 14

this case was adequately and properly prepared for trial. Those matters are set forth in

paragraph 4, subsections a) - f), above.

This is not a situation, like that presented in the case cited by the Court, *U.S. v.*

*Juncal,* 245 F.3d 166 (2nd Cir. 2001) where the Defendant was given an <u>honest</u> but

negative assessment of the chances at trial combined with advice from counsel to plead

guilty. Rather, this was a situation that, based upon the failure of the Government in

making timely disclosures of discovery, the failure due to other commitments by

counsel to review the discovery materials, the inability of the Defendant to participate

in his defense due to severe illness and the lack of preparation and investigation of the

case that counsel could not give an honest assessment of the Defendant's case or fairly

state that the chances of success at trial were limited. Counsel as well as the Defendant

were unprepared for trial. Counsel told the Defendant to do the only thing that could be

done under these oppressive and coercive circumstances, plead guilty. This was not a

situation where the Defendant made a fully formed conscious decision to plead guilty

after reviewing the evidence and discussing the matter with counsel. Instead, this was a

situation where the Defendant was compelled to acquiesce to dominate forces over

which he had no control, no advice and no way to fight for his freedom.

7. The Order, at page 5 states: "The Defendant's motion to withdraw (his) plea

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 15

is now the functional equivalent of a not guilty plea." This is precisely what the

Defendant wants, the opportunity to withdraw the guilty pleas and stand by his pleas of

not guilty.

8. The Court in its Order also recognizes that a plea may be withdrawn before

sentencing if there is a "fair and just reason" shown for seeking the relief. Order,

paragraph 13 at page 5. The Defendant here submits that he has presented to this Court

<u>numerous</u> fair and just reasons why the pleas in this instance should be set aside. The

totality of the circumstances in the present record support the Defendant's position, are

in conflict with the position taken in the Order and compel this Court's granting of the

relief sought by the instant motion. Actually the new Rule 11(d) as well as Rule 32(e)

now both control the withdrawal of pleas. That new rule states:[9]

> **(d) Withdrawing a Guilty or Nolo Contendere Plea.** A defendant may
withdraw a plea of guilty or nolo contendere:
>
> **(1)** before the court accepts the plea, for any reason or no reason; or
> **(2)** after the court accepts the plea, but before it imposes sentence if:
>   **(A)** the court rejects a plea agreement under Rule 11(c)(5); or
>   **(B)** the defendant can show a fair and just reason for requesting the
>   withdrawal.

_____

[9]This Rule became effective December 1, 2002.

Citing *U.S. v. Najjar*, 283 F.3d 1306 (11th Cir. 2002)[10] and *U.S. v. Buckles*, 843 F.2d

469, 472 (11th Cir.1988) the Order states that the right to withdraw a plea before

sentencing is to be "liberally construed". Actually, this Court's reliance on *Najjar* is

well placed, however, it is respectfully submitted that the Court misapplied both *Najjar*

and *Buckles* in reviewing the totality of the circumstances in this case. Unlike the

situation in this case, in those cases the defendant did have the close assistance of

counsel. In this instance, it is clearly demonstrated that due to the severe health

problems suffered by the Defendant and the unavailability of counsel due to his being

involved in another trial that counsel was far distant from the Defendant and the

Defendant in this instance was effectively forced to go it alone until the day of trial. In

fact, Mr. Sakin advised the Defendant that if he did not plead that his wife and family

would be homeless and that there was nothing that anyone could do for them,

particularly since trial was to begin the next day. Mr. Sakin admitted to the Defendant

that he was not prepared for trial. Mr. Sakin informed the Defendant that if he did not

answer the questions in the proper manner that the next day they would be in trial and

---

[10]In *Najjar* the Court conducted two evidentiary hearings on the issue. The Defendant here
seeks only one.

that the Defendant would lose. Again, this is not the type of counsel and advice that the court had in mind in *U.S. v. Juncal, supra.*

Second, the Court made a specific finding at the evidentiary hearings that the defendant Najjar had a rational and factual understanding of the offense. Here, due to the Defendant's physical condition, the medication that he was being administered, the unavailability of counsel for an extended period of time and the lack of sufficient time to review the evidence in the Government's case and to review it, the same finding absolutely could not be made in this instance.

Third, in *Najjar* the defendant was clearly trying to manipulate the system by moving to withdraw his plea after the statute of limitations had expired, thereby attempting to make it impossible for him to be prosecuted.[11] Here the Defendant, and to a lesser degree his counsel,[12] had been scrambling for months to obtain the documents that were in the possession of the Government in order to prepare the case

---

[11] The District Court found that "Evidence also showed that Defendant had the keen intellectual capacity to understand and manipulate the legal process to sufficiently delay resolution of this complex matter in an unusual manner, to the effect that the Statute of Limitations ran before he filed his Motion to Withdraw his Guilty Plea." *Najjar,* 283 F.3d at 1308.

[12] The Defendant endeavored to obtain the documents from the Government to the extent that it caused his a relapse in his recovery from the potentially deadly blood disease sepsis. Counsel had some time to review the documents that he received from prior counsel before he began his capital murder trial in state court. He did not have the opportunity to review and consider the documentation that the Defendant had gotten the Government to produce from South Carolina, materials that counsel for the Defendant's brother had called the "heart of the case."

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 18

for trial. As mentioned above, there were a number of things that the Defendant

wanted counsel to do to prepare this case for trial that was not done.

The question of whether judicial resources would be conserved by not allowing a

withdrawal of the plea in this case is illusory. All that was needed was a sufficient

amount of time to pass to allow both the Defendant and his attorney to prepare for trial.

This Court's failure to give the Defendant time to prepare the case, or even adequate

time to review the Plea Agreement[13] constituted an abuse of discretion. The Order

notes that Mr. Silvestri went to trial the following day. All defendants in this case were

on bond. Both the Government and the Defendants sought to delay the case. Mr.

Silvestri's attorney was new to the case. The Government did not claim prejudice by a

continuance at that time and virtually all of the witnesses in this case were either law

enforcement or corporate personnel. Nothing whatsoever prevented this Court from

granting a continuance of a reasonable duration to allow the Defendant to be adequately

prepared and represented to try the case.

---

[13]Fifteen minutes certainly was not enough time to barely read the plea agreement, let alone
have the meaningful assistance of counsel in digesting it and determining its consequences on the
Defendant for the rest of his life.

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 19

As noted in the Order, there is nothing whatsoever in the record that the Government would be prejudiced in any way from the granting of this motion. Quite the contrary, the Government had the benefit of the Defendant's input during the trial of Mr. Silvestri. On several occasions during the trial the Government called upon the Defendant to give them insight and information as to Mr. Silvestri's involvement in the case and the significance of certain materials. Far from being prejudiced, the Government would have an advantage if the trial was to proceed now. Simply stated, the "totality of the circumstances" supports the relief that the Defendant sought, first in seeking the continuance in order to allow adequate preparation for trial, then in the filing of the Motion to Withdraw Plea and in this Motion for Rehearing.

9. The Order in this case states that there is "no serious contention that the Defendant is innocent of this crime," citing *U.S. v. Nagra,* 147 F.3d 875 (9th Cir. 1998). Order at 6. The Defendant disputes this assertion and would remind the court that it has already found that what the Court found was that what the Defendant seeks is the "functional equivalent" of a not guilty plea. Order at 5. The Court is correct in that finding. The Defendant seeks to persevere in his plea of not guilty. A plea of "not guilty" and the presumption of innocence which accompanies it is the core foundation of our criminal justice system. This Court must abide by these fundamental principals

*U.S. v. David Morgenstern*, Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 20

and assure that the Defendant's rights in this regard are protected. The Defendant

asserts his innocence now, just as he has at all times that his free will was not

overwhelmed by circumstances, conditions, and decisions beyond his control.

The circumstances as set forth in *Nagra, supra*, are significantly different from

those presented in the present case. There the status of the case was that Nagra was

attempting to withdraw his plea after a remand from an appeal. Therefore a different

standard applies in determining whether the relief should be granted. *Id., U.S. v.*

*Camacho*, 233 F.3d 1308 (11th Cir. 2000); *U.S. v. Ramos,* 923 F.2d 1346, 1358 (9th

Cir.1991); U.S. v. Kay, 537 F.2d 1077, 1078 (9th Cir.1976). As opposed to "fair and

just cause" being required, there a defendant must show that to deny the withdrawal of

a plea would create a manifest injustice. *U.S. v. Baker*, 790 F.2d 1437, 1438 (9th Cir.

1986). At this higher standard the court in *Nagra* held that it was not manifest injustice

to not allow a defendant to withdraw his plea absent a showing of innocence. This

manifest injustice standard is <u>substantially</u> higher than that which the Defendant must

meet here and the Court's reliance on case law based on this higher standard is,

respectfully, misplaced.

10. With respect to this Court's finding that there was not showing that the

Defendant would have prevailed had he went to trial, it is respectfully submitted that

this is not the proper standard for this Court to be basing its decision. First, this

Court's reliance on *U.S. v. Gray*, 182 F.3d 762 (10th Cir. 1999) is misplaced. *Gray*

was a post-conviction proceeding filed pursuant to 28 U.S.C. §2255. The majority of

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 21

the opinion deals with whether the defendant had timely filed his motion under the "mailbox rule" in order to meet the deadlines imposed by the Antiterrorism and Effective Death Penalty Act of 1996. The Defendant's claim for relief was one wholly based on the ineffective assistance of counsel in failing to advise him of a possible defense. That was not the case here, due to the circumstances set forth above. This was far more egregious than counsel simply not telling the Defendant about a "possible" defense, something which would have, under the dictates of *Gray*, if the Defendant was in a §2255 setting, to establish that he would have "likely prevailed at trial". Again, as this Court pointed out in the Order, Rules 11 and 32 only require the Defendant in a pre-sentencing stage to show a "fair and just reason" to withdraw his plea. He is not required to establish that he would prevail at trial. Even if such a requirement were present in the instant case, the Defendant submits that the Order that was entered was in error. The Defendant submits that he has presented sufficient evidence in the form of the record in this case and the Affidavit that he has submitted. If the Court were to find that there is insufficient proof established to grant the relief, it would be based upon the fact that the Defendant was not accorded the opportunity to present such evidence in an evidentiary hearing. Such relief should be granted now. In *U.S. v. Torres,* 1239 F.3d 710 (2nd Cir. 1997) for example, the defendant Grullon filed two motions to withdraw his plea and had hearings on each of them. There the court went to great lengths to examine the issue and rule on the matter after permitting the defendant the opportunity to present his case to the court. This court should extend the same protections to the Defendant in this case. The Defendant here has done far more

than contradict the record and make conclusory allegations. Here the Defendant in his Motion and Affidavit and also in the record has clearly demonstrated that there are fair and just reasons for the granting of this motion. In *Torres* the district court explicitly told the defendant to take his time, that court was in no hurry as opposed to this case where the Court gave the Government two hours to prepare the Plea Agreement and the Defendant fifteen minutes to review it or face a trial, for which the Defendant was not prepared the following day. In *Torres* the court told the defendant not to hesitate to raise any questions or concern with the court, something which should have been accorded to the Defendant here and there was no evidence there, as there is clear proof of here that counsel was unprepared for trial.

11. Finally, the Defendant agrees with the assertion by the Court that "effective assistance of counsel was available" (Order at 6), however, that counsel was not given the opportunity to perform the work necessary to give the Defendant the effective assistance of counsel, to assure the Defendant got a fair trial and was accorded the due process of law. The Order actually acknowledges that there was a lack of preparedness on the part of counsel by making reference to "had Mr. Sakin been more prepared". Not only is this acknowledgment telling, but it is only part of the issue. As previously pointed out, the Defendant need not show that he would have proceeded to trial in order to have the plea set aside, he must establish a "fair and just" reason to do so. The Defendant cannot know and candidly cannot tell this Court that ultimately that he would go to trial in this case because the Court abused its discretion in not giving the Defendant and his counsel adequate time to prepare the case in the first place.

*U.S. v. David Morgenstern,* Case Nos. 00-6309-CR-Dimitrouleas and 02-60101-CR-Dimitrouleas
MOTION FOR REHEARING OF MOTION TO WITHDRAW GUILTY PLEA, ETC.
Page 23

WHEREFORE, the Defendant respectfully requests that this Honorable Court enter its Order granting the Defendant a rehearing on the Motion to Withdraw Plea, grant the Defendant an evidentiary hearing on the Motion and then grant the Motion itself, allowing the plea to be withdrawn and setting the case for trial sufficiently in the future to allow the Defendant and counsel to be adequately prepared for trial.

Respectfully submitted,

_____

BRIAN R. McCOMB, ESQ.

3458 SE Dixie Highway
Stuart, FL 34997

Under penalties of perjury, I declare that I have read the foregoing motion and that the facts stated in it are true.

_____
DAVID A. MORGENSTERN

I HEREBY CERTIFY that a true and correct copy of the Motion for

Rehearing of Motion to Withdraw Guilty Plea and Defendant's Affidavit

were mailed to AUSA Brian McCormick and Diana Fernandez, United

States Attorney's Office 500 E. Broward Blvd Ft. Lauderdale, Florida 33394

And Michael J. Rosen, Esquire, attorney for Fred Morgenstern this the 2nd

day of April 2003.

Brian R. McComb 174866

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.  00-6309-CR-DIMITROULEAS
and 02-60101-CR-DIMITROULEAS

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
DAVID MORGENSTERN,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)
_____)

## DEFENDANT DAVID A. MORGENSTERN'S
## SECOND AFFIDAVIT IN SUPPORT OF
## MOTION TO WITHDRAW PLEAS OF GUILTY

COMES NOW the Defendant, David A. Morgenstern, and files this Second Affidavit in support of the Motion for Rehearing on the Motion to Withdraw Plea. The Defendant states as follows:

1.　　　Scott W. Sakin was appointed CJA Counsel on December 3, 2002 for the Defendant. Counsel met with the Defendant after receiving first production discovery on December 13, 2002, to discuss the case and examine evidence received by him. Through January 25, 2002, Mr. Sakin endeavored to prepare a Defense for trial.

2.　　　On January 10, 2002, I had outpatient surgery on my left shoulder. Seeing me ill made Mr. Sakin feel ill. We shortened our time together. On January 14,

2002, a blood clot formed at my surgical site. On January 23, 2002, my doctor tested my white blood cell count. It was extremely high, indicating infection.

3.    Mr. Sakin filed a Motion to continue the case on January 24, 2002 using subject matter from a Memorandum that showed what was still left to do, considering the possibility that the Court might deny the Motion, and thus Mr. Sakin could show that he was summarily unprepared for trial. That Memorandum stated the following:

(a)    Mr. Sakin was appointed on November 6, 2001 as CJA Counsel;

(b)    He received "First Production Discovery" materials from former counsel (and only these) on December 13, 2001;

(c)    Given the holidays and his court schedule, he had only a very limited amount of time to review even these discovery materials in spite of working every day that he could with me until the date of the filing of that Motion;

(d)    There was discovery from South Carolina, as well as other discovery that was not yet available for a review by either myself or counsel;

(e)    We did not have the opportunity to discuss changes brought about by the Second Superceding Indictment and any shift in emphasis in the Government's case;

(f)    We first believed our defense was grounded in a document-based case but the changes in the Indictment could affect that view. Only a thorough review of all the documents could affirm a proper defense to the charges;

(g)    Changes in the indictment meant there was former co-defendants, some who were dropped, some who plead or were expected to plea, and this could mean any number of new witnesses. These would have to be investigated and cross-examination prepared for in advance of trial. Little, or virtually none, of these developments had been provided to the defense, either in writing or in the form of new discovery;

2

(h)  It also became apparent during this time that it would be necessary to secure, employ and prepare as witnesses several experts to explain various aspects of the case that I was preparing to present in my defense, in addition to other potential witnesses[1];

(i)  The case contained a myriad of complex and interrelated allegations where the discovery was expected and required to shed sufficient clarity. This discovery requires time to examine, analyze and to fully interpret. Mr. Sakin had preliminarily reviewed some 8,000 pages of discovery provided to him by former counsel, (received on 13 December, 2001). This was only part of the contents of seven (7) boxes received. There were at least 72 other boxes of discovery to be examined in the case;

(j)  During the week of January 14, 2002, Mr. Sakin was informed that there was new discovery to be used by the government that originated from the Bahamas. Volume 1, or 1337 pages, of three, was ordered from International Legal Imprints but it had not yet been received. The other volumes containing an unknown number of pages were yet to be released.

(k)  The Government advised Mr. Sakin that it intended to introduce other material as either 404(b) evidence or as "inextricably intertwined" evidence of other alleged wrongdoing that had not yet been provided to the defense;

---

[1] These persons were in the Memorandum under "potential witnesses:" Richard DeMerritt, Koed Smith, Gary Christie, Stewart Arnold, Jonathan Ogden, Alan Mildenhall, Urs Schol, Max Broder, James Wittahakker, Richard Scheidner, Balz Wolfensberger, Laurie Bolch, Don Clark, Scott Rein, Bruce Udolf, Jim Morgenstern, Tom Vialpando, Bill Borregard, Perry Christie, Ron Armbrister, Tim Davidson, Carlos Fuerntes, Ralph King, Robbie Stevens, John McKee, Jim Taber, Ed Reison, Juan Cabrera, Denis Berne, Gary Augustine and Bill Turner, Carl Lovell, David Tedder, Victor Lynas, James Anthony, Richard Collins, John Ruston, Goes Damiao, Edginho Bez, Danillo de Castro and Barry Denison.

(l)   The Defendant intended to call witnesses and expert witnesses, all of whom had to be located and prepared over some reasonable period of time;

(m)  CJA counsel needed time to gain approval to hire expert witnesses while at the same time I had the right to call such witnesses on my behalf. This was particularly important in the areas of forensic accounting, and also what is defined as ordinary, customary international banking, finance, investment and business practices, especially concerning monetary issues, transactions, common procedural management in the handling of funds and the records under which such financial transactions were undertaken by the Defendant.

(n)  The Defendant also needed to secure expert witnesses to address and cross-examine the testimony that could come from Government witnesses and also to present evidence and testimony concerning:

(i)      Whether any of the corporations, whether formed by the Defendant or not, to operate under the laws of other nations in fact did so in full compliance with the laws of that land.

(ii)     Whether there is any conflict between these legitimate operative guidelines and the guidelines of U.S. laws, and if these corporations in fact operated in compliance with laws in their countries of formation, how this could potentially by considered wrongly interpreted under U.S. law.

(iii)    Whether there is the possibility that while the Defendant is a US citizen, he did not operate any US corporations in association with the indictment. These corporations may not thus be subject to US law at all; especially in the way the government is interpreting these corporations are merely alter egos of the defendant, which can never be the case legitimately under law. This is especially critical in the differentiation between the laws of the United States versus such foreign laws, as they exist in these other countries, since the Defendant never acted as an individual or

4

personally in any capacity whatsoever, but only as the bone fide representative of various non-US, fully formed and legitimate corporations.

      (iv)   Whether Defendant, acting as representative of these financial intermediary corporations, undertook to follow generally accepted accounting practices in full force and effect in these countries for these corporations, and whether these corporations justly followed such practices, never concealment of ownership or location of proceeds, never taking any steps necessary to avoid detection by law enforcement, to the contrary always applying principles of inter-jurisdictional debiting and crediting of assets and or funds, always respecting the lawful and fungible nature of transferring US Dollars worldwide.

      (v)   Whether Defendant and certain financial intermediary companies followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and as such, complied with all governing law associated with business undertakings thereby.

      (vi)   Whether diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from the United States law, and whether even if the Defendant and these certain financial intermediary companies complied in every way with those laws, how this compliance effects the issues of the Defendant's intent this case.

      (vii)   Whether Defendant's action in non-US corporations was consistent with banking, trading, investment, fiduciary and trustee practices in each country, including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

      (viii) Whether any of these non-US practices that operated fully out of the United States violated any of RICO, money laundering or fraud statutes as cited in the indictment.

(o)   No preparation or transfer of documents under Rule 16 had been made so that I could present as a defense to Counts 16-45 showing that substantially all of the funds in those counts were returned in full by Falcon Trust Company, London, England, under my signatory authority and control - and at my insistence without any "deal" from the Government which occurred a full 9 months before this indictment was returned, (31 January 2000 versus 30 October 2000) and prior to any Freeze Order or Repatriation Order being issued in any jurisdiction requiring me to do so;

(p)   No motion to compel disclosure was made nor was any disclosure made by the Government concerning the repatriation of monies through Falcon Trust of funds that were originally delivered into my control on behalf of Virgil Womack;

(q)   Other matters cited, that I felt needed to be addressed, was work done by the Government with respect to: Interpretative Accounting, Charts that needed to be prepared in order to make the defense's case clear to the jury; discovery concerning the South Carolina indictment and documents still there that would be of use to the defense, and plea agreements that had been entered into by the Government with the former codefendants or any others.

Materially, none of the requirements or circumstances, as cited in this Number 3, or the actions deemed required to mount a defense, have changed or been fulfilled through to the date of filing this Affidavit.  Given this fact, and the other events and circumstances leading up and including May 21, 2002, I was compelled to plead guilty against my will.

4.   The January 24, 2002 Unopposed Motion for a Continuance was granted, resetting the trial for May 6, 2002.

6

5. January 25, 2002 was the last day I spent with Mr. Sakin on my case before May 21, 2002, the day of the guilty pleas. Right after the January meeting, I was admitted to West Boca Medical Center for emergency surgery.

6. On January 26, 2002, I went into sepsis shock. My condition was declared "critical." I was diagnosed with septicemia, a life-threatening infection of the blood.

7. It would be April 19, 2002 before I was out of the hospital, whether as an inpatient or outpatient, every day since January 25, 2002, except for the few days as ordered by the US courts, March 23-April 3, 2002. These events caused me to relapse into sepsis shock, and to be re-admitted to the hospital April 4-17, 2002. [2]

8. On March 23, 2002, having been ordered to trial, the Defendant chose rather to enter into a proffer agreement with the government with regards to Case No. 00-697-CR. After 3 and half days of testimony, the Defendant returned to South Florida and met with Mr. Sakin and Mr. McCormick on April 2 and 3, 2002.

---

[2]  Defendant was involved in a civil suit in the South Carolina District Court, Anderson South Carolina. I had requested a continuance due to my not being cleared to travel. The Court refused to grant this continuance. My treating physician, Dr. Sortino in a letter to Judge Anderson in South Carolina stated:

> Mr. Morgenstern is undergoing post-operative care and infectious disease therapy as the result of an unsuccessful surgical repair of a separated left shoulder. He is lethargic, with little energy and in chronic pain. Today's office visit was to prescribe a blood test, that will be done today at North Broward Medical Center, Pompano Beach, Florida, which is in addition to his weekly blood test taken each Monday that monitors his progress towards defeating both a condition of anemia caused by internal bleeding in the GI tract, and sepsis, a severe infection of the blood. The additional tests include a blood culture, a routine procedure at this point in his therapy, in order to determine the progress and the effectiveness to date of his daily intravenous antibiotics treatment that have been underway since February 1, 2002. It will be determined as to whether the date of March 26, 2002 will in fact be the last day of his IV therapy, which cannot be abated or interrupted prior to that date. For this reason alone, and there are others, as I have said in my last letter (attached), he cannot travel on March 22 or 23, 2002 to meet with his attorney in Greenville, South Carolina. In addition, the Patient is also actively GI bleeding from an unknown source. He is scheduled to undergo upper and lower endoscopies with Dr. Harold Rosen, a GI specialist. Until the source of bleeding is known, it is not medically safe for him to travel. /s/ John D. Sortino, MD.

7

After a difficult time in the 4-hour session on April 2, 2002 the Defendant, after a little over 2 hours into the April 3, 2002 session, asked to be excused because he felt as disoriented, ill, and was obviously (the observation of Mr. McCormick) not understanding the questions being posed to him. At 2AM April 4, 2002, the Defendant was rushed to the hospital in sepsis shock, and was re-admitted to North Broward Medical Center as an inpatient through April 12 and as a 7-hour per day outpatient for the infusion of intravenous antibiotics through April 17 2002.

9.   On April 19, 2002, the Defendant had a doctor's appointment where a letter was generated to Mr. Sakin. [3] The Defendant tried to get Mr. Sakin to file a continuance, citing Defendant's medical impairments, combined with Mr. Sakin's own admissions that he was just as unprepared for trial in April 2002 as he had been on January 24, 2002. Mr. Sakin refused. The Defendant filed the Motion himself, *pro se.* This court granted it on May 2, 2002, setting the trial for May 20, 2002, in

---

[3]   On April 19, 2002, Dr. John D. Sortino, MD, attending physician to the Defendant, wrote this letter to Mr. Sakin, Re: Patient David Morgenstern, which was sent by Mr. Sakin to the government:

"As a physician, it is my opinion that Mr. Morgenstern is not well enough to begin trial on May 6, 2002, given his present health crisis that has consumed almost all of his time and attention for the past three months. After examining him today, I cannot see any reasonable way that he could be expected to fully address or properly comprehend the intricacy of a trial. This Patient is still in extreme pain managed by heavy narcotics. The January 10, 2002 surgery on his shoulder has failed, and he is now a sepsis patient. He is subject to cramps, nausea, disorientation, headaches, irritability and depression, among other symptoms. The Patient simply is not mentally acute enough or completely cognitive, due to both his physical and mental condition, but also due to the high level of medication that he is required to take. Mr. Morgenstern is in the middle of his treatment regimen. He is not cured. He is very susceptible to relapse. To bring his prognosis current, I address the specifically: He is still on heavy medication, including *Oxycontin,* a time-release narcotic pain reliever that affects mental acuity; *Percocet,* a *narc*otic a pain reliever affecting mental acuity; *Prevacid,* a proton-pump inhibitor maintain healing in the stomach, that causes headache, abdominal pain, and tiredness; *Norvasc,* a calcium channel blocker that causes dizziness and anxiety, and *Zestril,* a angiotension-converting enzyme (ACE) inhibitor, that causes drowsiness and fatigue. If needed, he would re-start Vancomyocin IV treatment again, 1,250 mg twice a day, 12 hours apart, which requires about seven hours per day of outpatient time. This antibiotic is toxic, causing nausea, gastric distress, kidney pain and fatigue. Mr. Morgenstern is not mentally cleared for trial at this date. A reasonable continuance in the proceedings should be accorded for medical reasons."

8

contrast to the Miami Division giving the exact topic-subject matter a continuance an approximate 3-months.

10.    On May 17, 2002, Mr. Sakin was still unavailable for trial and had not been able to meet with the Defendant at all.

11.    Mr. Sakin was still not available for trial on May 20, 2002 due to his State capital murder trial. This Court was going "day-to-day" based upon Mr. Sakin's availability in order to start the trial. At the morning Status Hearing session of May 21, 2002, this Court intruded into the plea process. Mr. Sakin told the Court that there was going to be a plea pursuant to Rule 20. [DE-996] Page 4:13-17. [4]

12.    On May 21, 2002, the Court omitted from the plea colloquy crucial matters. I was not informed, nor could I have known that the consequence of my guilty pleas were that he had to plead guilty in another case as the result of his plea. He was also not made aware of the possible conflict that would arise by this Court splitting a Rule 20 process – namely the plea from the sentence.  No disclosure was

---

[4] The Court answers: "I am not going to transfer the case. If he wants to take a plea, it will have to be here. I am not postponing the case and then he goes to South Carolina and then for some reason he decides not to take the plea in South Carolina." Mr. Sakin adds at Page 5:9-10: "I know that's what he wants to do. We had a whole thing worked out with South Carolina." At this point the court put the session on recall. Mr. Sakin during that break, made these points clear: No one was prepared for this. I had to plead guilty or else. My days of good faith negotiation were over. All I was going to get here (in south Florida) was a split of the plea from the sentence and go with that to South Carolina, or I'd be in trial tomorrow. He said it was a 'take it or leave it' situation. Hew told me in the plea to answer the questions to 'get out of Florida or your choice is to be in trial tomorrow - and we'll lose.' I asked him what happened to our deal? He said: "The judge just gave it to the government. They write what they want and you sign it, period. That's all you've got. Or you can go to trial and face a jury for 30 years in jail – and you can't win. We have nothing prepared. No one expected this. We have no witnesses, no affidavits, no exhibits, no accounting, no objections (to evidence entered into the record), no motions filed, no record for appeal, in effect, you don't have a defense, not for tomorrow." He told me clearly to answer 'yes.' "Don't say anything else. Stop your talking. The judge will hang you." He said: You have to plea today. If you don't plea now, your wife and children will homeless, be weeping in the hallway and there will be nothing anyone could do for them or for you - certainly if you're in trial tomorrow."

given as to which jurisdiction's prosecutor was to be in charge of his case, especially with regard to who was to marshal the 5K(1) process, an omission that confused the Defendant, both prosecutors, and the South Carolina District Court.

13.    On May 21, 2002, I was coerced to involuntarily plead guilty, which is a fair and just reason to withdraw my plea. I could not escape this coercion. In the morning session, this Court gave the government a prejudiced advantage over the plea process by insisting an agreement had to reached or else. The Defendant could not weigh his options rationally since his options were reduced to none at all.

14.    On July 11, 2002, the District of South Carolina accepted my cases under Rule 20 where I had been providing substantial assistance under proffer for months, cited in prosecutor Stephens letter as "good information."

15.    On January 21, 2003, the District of South Carolina transferred these cases back to this district as the result of an Order generated from prosecutor Stephens letter who cited the cause being judicial economy, "several confusions" and because I would not plead "guilty as charged" in another case.

16.    The Defendant believes he has put forth hereby an entirely believable reason that justifies why this Affidavit departs from the apparent truth in his plea colloquy. This court made it clear that it would accept nothing but a plea proceeding or a trial the next day, where Defendant's counsel, on the record, was shown to be ineffective in representing the Defendant (re: File of Motion for Continuance *pro se* among other events) and was unprepared to present any defense at all (re: text of both continuances as granted and the Memorandum as cited herein, and the record of this

10

case) against the fifty-five count, Second Superseding Indictment, alleging RICO, money laundering and fraud.

17. The Defendant is not guilty as charged in any of the counts that name him in either the Second Superceding Indictment and or in the Information Case as styled above.

_David A. Morgenstern_

STATE OF FLORIDA,      )
                     ss   )
COUNTY OF PALM BEACH   )

Before me, the undersigned authority, this day personally appeared DAVID A. MORGENSTERN, who first being duly sworn, says that he is the defendant in the above-styled case, that he has read the foregoing Second Affidavit In Support of Involuntarily Pleas of Guilty and has personal knowledge of facts and matters therein set forth and alleged and that each and all of these facts and matters are true and correct.


SWORN AND SUBSCRIBED TO before me this 1st day of April 2003.

_Lisa A. Vargo_

NOTARY PUBLIC
State of Florida at Large
My Commission Expires:

```
LISA A. VARGO
MY COMMISSION # DD 109580
EXPIRES: June 28, 2006
Bonded Thru Notary Public Underwriters
```

David A. Morgenstern Personally known ___ or produced identification ✓. Type of identification produced: Florida Driver's License. M625-161-48-388-0.

11