UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

00-6309-Cr-DIMITROULEAS(s)(s)

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

DAVID MORGENSTERN,

                    Defendant.

_____/

**NIGHT BOX**
**FILED**

APR 1 4 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

GOVERNMENT'S RESPONSE TO DEFENDANT DAVID MORGENSTERN'S
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT,
POSITION WITH RESPECT TO SENTENCING FACTORS,
MOTION OF DOWNWARD DEPARTURE AND
INCORPORATED MEMORANDUM OF LAW

The United States of America, through its undersigned Assistant United States Attorneys, files this response to defendant David Morgenstern's objections to the presentence investigation report (PSI), position with respect to sentencing factors, and motion for downward departure. The government will address each objection in the order contained in the defendant's objections. As to any factual disputes which are not already supported by the record, the government will be prepared to present witnesses and/or evidence at the sentencing hearing.

Rule 32(c)(1) of the Federal Rules of Criminal Procedure provides that the Court, at sentencing, "must rule on any unresolved objections to the presentence report." However, as the rule states, "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not

affect, sentencing." [1] *Id.*

**The Offense Conduct**

The defendant complains that the offense conduct portion of the PSI was improperly written by the government rather than the Probation Officer and contains merely the government's theory of the case and the facts provided by the government. The government submits that there is absolutely nothing wrong with the underlying facts of the offense conduct being provided by the government. Where there is a plea of guilty entered, rather than a trial, there is no other way for the Probation Department to obtain the necessary facts for the offense conduct upon which it may then apply them to the guidelines. The defendant has every opportunity to file objections to all portions of the PSI, of which he has availed himself. Further, other portions of the PSI contain information obtained from other sources, including the defendant, such as criminal history, personal and family data, physical condition including mental and emotional health and substance abuse, educational and vocational skills, employment record, and financial. Therefore this overall objection to the offense conduct of the PSI should be overruled by the Court.

**Sale of Mercedes - Page 8, Paragraph 8**

The only factual dispute the defendant has with this paragraph is that the Mercedes was a 1998, not a 1988 vehicle. The government has no objection to this correction being made to the PSI.

Although the court found the defendant in violation of bond because of this sale and placed him in Dismas House pending trial, this is not one of the basis for enhancement under U.S.S.G. 3C1.1; therefore

---

[1]     Rule 32 also provides that a written record of the court's findings and determinations must be appended to the PSI.

the defendant's arguments in this regard are irrelevant.

**Involvement in Womack Fraud - Page 12, Paragraph 27**

The defendant complains that he and his brother did not "become involved" in an investment fraud scheme orchestrated by Virgil Womack because this scheme was not an integral part of the crime charged.[2]

Defendant's argument ignores reality; *but for* the defendant's actions in receiving, negotiating and converting millions of dollars' worth of Chemical Trust investor checks and funds, the fraud scheme in South Carolina could not have operated to the massive extent that it did, victimizing over 1,200 victims of over $50 million dollars. Defendant joined the South Carolina fraud scheme upon his first receipt of $2.8 million in Chemical Trust funds in early August, 1999.[3] As the government stated during the plea colloquy, at 66, this $2.8 million in Chemical Trust fraud proceeds had been transferred from Womack's Alliance Trust account at Admiralty Bank in Florida to the defendant's AFAC account at AIBC Bank in the Bahamas. This transfer occurred on August 8, 1999 (May 31, 2002, Harrison trial testimony at 34). Thereafter, just days after this first transfer of Chemical Trust proceeds were received into the defendant's AFAC account at AIBC, the defendant caused a $2.5 million dollar draft to be sent to an attorney

---

[2]    The South Carolina fraud scheme is charged as the underlying specified unlawful activity of the money laundering conspiracy.

[3]    Notably, this $2.8 million transfer of Chemical Trust fraud proceeds from Admiralty Bank to the defendant's Americas Fidelity Assurance Corp., Ltd. (AFAC) account at Americas International Bank (AIBC) in Nassau was the very transfer that the defendant pled guilty to on the one count information as a violation of 18 U.S.C. 1952. As the government described during the plea colloquy, this $2.8 million was transferred by the defendant to settle a lawsuit brought by Lord Guernsey in England against the defendant. (Plea colloquy at 68).

in England, Stewart Arnold, who was representing the defendant in a civil lawsuit brought by Charles Finch-Knightley (Lord Guernsey) and arising out of Lord Guernsey's investment of $2.5 million in the defendant's AFCM "investment program." As Mr. Marvin Harrison, the South Carolina Receiver's investigator, described during the Silvestri trial (May 31, 2002, Harrison trial transcript at 32-34), the defendant disbursed a total of over $3 million in Chemical Trust funds in his efforts to settle the lawsuit brought by Lord Guernsey and to pay various attorneys' fees associated with the lawsuit.

Defendant's role as an integral part of the Womack fraud is further demonstrated by the continuing deposit of actual Chemical Trust checks into his AIBC bank accounts in the Bahamas throughout the fall of 1999. A total of $3.4 million in Chemical Trust checks were deposited into the AFAC account at AIBC, an account controlled by the defendant (May 31, 2002, Harrison trial testimony at 26) and over which the defendant maintained day-to-day supervision. Moreover, throughout the fall of 1999, defendant's AFAC account received additional millions of dollars of Chemical Trust fraud proceeds by way of checks written by his brother, Fred Morgenstern, from his Americas Resources account. Chemical Trust funds were used by the defendant to pay not only hundreds of thousands of dollars worth of American Express bills on his, his wife's and his brother Fred's accounts, but also to settle another multi-million dollar claim brought by other investors in AFCM who were located in Wisconsin (the "5 Star Global" investors) (May 31, 2002, trial testimony at 36-46).

Therefore, because the defendant's actions promoted the carrying on of the mail and wire fraud being committed in South Carolina and elsewhere, the description in the PSI is accurate and should remain

4

unchanged.

**Elderly Victims - Page 13, Paragraph 27 (continued)**

Defendant disputes that most of the investments were made from the elderly or those with limited resources, contending that there is no support in the record for this assertion.

Defendant's argument ignores the fact that during the plea colloquy, the government specifically stated that the Womacks and their coconspirators "defrauded over 1,200 victims, many of whom were elderly...." (Plea colloquy at 66). For example, at the trial of Silvestri, a number of these victims testified:   Albert Kissen, 79 years old, retired, who invested all his savings from work into Chemical Trust (May 23, 2002, Kissen trial testimony at 2, 4, 6-7); Sharon Bohlen, 62 years old, retired and supports herself on limited retirement fund and social security, rolled an IRA into Chemical Trust (May 23, 2002, Bohlen trial testimony at 31-32, 39);  and, Phyllis Goldberg, 67 years old, retired, invested IRA retirement money into Chemical Trust (May 23, 2002, Goldberg trial testimony at 55-56, 64).[4]

In addition, the government has provided the background of all 1,200 victims to the defendant in discovery and the 1,200 victim investor files were introduced as evidence in the Silvestri trial. These files clearly reflect that the majority of the victims who invested in Alliance/Chemical Trust were elderly and/or had limited resources.  Therefore defendant's objection should be overruled.

**Recovery of 16 Million - Page 13, Paragraph 31**

Defendant contends that the monies recovered by the receiver was solely due to the voluntary actions of the defendant.  Defendant also

---

[4]    The transcript of the testimony of the other victims who testified is not yet available.

argues that the transfer of the funds to the Falcon Trust in London was a legitimate business transaction and that these funds were being administered at the defendant's direction for the benefit of Chemical Trust. Defendant claims that he was an investment fund manager and was not a party nor did he have any association with Chemical Trust. Finally, defendant argues that he did not, nor could have had, any knowledge or responsibility to foresee what Womack was doing in the United States.

The defendant's argument entails much more than is contained in paragraph 31 of the PSI, which merely recites that $6 million of Chemical Trust investor funds was transferred directly into an account in Great Britain by Womack, and that this account received over $16 million of Chemical Trust funds, most of which was recovered by the receiver in South Carolina. It seems that the only factual dispute that the defendant has with this paragraph is that he was the one that returned the monies from Great Britain to the receiver.

Factually this paragraph is correct, since the money was recovered by the receiver. The fact that the defendant was involved in the return of the money is not in dispute. However, contrary to his suggestion, defendant's motivation was not altruistic. Chemical Trust funds were not returned until after the defendant learned that the FBI and the U.S. Attorney's Office in South Carolina had initiated an investigation involving them in early 2000. Defendant's knowledge of the investigation is evidenced by intercepted conversations with his brother, Fred Morgenstern. In fact, the evidence of the true motivation of the defendant for being involved in the return of these fraud proceeds is best illustrated by a meeting between the defendant and a confidential informant on October 6, 2000 (which was videotaped

by law enforcement and is part of the evidence in the defendant's pending case in South Carolina). During the course of that meeting, the defendant explained that he and his older brother, James, had voluntarily returned the 16 million dollars as "a shot over the bow of the federal prosecutors" to see whether it would have any effect on receiving favorable treatment from the government – namely, "immunity" from prosecution.

Since the paragraph is an accurate as it stands, the defendant's objection should be overruled.

**Bahamian Bank Records – Page 14, Paragraph 32**

Defendant claims that the analysis of the Bahamian bank records is incorrect because it double counts funds already accounted for or adds funds which are irrelevant to this case and the forfeiture order.[5]

Defendant's argument does not dispute the occurrence of these events, nor could he. An accounting of the amounts was established by the testimony of Mr. Harrison during the Silvestri trial and is established the Bahamian bank records themselves. In summary, Mr. Harrison testified that hundreds of thousands of dollars worth of American Express bills were paid off by the defendant from his AFAC account at AIBC, which account was funded almost entirely by Chemical Trust funds (May 31, 2002, Harrison trial testimony at 36-46). In addition, defendant caused $2.9 million of Chemical Trust funds to be transferred to Wisconsin to settle a claim brought by individuals who had invested in the defendant's AFCM program. Lastly, Mr. Harrison testified that approximately $3.2 million was transferred to settle a lawsuit brought by Lord Guernsey and to pay associated attorneys' fees

---

[5]    The amount of forfeiture and/or restitution was agree upon in the written plea agreement (See ¶ 9).

(May 31, 2002, Harrison trial testimony at 32-34), and $2.8 million was transferred to defendant's Slattocks account in Switzerland, for a total of $6 million (May 31, 2002, Harrison trial testimony at 35-36).

This paragraph of the PSI has nothing to do with "double counting" or the forfeiture; it merely describes how the defendant and his brother used the fraud proceeds for their personal benefit. The information in this paragraph is appropriately included in the PSI to provide the Court with an understanding of the final disposition of some of the laundered funds. Further, the monies transferred to England relate to the settlement of the Lord Guersney suit, which was the subject of the defendant's plea on the one count information. Therefore defendant's objection to this paragraph should be overruled.

**Role in the Offense - Page 19, Paragraph 58; Page 22, Paragraph 75; Page 26, Paragraph 92**

Defendant objects to the finding that he was an organizer or leader which leads to a four level role adjustment. Defendant states that he lived and worked in London, did not work in the United States, did not have involvement with a significant part of the extensive activities charged in the indictment, did not have control over other persons, and certainly not five of them, did not instruct anyone to commit criminal actions, and did not recruit others into the criminal activity.

U.S.S.G. Section 3B1.1 provides for a four level increase if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Application Note 4 lists a number of factors that the court should consider: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of

accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Further, as the Note explains, "there can, of course, be more than one person who qualifies as a leader or organizer" in any criminal activity.

Moreover, it should be noted that the second portion of 3B1.1(a) is in the disjunctive. Accordingly, other than finding that the defendant occupied a role of leader or organizer, the Court must also determine that the criminal activity involved five or more participants or that the operation was otherwise extensive. *See United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994); *United States v. Hall*, 996 F.2d 284, 287 (11th Cir. 1993).

The facts underlying the defendant's conviction clearly qualify him as a leader or organizer of the money laundering conspiracy. The defendant became a part of this conspiracy from the beginning and accounts under his control were the primary conduits for the money laundering. As set forth in the AIBC bank records, the defendant established the AFAC account, into which the Chemical Trust fraud proceeds were deposited and transferred, starting with the first deposit of $2.8 million in August 1999. As evidenced by the AIBC bank records, the defendant coordinated the deposits and withdrawals of funds with his brother and the president of AIBC, Gary Christie, on an almost daily basis. The records are replete with instructions signed or authored by the defendant regarding the disposition of funds traceable to the Chemical Trust fund. Notably, numerous actual Chemical Trust checks were received by AIBC and credited to the defendant's AFAC account. The defendant's account also received a

number of large checks from his brother drawn on the Americas Resources account. As set forth by Mr. Harrison during the Silvestri trial, the defendant caused wire transfers of millions of dollars of Chemical Trust funds to overseas accounts, beyond the reach of U.S. law enforcement.

All of these facts clearly demonstrate that the defendant exercised decision making authority by directing the manner in which the millions of fraud money were deposited and thereafter used for the benefit of himself and coconspirators. Defendant organized, controlled and directed a number of individuals in that regard. Although the government is not obligated to demonstrate that there were five or more participants involved in the criminal activity, it is clearly the case here. These would include Fred Morgenstern, Peggy Preston, Mark Weiss, Jason Crossen, Debbie and Michael Buccinna as well as Gary Christie (President of AIBC) and Keod Smith (Bahamian attorney who handled the settlement of other fraud claims for the defendant), among others.

There is also no question that the money laundering activity of which the defendant was an integral part qualifies as "otherwise extensive." The money laundering activity continued from the summer of 1999 until at least the early part of 2000. Indeed, defendant continued to cause the transfers of millions of dollars of Chemical Trust funds in January 2000, even after he became aware of Womack's arrest on January 7, 2000. Approximately $30 million dollars was received in South Florida by the defendant's organization, which then negotiated the checks at a number of local banks as well as check cashing stores. Much of the money was subsequently transferred offshore to the defendant where it was utilized for the personal benefit of the conspirators. Further, the extensive nature of this

money laundering conspiracy was acknowledged by the defendant during the plea colloquy.   Therefore this objection should be overruled as well.

**Return of Additional Assets - Page 22, Paragraph 76**

Defendant complains that an additional $128,800 was returned to the receiver, composed of $16,800 paid by codefendant Fred Morgentstern and $112,000 in jewelry delivered by the defendant, which has not been credited.   Defendant contends that these amounts, along with the $17,769,346.22 also transferred to the receiver voluntarily before the defendant was indicted should be credited toward the forfeiture and/or restitution order.[6]

The government does not presently have an accurate accounting of the additional monies and the value of the jewelry from South Carolina. Moreover, though defendant agreed to turn over the subject jewelry, he has never agreed to the entry of a forfeiture order with respect to that property. Therefore, the government would respectfully request that the Court enter the forfeiture and/or restitution order in the amount of $31,273,273.58, as was agreed to by the defendant in the plea agreement (See paragraph 9 of the written plea agreement).   Once the accounting of the additional monies and/or assets has been finalized, the forfeiture and/or restitution amount will be automatically credited.   Therefore the Court need not address this objection and it should be denied as moot.

---

[6]    Defendant also argues that these actions should be considered substantial assistance and that he should receive a downward departure.   The government will address the issue of a downward departure below within the government's response to all the requests for departure.

**Obstruction of Justice - Pages 22-23, Paragraphs 77-79; Page 26, Paragraph 94**

Defendant objects to the inclusion in the PSI the determination that the defendant obstructed justice. Further, defendant complains that the PSI relies upon matters which are the subject of an unresolved civil case in South Carolina.[7] Finally, defendant contends that there has not been any showing of willful conduct,[8] that it actually hindered the investigation, or that any false statements were material, and therefore, he claims he cannot be found to have obstructed justice.

U.S.S.G. 3C1.1 provides for a two level increase if the defendant obstructed or impeded, or attempted to do so, the administration of justice during the course of the investigation, prosecutions, or sentencing of the offense of conviction.[9]

The PSI has increased the defendant's guideline calculation based on the defendant's statements to the government, which were reiterated during his plea colloquy, that no Chemical Trust funds were used toward the purchase of his residence. At issue was whether or not the defendant's residence would be subjected to forfeiture. Obviously the

---

[7]    Defendant provides no further information as to what unresolved civil suit he makes reference, therefore the government cannot presently address this argument.

[8]    Defendant also argues that he did not willfully violate the conditions of bond through his sale of a vehicle on E-Bay. However, Magistrate-Judge Barry S. Seltzer, after a full hearing, found that the defendant did, in fact, violate his conditions of bond. Neither the government not the PSI relies upon this violation of bond as an enhancement for obstruction of justice.

[9]    U.S.S.G. 3C1.1 also requires that the obstructive conduct be related to the defendant's offense and any relevant conduct, or a closely related offense. This portion of the guideline provision is not really at issue here.

defendant's false statements would be material to that issue (See U.S.S.G. 3C1.1, commentary, ¶ 6, defines material if it "would tend to influence or affect the issue under determination.").

Defendant disputes the factual allegations contained in these paragraphs concerning the monies used for the down payment on his house. Defendant agrees that $150,000 withdrawn from his wife's "Commercial Holdings" account and traceable to the AFCM account was used for the down payment, but claims that these were not Chemical Trust funds. Defendant also states that all Chemical Trust funds were either expensed or transferred out of AIBC prior to the closing on his house, which took place in early February, 2000.

The government stands by the factual recitation set forth in the PSI concerning the defendant's purchase of his home. The down payment ($146,000) used to purchase this residence is directly traceable to funds transferred from defendant's AFCM account into his wife's Commercial Holdings account, however, at the time of the transfer in September 1999, the AFCM account was in a substantial overdraft status. It remained in overdraft status until the defendant caused the transfer of $2.1 million in Chemical Trust funds to correct the overdraft status. Therefore, the downpayment used to purchase the residence was clearly traceable to Alliance/Chemical Trust.

Secondly, the funds used by the defendant to refinance the mortgage on his residence in June 2000 were also derived from Alliance/Chemical Trust fraud funds, which were initially deposited into defendant's AFAC account and which the defendant later transferred to Gabriel MacEnroe's Swiss and Liechtenstein accounts in January 2000. These MacEnroe controlled accounts were ultimately used to pay off the defendant's mortgage in June 2000, and in return a bogus three month

"balloon" mortgage was placed on the home by MacEnroe.  No payments were ever made on this mortgage.

Therefore for all of these reasons, the government submits that the two level increase for obstruction of justice was properly applied to the defendant.

**Acceptance of Responsibility - Pages 24-25, Paragraphs 84-85; Page 26, Paragraph 92**

Defendant objects to the denial of a three level adjustment for acceptance of responsibility.  Defendant contends that he has provided voluntary assistance to recover proceeds of the offense, nearly $18 million, even before his was indicted, that he pled guilty and gave a statement to the Probation Department, that he assisted the government during the trial of codefendant Silvestri, and that he has been debriefed in both South Carolina and Florida at which time the government assessed his information to be good.  Defendant, in sum, asserts that he has taken responsibility for his actions and that he has assisted the government.  Defendant also complains that the domestic battery charges which have been resolved should not be included in the PSI and that the defendant has not obstructed justice.

The PSI finds that the defendant does not qualify for acceptance of responsibility based on two main grounds: 1) failure to provide a personal financial statement; and, 2) obstruction of justice.  The government has been informed by the Probation Department that the defendant has now provided a personal financial statement so that issue is resolved.

Because the defendant violated paragraph 8 of the written plea agreement, the defendant does not qualify for acceptance of responsibility.  Specifically, the defendant made false statements to

14

the government, which was confirmed by him in Court, concerning the possible forfeiture of his residence.  Moreover, he has affirmatively disavowed his guilt by filing two affidavits proclaiming his complete innocence of these charges.   Further, when a defendant's conduct results in an enhancement for obstruction of justice, an adjustment for acceptance of responsibility is not warranted.  *See*  U.S.S.G. § 3E1.1, Application Note 4; *United States v. Arguedas*, 86 F.3d 1054 (11th Cir. 1996).

The government acknowledges that restitution can be considered as one of the factors in determining whether a defendant qualifies for acceptance of responsibility.  However, because the defendant has failed to comply with all other requirements for acceptance of responsibility, he does not qualify for this adjustment.

Accordingly, defendant's objection should be overruled.

**Amount of Laundered Funds - Page 26, Paragraph 91**

Defendant contends that he should receive credit for the returned monies against the amount of laundered money, resulting in a total sum of approximately $13.4 million dollars.  This is incorrect.  Although these monies may be applied as credit on the restitution, they do not affect the amount of laundered funds for guideline calculation purposes.

In *United States v. Lane*, 2003 WL 1450019 (7th Cir. 2003), the court recognized, in the context of a fraud case, that the purpose of the loss calculation is to measure the magnitude of the crime at the time it was committed.  In this case, the PSI is correct in assessing the actual loss for enhancement purposes at $31,000,000.  The defendant is not entitled to an off-set to the extent of fraud proceeds returned by his brother.  These proceeds were returned only after the

15

defendant became aware that the crime had been detected and law enforcement was conducting an active investigation.

Courts which have considered whether the defendant should receive credit on fraud or loss amount based on repayment have rejected this same argument. *See United States v. Daniels*, 148 F.3d 1260, 1261 (11th Cir. 1998)(partial reimbursement of funds did not change the amount the defendant had embezzled); *United States v. Norris*, 50 F.3d 959, 961 (11th Cir. 1995) (Repayment of fraud reduced the amount of restitution owed, but not the loss amount). As the court recognized in *Norris* when considering a fraud loss amount under U.S.S.G. 2F1.1, the loss amount was to be determined as of the time the offense was discovered. The defendant's son's repayment of a student loan did not alter the loss amount because it came "way too late" to reduce the loss. *United States v. Norris*, 50 F.3d at 961-62. In *United States v. Bald*, 132 F.3d 1414,1416 (11th Cir. 1998), in the context of unauthorized credit card purchases, the court included all credit card charges in loss amount, even though some purchases were returned for credit even before detection. As the court stated, the crime was completed at the time the credit cards were used and an actual loss had resulted. *Id*. at 1416-17.

Such is the case here. The relevant crime of conspiracy to launder money was completed once the defendant engaged in the money laundering transactions. The money laundered amount is unaffected by whatever may have occurred later, particularly after the crime was detected. Therefore defendant's objection should be overruled.

**Total Offense Level - Page 27, Paragraph 98**

Based on the other objections, the defendant contends that his total offense level should be 26. The government maintains that the

guideline calculations are correct and should remain unchanged.

**Defendant's Health - Page 33, Paragraphs 114, et seq.**

The defendant claims that he suffers from serious health maladies which should be considered by the Court in imposing sentence. Physical condition, however, is a discouraged factor under the guidelines and the government submits that the defendant's health should not be considered as a possible basis for departure. U.S.S.G. 5H1.4.

**Drug Program - Page 35, Paragraphs 122, et seq.**

Defendant acknowledges that he has a substance abuse problem and requests that the Court order that the defendant be placed in the drug program while incarcerated. The government takes no position on this request and leaves it to the discretion of the Court.

**Fine - Page 40, Paragraphs 143, et seq.**

Defendant argues that he does not have the ability to pay a fine and that one should not be ordered. The government abides by the provisions of the plea agreement that no fine should be imposed in lieu of the entry of a forfeiture and/or restitution order.

**Guideline Calculations - Page 47, Paragraph 171**

Defendant contends that based on his objections, the total offense level should be 26, criminal history category of II, with a guideline imprisonment range of 63 to 78 months. As stated above, the government contends that the PSI guideline calculations and imprisonment range are correct and should remain the unchanged.

**DOWNWARD DEPARTURE**

Defendant also argues that he should be entitled to a downward departure based on a number of grounds:

1)    Substantial assistance to law enforcement in the prosecution of codefendant Silvestri, valuable assistance in obtaining the return

of money, and identification and arrest of individuals through his cooperation in South Carolina.

2)    Pursuant to U.S.S.G. 5K2.16 based on his voluntary disgorgement of over $16 million dollars prior to his being named a party in any criminal or civil lawsuit.

3)    Substantial restitution.

**Substantial Assistance to Law Enforcement**

Defendant argues that he should be entitled to a downward departure based on his claimed substantial assistance to law enforcement.  The only basis for this departure is U.S.S.G. 5K1.1, which provides for a downward departure solely on the motion of the government.

The undersigned Assistant United States Attorneys, in conjunction with the prosecutors in South Carolina, have considered what cooperation the defendant has provided.  It is the judgment of the government that the defendant has not provided substantial assistance and therefore, the government does not intend to file a motion pursuant to 5K1.1.[10]

**Voluntary Disgorgement of Monies**

The defendant also requests a downward departure under U.S.S.G. 5K2.16 which provides that '[i]f the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a departure below the

_____

[10]    Paragraph 12 of the plea agreement provides that it is in the sole and unreviewable judgement by the government to determine if the defendant's cooperation warrants a motion for a downward departure.

applicable guideline range for that offense may be warranted."

The defendant did not voluntarily disclose the existence of the offense prior to its discovery and has not accepted responsibility for the offense.  Therefore he does not qualify for a departure pursuant to U.S.S.G. 5K2.16.

**Substantial Restitution**

Defendant also argues that he is entitled to a downward departure because of the "substantial restitution" that he provided.  It is clear that mere voluntary payment of restitution prior to adjudication normally cannot serve as a basis for departure.  *United States v. Seacott*, 15 F.3d 1380, 1388 (7th Cir. 1994) (the defendant who made restitution was not entitled to a downward departure because the guidelines had already considered such conduct as a part of "acceptance of responsibility"); *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990) (the defendant was not entitled to a downward departure even though he had paid restitution and demonstrated remorse because the guidelines had already provided for this as a factor in determining acceptance of responsibility).  Therefore defendant's motion for downward departure on this ground should also be denied.

<u>CONCLUSION</u>

WHEREFORE, for all the foregoing reasons, the government respectfully requests that this Honorable Court deny the defendant's objections to the PSI, except those that have been agreed to by the government.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:    _____
       J. BRIAN McCORMICK
       ASSISTANT UNITED STATES ATTORNEY
       Court I.D. #A5500084
       500 East Broward Boulevard
       Suite 700
       Fort Lauderdale, FL 33394
       Telephone: (954) 356-7392
       Fax:       (954) 356-7230


By:    _____
       DIANA L.W. FERNANDEZ
       ASSISTANT UNITED STATES ATTORNEY
       Court I.D. #A5500017


By:    _____
       JAMES R. PAVLOCK
       SENIOR TRIAL ATTORNEY
       DOJ/CRIMINAL DIVISION
       Court I.D. #A5500657

20

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served by fax and mail to the following on the _15th_ day of _April_ , 2003:

Brian R. McComb, Esquire
3458 S.E. Dixie Highway
Stuart, Florida 34997

_Diana W. Fernandez_
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

21