UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number: 00-6309-Cr-Dimitrouleas



UNITED STATES OF AMERICA,  )
               Plaintiff,  )
                 )
                 )
v.  )
                 )
                 )
DAVID MORGENSTERN,  )
               Defendant.  )
_____ )

## MOTION TO AMEND ORDER OF FORFEITURE AND
## INCORPORATED MEMORANDUM OF LAW

The United States of America, by its undersigned counsel, hereby moves pursuant to Rule

32.2(e)(1), Federal Rules of Criminal Procedure, to amend the Judgment and Order of Forfeiture

entered by the Court on May 7, 2003, in the above-captioned matter to include additional property

subject to forfeiture pursuant to Title 18, United States Code, Section 982(a). In support thereof, the

United States represents the following:

        1.     On May 21, 2002, David Morgenstern entered a plea of guilty to Count 14 of the

Second Superceding Indictment, which charged him with conspiracy to commit money laundering,

in violation of Title 18, United States Code, Section 1956(h). As part of the plea agreement, the

defendant agreed to the entry of a money judgment forfeiture order/restitution order in the amount

of $31,273,273,58, for which credit would be received for the repatriation of approximately $17

million from Barclays Bank, London. The defendant further agreed to voluntarily surrender and not

contest the forfeiture of property subject to forfeiture, including assets which may be located by the

United States at a future time, or as substitute property thereof.



2.      On May 7, 2003, the Court sentenced the defendant to 120 months incarceration[1], followed by three years supervised release, as well as restitution in the amount of $13,375,927.36 and forfeiture in the amount of $31,273,273.58.

3.      During the hearing on May 21, 2002 at which the Court accepted the defendant's plea, the government also agreed, at the request of the defendant and upon certain conditions, to exclude his residence located at 7534 Estrella Circle, Boca Raton, Florida (the "Estrella Circle property"), from forfeiture either as property traceable to the money laundering conspiracy or as substitute property.[2] At the time, the defendant represented to the government's attorney, James R. Pavlock, that no Chemical Trust fraud proceeds were used toward the purchase or financing of the Estrella Circle property. As represented to the Court during the change of plea hearing, the government was willing to exclude the Estrella Circle property from forfeiture only on the condition that no Chemical Trust fraud proceeds were traceable to that property. The Court summarized the understanding in stating that if the government can show that some of the proceeds from this fraudulent activity either bought the house or paid the mortgage on the house, then the government could sell the house and make up the difference owing on the forfeiture order. (May 21, 2002, transcript at 16-18).

4.      After the acceptance of the defendant's plea, the government received records from the Governments of Liechtenstein and Switzerland related to accounts maintained in those countries by the defendant and Gabriel MacEnroe. In addition, the government also received additional

---

[1]      The defendant was also sentenced on an Information, 02-60100-Cr-Dimitrouleas, to 60 months, which was to run consecutive to the sentence in this matter.

[2]  The Estrella Circle property is titled in the name of the defendant and, as such, would be subject to forfeiture as substitute property under Fed. R. Crim. P. 32.2 (e) and Title 21, U.S.C. Section 853(p).

2

records from the Government of the Bahamas related to Americas International Bank Corp. ("AIBC"), the Bahamian bank used by the defendant to launder millions of dollars of Chemical Trust fraud proceeds.

5.       As set forth in detail in the attached affidavit of Wendy Spaulding, a certified public accountant who analyzed substantially all of the domestic and foreign bank records related to the Chemical Trust fraud, the first mortgage held by Yale Mortgage Company, Miami, Florida on the Estrella Circle property was satisfied by a "balloon" loan made by Gabriel MacEnroe[3] in the name of his company, "Commercial Capital Finance, AG," to David and Victoria Morgenstern in the summer of 2000, the proceeds of which consisted of approximately $348,000 in traceable Chemical Trust fraud proceeds.   These bank records reveal that this $348,000 of Chemical Trust proceeds was a portion of $2.8 million in Chemical Trust fraud proceeds that David Morgenstern had transferred to MacEnroe in mid-January, 2000,  just days after the arrest of Virgil Womack in South Carolina on money laundering charges related to the Chemical Trust fraud.

6.       In addition, the government has determined that a substantial part of the purchase of the Estrella Circle property in January 2000 was paid for by a transfer of $146,000 from an account maintained by Victoria Morgenstern (David Morgenstern's wife) at AIBC.  As set forth in greater detail in the attached Spaulding affidavit, these funds are also traceable to the Chemical Trust fraud.

_____

[3] MacEnroe, an Irish citizen and resident of Switzerland, is currently a fugitive.  In October, 2000, MacEnroe was charged along with David Morgenstern and Joseph Silvestri in the District of South Carolina on wire fraud conspiracy charges.  On June 20, 2003, MacEnroe failed to appear at an ancillary hearing and bond status hearing in MacEnroe's criminal case scheduled by U.S. District Judge G. Ross Anderson, Jr. to address the forfeiture of $200,000 posted by MacEnroe as bond.  At the conclusion of the hearing, the $200,000 bond was forfeited as traceable Chemical Trust fraud proceeds and a warrant was issued for MacEnroe.   Coconspirator David Morgenstern also pled guilty recently to wire fraud conspiracy charges in Greenville, South Carolina.

7.      Based upon the government's investigation of these bank records and upon other information, it appears that the mortgage arranged by David and Victoria Morgenstern and held by Gabriel MacEnroe on the Estrella Circle property was a sham designed to further conceal and disguise almost a half million dollars of Chemical Trust fraud proceeds.  It appears that David Morgenstern has never made a mortgage payment to MacEnroe's company, Commercial Capital Establishment.

8.      Accordingly, pursuant to Fed. R. Crim. P. 32.2(e)(1) and in accordance with the plea agreement, since the government has established that Chemical Trust fraud proceeds were used toward the financing and purchase of the Estrella Circle property, the government moves to amend the Judgment and Order of Forfeiture to include that property as subject to forfeiture, the proceeds of which the government ultimately seeks to repatriate to the victims of the Chemical Trust fraud.

## MEMORANDUM

Generally, in imposing a sentence for violating Title 18, United States Code, Section 1956(h) (money laundering conspiracy), the Court shall order forfeiture to the United States of any property involved in the money laundering conspiracy, or any property traceable to such property.  Title 18, United States Code, Section 982(a)(1).  *United States v. McCorkle*, 321 F.3d 1292 (11th Cir. 2003).  Forfeiture is a part of sentencing.  *United States v. Libretti*, 516 U.S. 29 (1995); see also Fed. R. Crim. P. 32.2(b)(3) (the order of forfeiture "shall be made part of the sentence and included in the judgment.").

The Government may move to amend such an order of forfeiture, pursuant to Rule 32.2(e), when it subsequently locates property subject to forfeiture.  Rule 32.2(e)(1) provides that:

4

(1)    On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that:

(A) is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or

(B) is substitute property that qualifies for forfeiture under an applicable statute.

In all cases where specific property is sought to be forfeited, criminal forfeiture occurs in two steps: (1) the jury (or the Court in the case of a guilty plea (see Rule 32.2(b)(1)) determines the forfeitability of the property and the Court enters an order of forfeiture; and (2) third parties assert their interests in an ancillary proceeding. *United States v. Pelullo*, 278 F.3d 196 (3rd Cir. 1999). Because forfeiture is part of the sentence, only property that belongs to the defendant can be forfeited. *United States v. BCCI Holdings (Luxembourg S.A. (Petition of Chawla)*, 46 F.3d 1185, 1190 (D.C. Cir. 1995); *United States v. Gilbert*, 244 F.3d 888, 919 (11th Cir. 2001) ("because it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only that property, or portion thereof, owned by the defendant"); *id*. at 920 (what distinguishes criminal forfeiture from civil forfeiture is that "the property itself is not forfeited; rather, the defendant's *interest* in the property is forfeited.") (emphasis in original).

In this case, defendant David Morgenstern pleaded guilty to receiving, depositing and transferring millions of dollars of Chemical Trust and Alliance Trust investor checks into various bank accounts in the United States and abroad.   After this plea and after the entry of the order of forfeiture, the government determined that Chemical Trust funds were used to finance and purchase Morgenstern's home, the Estrella Circle property, in an amount approximating a half million dollars. The attached Spaulding affidavit conclusively traces the flow of Chemical Trust funds from the fraud

victims to the Estrella Circle property, and as such, the property is now forfeitable by virtue of the

terms of the plea agreement and is subject to the existing forfeiture money judgment entered by the

Court. Fed. R. Crim. P. 32.2(e)(1)(A). Alternatively, it is substitute property in its entirety subject

to forfeiture under Fed. R. Crim. P. 32.2(e)(1)(B) and 21 U.S.C. §853(p).[4]

In general, in making a determination as to whether the property is subject to forfeiture, the

court must first make a finding, by a preponderance of the evidence, that the property that the

Government seeks to forfeit is the proceeds of, or is property involved in, the offenses for which the

defendant has been convicted. *See* Rule 32.2(b)(1) ("As soon as practicable after . . . accepting a

plea of guilty . . . , the court shall determine what property is subject to forfeiture under the applicable

statute. If the forfeiture of specific property is sought, the court shall determine whether the

Government has established the requisite nexus between the property and the offense."); *United

States v. Dicter*, 198 F.3d 1284, 1289; *United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir.

1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense,

but only an additional penalty for an offense that was established beyond a reasonable doubt); *United

States v. DeFries*, 129 F.3d 1293, 1312 (D.C. Cir. 1997) (in light of the Supreme Court's decision

in *Libretti*, the burden of proof in RICO forfeiture case is preponderance of the evidence); *United

States v. Patel*, 131 F.3d 1195, 1200 (7th Cir. 1997) (burden of proof in criminal forfeiture cases is

preponderance of the evidence because criminal forfeiture is part of the sentence under *Libretti*);

*United States v. Rogers*, 102 F.3d 641, 648 (1st Cir. 1996) (same); *United States v. Bellomo*, 176

F.3d 580, 595 (2d Cir. 1999) (following *DeFries*, *Patel*, and *Rogers*; because forfeiture is part of

---

[4] 18 U.S.C. §982(b)(1) incorporates by reference 21 U.S.C. §853 as the procedure governing forfeiture and disposition of property.

sentencing, and fact-finding at sentencing is established by a preponderance of the evidence, the preponderance standard applies to criminal forfeiture); *United States v. Cherry*, 330 F.3d 658 (4th Cir. 2003) (preponderance of evidence is the standard governing criminal forfeiture)..

Once the Court has determined that the property in question is subject to forfeiture under the applicable statute, it must enter a preliminary order forfeiting the property to the United States. Rule 32.2(e)(2); Rule 32.2(b)(2).

If a third-party files a petition claiming an interest in the property (see Rule 32.2(e)(2)(B)), the court must conduct an ancillary proceeding. The ancillary proceeding is a process governed by Rule 32.2(c) and 21 U.S.C. § 853(n), whereby third parties have the opportunity to contest a forfeiture on the ground that the forfeited property really belonged to them and not to the convicted defendant. *See, United States v. Bennett*, 252 F.3d 559 (2d Cir. 2001) (the procedure for recovering criminal proceeds transferred by a defendant to a third party is codified at sections 853(c) and (n)(6)(B); the Government forfeits the property in the criminal case, subject to the third party's right to contest the forfeiture in the ancillary proceeding); *United States v. McCorkle,* 143 F. Supp. 2d 1311 (M.D. Fla. 2001), *aff'd*, 321 F.3d 1292 (11th Cir. 2003) As is set forth in Section 853(n)(6), third parties may attempt to show either that the forfeited property belonged to them *before* the criminal offense ever took place, *see* § 853(n)(6)(A) (the "superior interest" defense), or in the case of subsequently acquired property, that they acquired the property as "bona fide purchasers for value" *see* § 853(n)(6)(B) reasonably without cause to believe that the property was subject to forfeiture. *See, United States v. Schecter*, 251 F.3d 490 (4th Cir. 2001) (forfeiture is effective at the time of the commission of the illegal act; to succeed with a third party claim, a third party must have had an interest in the property at that time, or must have acquired it later as a bona fide purchaser); *United*

*States v. Hooper*, 229 F.3d 818 (9th Cir. 2000) (given the clear direction in section 853(n)(6) limiting

recovery to two categories of claimants, the courts are not at liberty to create additional grounds for

relief); *United States v. Kennedy*, 201 F.3d 1324 (11th Cir. 2000) (the alternative grounds set forth

in sections 853(n)(6)(A) and (B) are the only grounds for recovery in the ancillary proceeding).

## CONCLUSION

For all of these reasons, the court should find that the Government has established the

forfeitability of the subject property by a preponderance of the evidence, and should enter a amended

order of forfeiture in accordance with Rule 32.2(b)(1), (2) and (e). Thereafter, the order will be

published and any third parties who appear to have an interest in the subject property will be notified

and afforded a full and fair opportunity in accordance with Rule 32.2(c) and Title 21, U.S.C. Section

853(n) to establish that the order of forfeiture should be modified to reflect that interest. A proposed

amended order of forfeiture is attached hereto.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
J. Brian McCormick
Assistant United States Attorney
500 East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax: (954) 356-7230

By: _____
Diana L.W. Fernandez
Assistant United States Attorney
Court I.D. #A5500017
Fax: (954) 356-7230

By: _____
James R. Pavlock
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Court I.D. #A5500657

9

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was mailed this 24th day of

_____, 2003 to:

Brian R. McComb, Esq.
3458 S.E. Dixie Highway
Stuart, FL 34997-5712
(Counsel for David Morgenstern)

J. Brian McCormick
Assistant United States Attorney

10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | Crim. No. 00-6309-CR |
| | ) | DIMITROULEAS |
| | ) | |
| v | ) | **AFFIDAVIT OF** |
| | ) | **WENDY SPAULDING** |
| | ) | **IN SUPPORT OF** |
| David Morgenstern | ) | **AMENDED ORDER** |
| Defendant | ) | **OF FORFEITURE** |

I, Wendy Spaulding, being competent to testify to the matters herein, declare as follows:

**INTRODUCTION**

1. I am a certified public accountant and have been licensed as such since 1983. I have worked in the field of investigative accounting for a company called Nossen & Associates since 1989, and since that time I have provided financial analytical services to federal law enforcement agencies, including expert witness testimony.

2. In November of 1999, Nossen & Associates was asked by the Federal Bureau of Investigation in Greenville, South Carolina to provide financial analytical services for a fraud investigation being conducted there. The main target of the South Carolina investigation was Virgil Womack, his wife Charlotte Womack and other coconspirators (including Womack's attorney, Nelson Jarnagin), who perpetrated a "Ponzi" fraud scheme known as "Chemical Trust." Based upon my knowledge of the investigation and prosecutions in this case, I know that Virgil

1

Womack promoted the scheme through sham entities created by him and known as the
"Chemical Trust," "Alliance Trust," "United Marketing Trust," and other trust names.  Womack
solicited a network of insurance agents and investment brokers to market the fraudulent
investment program to over 1200 unsuspecting investors throughout the country, many of whom
were elderly.   In this affidavit, I refer to this fraud scheme generally as "Chemical Trust," and
checks and funds invested by investors as "Chemical Trust funds."   As part of the scheme,
investors in the Womack fraud scheme were instructed by Womack's agents to execute
investment checks payable to these Womack trust entities, which checks were then delivered by
mail to Womack, deposited by Womack into bank accounts bearing the "trust" names, and/or
delivered by Womack to others, including the Morgensterns, to be laundered through their
respective bank accounts.  In addition, I know that Womack (through his agents) also caused
investors to make investments by way of wire transfers from the investors' bank accounts and
investment brokers into "trust" bank accounts which were controlled by Womack.

   3.  I am aware that Virgil Womack pled guilty and was then sentenced on November 7,
2002 on mail/wire fraud conspiracy and money laundering conspiracy charges in the Chemical
Trust matter.  I am familiar with the related investigation and prosecution of Fred Morgenstern
and David Morgenstern in the Southern District of Florida, who in May 2002 pleaded to money
laundering conspiracy charges under Title 18, United States Code, Section 1956(h) arising out of
the receipt and transfer of Chemical Trust fraud proceeds, and who were sentenced in May,
2003.  I am familiar with the trial of co-defendant Joseph Silvestri, who was tried and convicted

in June 2002 of money laundering conspiracy charges related to the Chemical Trust fraud. I am also familiar with the related investigation and prosecution of Gabriel MacEnroe, an Irish citizen and resident of St. Gallen, Switzerland, on wire fraud conspiracy charges in the District of South Carolina (*United States v. Gabriel MacEnroe, et al.*, Crim. No. 8:00-697), his receipt of approximately $2.8 million in Chemical Trust funds, his use of $200,000 of such Chemical Trust funds to post bond in his criminal matter, and related criminal forfeiture proceedings which resulted in the forfeiture of this $200,000 bond. MacEnroe failed to appear at a bond status conference in the District of South Carolina on June 20, 2003 and is currently a fugitive.

4. At the request of the F.B.I., in late 1999 I also began an analysis of a large number of domestic bank records obtained by grand jury subpoena, and foreign bank records obtained through litigation instituted in the Bahamas by the court-appointed Receiver in the Womack/ Chemical Trust case. I have analyzed additional bank records obtained through legal assistance requests made by the U.S. Department of Justice to several foreign countries, including the Bahamas and Switzerland. I have also analyzed records obtained by the U.S. Department of Justice obtained through a letter rogatory issued by U.S. District Court Judge G. Ross Anderson, Jr., District of South Carolina, to the Government of Liechtenstein and other relevant documents on a continuing basis since the outset of my participation in the investigation.

5. The primary focus of my analysis has been to trace the deposit and disposition of Chemical Trust funds lost by defrauded Chemical Trust investors. In connection with my analysis, I am familiar with (1) the various affidavits filed by Special Agents Paul Jacobs and Charles Sheppard, Jr., of the Federal Bureau of Investigation, South Carolina, in support of search warrants, seizure warrants, restraining orders and the first Preliminary Order of Forfeiture in this case; (2) various documents filed with the Court in these matters, in both the Southern

3

District of Florida and South Carolina;  (3) the schedules prepared by H. Marvin Harrison (the Receiver's investigator) which were submitted to the U.S. District Court in South Carolina and which identify the Chemical Trust fraud victims, and his testimony in the prosecution of *United States v. Joseph Silvestri*, Southern District of Florida, Fort Lauderdale Division, Crim. No. 00-CR-6309-SEITZ; (4) the indictments of Virgil Womack, Nelson Jarnagin and others charged in the "Chemical Trust" fraud scheme;  and (5) other reports and documents related to the Chemical Trust fraud and the disposition of those funds.  I am familiar with how Chemical Trust investor checks and funds were initially deposited into accounts controlled by Virgil Womack and the Morgensterns which were located in South Carolina, Florida and the Bahamas, and have confirmed the deposit of such funds through my analysis of related bank records.  Based upon my analysis and other evidence, I know that Virgil Womack caused Chemical Trust investor checks and funds to be delivered (and wire transfers to be made) to various bank accounts controlled by him.   Furthermore, I also have identified transfers of such funds to other bank accounts (both domestic and abroad) controlled by Womack, the Morgensterns and other coconspirators, both indicted and non-indicted, and have traced the disposition of such funds.

4

**THE TRANSFER OF CHEMICAL TRUST FUNDS FROM DAVID MORGENSTERN
TO GABRIEL MACENROE'S ACCOUNTS IN EUROPE**

6. My analysis of the records maintained by Americas International Bank Corporation

("AIBC"), Nassau, Bahamas of the accounts entitled "Americas Fidelity Assurance Corporation"

("AFAC") shows that Chemical Trust funds totaling approximately $7,000,000 were credited to

the AFAC account at AIBC from August 10, 1999 through early October, 1999. (These are not

the total amount of funds credited to this account during the life of the Chemical Trust fraud

scheme, but only those funds credited through early October, 1999). This AFAC account was

controlled by David A. Morgenstern.

7. These records further show that two transfers of Chemical Trust funds were made by

David Morgenstern in October, 1999 to a Swiss bank account. On October 7, 1999, $1,500,000

of directly traceable Chemical Trust funds were ordered transferred by David Morgenstern from

Morgenstern's AFAC account to an account at Canadian Imperial Bank of Commerce, Ltd. in

Switzerland entitled "Slattocks Invest, S.A." (Account #21444). Based upon the Slattocks bank

records, I have determined that the Slattocks account was also controlled by David A.

Morgenstern. David A. Morgenstern was an officer of Slattocks Invest, S.A. and, along with his

wife Victoria, was a signatory on the account. (See Exhibit 1, signature card). The Slattocks

account was comprised of two components: a "current account" and a "fiduciary account." The

balance in the Slattocks current account prior to the $1,500,000 transfer in on October 11, 1999

was $3,804.56. The balance in the fiduciary account just prior to the $1,500,000 transfer into the

current account was $235,000.00. On October 15, 1999 David Morgenstern ordered a second

transfer from his AFAC account at AIBC to the Slattocks account of an additional $1,300,000 of

directly traceable Chemical Trust investor funds. In total, $2.8 million in Chemical Trust funds

5

was transferred by Morgenstern from his AFAC account to his Slattocks account in October, 1999.  Those funds remained in the Slattocks account until January, 2000, and during the period from October 1999 to January, 2000, no other deposits were made into the Slattocks account from other sources, other than interest accruing primarily on the $2.8 million of Chemical Trust funds.

8.  On or about January 14, 2000, several days after the arrest of Virgil Womack, $2,800,000 of traceable Chemical Trust funds were transferred from the Slattocks account to two accounts controlled by Gabriel MacEnroe, (contained in a total deposit of $2,862,000) as follows:

a.      $1,437,000 to Commercial Capital Establishment (CCE) account #00106540-00-00-333 at Neue Bank in Liechtenstein, and

b.      $1,425,000 to the Commercial Capital Finance (CCF) account #254-L025220.2 at UBS Bank, St. Gallen, Switzerland.

The balance in the CCE account at Neue Bank was $218.58 prior to the $1,437,000 transfer in on January 14, 2000 (posted on January 24, 2000).  The balance in the CCF account at UBS Bank was $37.73 prior to the $1,425,000 transfer in on January 14, 2000. Thus, the CCE and CCF accounts were funded almost exclusively with Chemical Trust funds on January 14, 2000. Moreover, no other significant source of deposits existed in the CCE and CCF accounts other than the transfer of Chemical Trust funds into those accounts.   Gabriel MacEnroe is a signatory on both the CCE and CCF accounts (See Exhibit 2, signature cards, related documents and translation) and has described himself as an officer/director of those entities.

6

**USE OF CHEMICAL TRUST FUNDS TO REFINANCE DAVID MORGENSTERN'S HOME IN BOCA RATON, FLORIDA**

9. I am also familiar with a title search of Palm Beach County public records dated June 27, 2002, prepared by Ticor Title Insurance Company at the request of the Federal Bureau of Investigation, which shows that David Alan Morgenstern purchased the real property located at 7534 Estrella Circle, Boca Raton, Florida, 33433 on or about February 8, 2000 for a purchase price of $480,000. (Other documents that I have reviewed indicates that actual settlement on this property occurred on January 20, 2000). This title search shows that David Alan Morgenstern is the sole purchaser of this property and that no other individual holds title to this property. The title search shows that, in addition to the deed being executed (recorded at Book 11597, page 1708), David Alan Morgenstern executed a mortgage to Southern Funding Corporation in the amount of $336,000. (This mortgage is recorded at Book 11597, page 1709). Palm Beach County records also show that on or about February 29, 2000, Southern Funding Corporation assigned this mortgage to Yale Mortgage Corporation. (This assignment is recorded at Book 11630, page 1798). Palm Beach County records further disclose that David Alan Morgenstern and Victoria Morgenstern, husband and wife, gave a mortgage to Commercial Capital Finance AG on September 7, 2000 and that Yale Mortgage Corporation recorded a satisfaction of mortgage on September 21, 2000. (The note executed by Victoria Morgenstern is recorded at Book 12000, page 376-378, the mortgage to Commercial Capital Finance AG is recorded at Book 12000, page 370-375, and the satisfaction of mortgage recorded by Yale Mortgage is reported at Book 12026, page 1477. (See Exhibit 4, note and mortgage). Documents provided by Yale Mortgage to the Receiver's investigator, H. Marvin Harrison, in Greenville, South Carolina, which were reviewed by me, show that on or about June 26, 2000, Commercial

7

Capital Finance AG sent, via facsimile, to Yale Mortgage Corporation, reference property address 7534 Estrella Circle, Boca Raton, Florida, 33433 / Ms. V. Morgenstern, a letter which states in part, "Dear Ms. Ellingsworth: We have today swift wired to the coordinates per your fax of June 23, the sum of USD 348,007.81." Handwritten notes on this faxed document show a date of 6/28 and a figure 249,985 and 98,007.81, which equals 347,992.81. The letter is signed "Yours sincerely, Gabriel MacEnroe."    See Exhibit 3.  The subsequent satisfaction of mortgage provided by Yale Mortgage Corporation is date stamped September 21, 2000 but bears the handwritten date July 25, 2000.

10. Documents provided by D. Jay Snyder, PA, Attorney at Law, St. Petersburg, Florida to the Receiver's investigator show that on or about January 30, 2001 (David Morgenstern was arrested in October, 2000), David Alan Morgenstern, as maker, executed a subsequent note/mortgage in favor of Commercial Capital Finance in the amount of $405,734.71.  This note states, "This note is secured by a mortgage dated September 5, 2000 recorded in official records book 12000, page 370 - 378, Palm Beach County, with all such terms and provisions of said mortgage being incorporated herein."  (See Exhibit 5, "Renewal Promissory Note").  Palm Beach County records show no further filing of notes or rollover of the mortgage executed by David and Victoria Morgenstern to Commercial Capital Establishment after September 5, 2000. Both the September 5, 2000 mortgage in the amount of $348,000.00 (which became due in full just three weeks later, on September 28, 2000) and the January 30, 2001 mortgage in the amount

of $405,734.71 (which appears to have come due on March 28, 2001) do not appear to obligate the Morgensterns to make any periodic payment toward principal *or* interest.

11. With respect to MacEnroe's Swiss CCF account, from January, 2000 to July, 2000, no other deposits were made into that account.   Thus, as described above,  the balance in the CCF account consisted almost exclusively of Chemical Trust funds received from Morgenstern's Slattocks account in January, 2000.   On June 27, 2000, a transfer was made from the CCF account in the amount of $98,007.81 to "Yale Mortgage Corporation," the new mortgagee of David Morgenstern's home at 7534 Estrella Circle, Boca Raton, Florida.   A copy of the wire transfer record from the CCF account is attached as Exhibit 6 and references the Estrella Circle address and "Mrs. V. Morgenstern." (Victoria Morgenstern, David Morgenstern's wife).   With respect to MacEnroe's CCE account at Neue Bank, Liechtenstein,   from January, 2000 to July, 2000,  no other deposits were made into that account. As described above, the balance in the CCE account consisted almost exclusively of Chemical Trust funds received from Morgenstern's Slattocks account in January, 2000.  On June 26, 2000, a transfer was made from the CCE account in the amount of $250,000.00 to "Yale Mortgage Corp." Miami, Beach, Florida., "Ref, 7534 Estrella Circle, Boca Raton, Florida 33433/Mrs. V. Morgenstern" (Victoria Morgenstern). (See Exhibit 7).

12. I have prepared a chart detailing the flow of Chemical Trust investor funds from investor deposits in AIBC Bank through the European accounts of David Morgenstern and Gabriel MacEnroe to Yale Mortgage. (See Exhibit 8).   In sum, my analysis of deposits of investor funds shows that David Morgenstern transferred $2,800,000 of Chemical Trust funds to Gabriel MacEnroe's CCE and CCF accounts in Liechtenstein and Switzerland, just days after Virgil Womack was arrested in South Carolina.  At the time of the transfers, MacEnroe's

accounts had negligible balances. From January, 2000 to July, 2000, no other deposits were made into these MacEnroe accounts. On June 26 and 27, 2000, MacEnroe transferred approximately $348,000 of Chemical Trust funds to Yale Mortgage Corp. to satisfy David Morgenstern's pre-existing mortgage on his Estrella Circle, Boca Raton, Florida home.

## USE OF CHEMICAL TRUST FUNDS TO PURCHASE DAVID MORGENSTERN'S HOME IN BOCA RATON.

13. My analysis of AIBC bank records further confirms that Chemical Trust funds are also traceable to the initial payment for the 7534 Estrella Circle property when it was purchased by David Morgenstern in January, 2000.

14. From August, 1999 through January, 2000 and beyond, David Morgenstern had control of two bank accounts at AIBC Bank in the Bahamas; namely, the AFAC account described above, and another account called "Americas Fidelity Capital Management ("AFCM"). The AFCM account appears to have been opened a number of months prior to the opening of the AFAC account at AIBC. According to one AIBC document dated September 13, 1999 (contained in Exhibit 9 described below), David Morgenstern himself considered the AFCM account the "counterpart" of AFAC.

15. The AFCM account appears to have been the repository of other non-Chemical Trust funds. Prior to August 1999, the AFCM account received non-Chemical Trust funds amounting to several million dollars. According to AIBC bank records, a number of deposits appear to have been from investors in Morgenstern's AFCM investment program. In my opinion, the AFCM account appears to have been used by Morgenstern to operate another Ponzi scheme prior to and

10

during the Chemical Trust fraud.   Shortly after David Morgenstern began to receive the first

several million dollars of Chemical Trust monies in August, 1999 into the AFAC account,

periodic "interest" payments of Chemical Trust funds were made on David Morgenstern's orders

to apparent AFCM investors.  (I also know that David Morgenstern pled guilty to having used

$2.5 million in Chemical Trust funds to settle a lawsuit brought by the Lord Guernsey, Charles

Finch-Knightley, who according to British court documents invested $2.5 million in

Morgenstern's AFCM investment program.  Facts set forth by the Government during

Morgenstern's guilty plea, as well as testimony adduced during the Silvestri trial, demonstrates

that David Morgenstern routinely used Chemical Trust funds to pay settlements and satisfy

personal obligations).

16.  Victoria Morgenstern also maintained an account at AIBC called "Commercial

Holdings," and funds on deposit in that Commercial Holdings account were used by David

Morgenstern to purchase the Estrella Circle home in January, 2000.   (See Exhibit 9,

Commercial Holdings account statement and related correspondence.)   Specifically, AIBC bank

records reveal that on or about January 20, 2000, a check in the amount of $146,000 was drawn

on the Commercial Holdings account and made payable to the "Charles Jaffe Trust Account."

Based upon settlement documents generated in connection with the purchase of the Estrella

Circle property,  I know that Charles Jaffe served as the settlement attorney in that purchase

transaction, and that the $146,000 was used in payment for the property.

17.  At the time of the $146,000 payment out of the Commercial Holdings account, a

balance of $161,536.74 existed in the account, and the bulk of that balance originated months

earlier, when David Morgenstern ordered that $150,000 from his AFCM account be transferred

to his wife's Commercial Holdings account on September 13, 1999.  (David Morgenstern

11

ordered this transfer in the same AIBC document that he describes the AFCM account as

AFAC's "counterpart." (See Exhibit 9 ).

18.  Notwithstanding the fact that the $150,000 came from the AFCM account at AIBC,

and not the AFAC account,  the $150,000 was nonetheless traceable to the Chemical Trust fraud

because, at the time of the transfer of this $150,000, the AFCM account itself was in a sizeable

*negative* balance of over several hundred thousand dollars.   At that time, however, the AFAC

account at AIBC was being regularly credited with hundreds of thousands of dollars of incoming

Chemical Trust funds and had a sizeable *positive* balance of over $2,000,000.    After the

$150,000 transfer from AFCM to Commercial Holdings, the negative balance in the AFCM

account continued to grow, and was ultimately satisfied with a $2.2 million transfer of Chemical

Trust funds from AFAC at the end of 1999, when David Morgenstern ordered that the AFCM

account be closed and that AFAC become the "principal company used."

19.  It appears that although David Morgenstern maintained both the AFCM and AFAC

accounts at AIBC, the bank routinely paid AFCM "obligations" with AFAC funds and, in David

Morgenstern's own words, the accounts were considered "counterparts."  Given that

Morgenstern's principal source of funds in September 1999 through January 2000 was millions

of dollars of Chemical Trust funds, the interbank transfer of funds at his disposal to his wife's

Commercial Holdings account in September 1999 was, in reality, one made with and backed by

Chemical Trust funds.  This view is confirmed by the fact that the AFCM account was closed at

the end of 1999, when a bookkeeping entry was made zeroing out the AFCM account's negative

balance with a transfer of $2.2 million from the AFAC account.   Accordingly, the funds used by

Morgenstern to fund the purchase of his Estrella Circle home were also funds directly traceable to laundered Chemical Trust funds.   (See Flow Chart, Exhibit 8).

**CONCLUSION**

20.  Given my analysis of various bank records and other information related to the Chemical Trust fraud, I have concluded that in June, 2000, $348,007.81 traceable to laundered Chemical Trust fraud proceeds were transferred by Gabriel MacEnroe to Yale Mortgage in satisfaction of an outstanding mortgage held by Yale Mortgage on the Estrella Circle property, which is owned by David Morgenstern.   In addition, in January, 2000, $146,000 traceable to laundered Chemical Trust fraud proceeds was transferred by David Morgenstern from his wife's Commercial Holdings account at AIBC Bank, Nassau, Bahamas and used in making a payment toward the purchase and settlement of the Estrella Circle property.   Accordingly, the Estrella Circle property is subject to criminal forfeiture pursuant to Title 18, United States Code, Section 982(a).

Wendy Spaulding

Date: 7 | 19 | 0 3

Sworn to before me this 19 day of July, 2003.

Notary Public for the State of Arizona

My Commission Expires 6 / 30 2006

Jamie Davenport

Official Seal
NOTARY PUBLIC
STATE OF ARIZONA
County of Pima
JAMIE DAVENPORT
My Commission Expires June 30 2006

13

# EXHIBIT 1

# CIBC Canadian Imperial Bank of Commerce (Switzerland) Ltd

Staatsanwaltschaft

1 7. OKT. 2001

## AUTHORIZED SIGNATURES

Account No _21444_    Account Name _SLATTOCKS INVEST S.A._

Account holder(s)/Company name _SLATTOCKS INVEST S.A._    Signature(s) _____

Place and Date _November 12, 1998_

Attorney(s) :

| Full name | Signature | ind. | coll. by... | Signature Holder(s) |
|---|---|---|---|---|
| MORGENSTERN DAVID | | X | ☐ | |
| MORGENSTERN VICTORIA | W Morgenstern | ☐ | X | |
| Schumadel Walter | | ☐ | X | |
| OGDEN Jonathan | | | X | |

1.4.

# CIBC Canadian Imperial Bank of Commerce (Switzerland) Ltd

## AUTHORIZED SIGNATURES

Account No _____    Account Name _____

Account holder(s)/Company name _____    Signature(s) _____

Place and Date _____

Attorney(s) :

| Full name | Signature | ind. | coll. by... | Signature Holder(s) |
|---|---|---|---|---|
| | GOVERNMENT EXHIBIT 1 | ☐ | ☐ | |
| | | ☐ | ☐ | |

## MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS OF SLATTOCKS INVEST S.A., BVI

On November 12, 1998 there was held a Meeting of the Board of Directors at Usteri-strasse 19, 8001 Zurich of

### SLATTOCKS INVEST S.A., BVI
(„the Company")

Present at the meeting:   David A. Morgenstern, new President and Chairman
Victoria L. Morgenstern
Jonathan D. Ogden, new Treasurer
Walter Schumacher, Secretary

The Chairman then called the meeting to order and explained the he deemed it convenient for to business of the Company to appoint additional Officers and to designate the person(s) who may act on behalf of the Company regarding the bank account with CIBC Canadian Imperial Bank of Commerce (Suisse) S.A. in Zurich.

After a brief discussion of the matter brought before this meeting and upon motion duly made seconded, the following resolutions were unanimously approved:

### IT WAS RESOLVED:

Ruth Kellerhals and Urs E. Scholl resign as Directors of the Company as per today. Therefore, the following persons are appointed as new Directors:
Victoria L. Morgenstern
Jonathan D. Ogden  Treasurer
David A. Morgenstern shall be the President of the Company, Jonathan D. Ogden shall be the Treasurer.

The Officers are authorized to sign as follows:
David A. Morgenstern       single
Victoria L. Morgenstern       jointly
Jonathan D. Ogden       jointly
Walter Schumacher       jointly

There being no further business to come before, the meeting was adjourned and in witness therof these minutes have been issued, signed and sealed on the date and place above written.

David A. Morgenstern (Chairman)          (Walter Schumacher (Secretary)

Victoria L. Morgenstern          Jonathan D. Ogden (Treasurer)

# EXHIBIT 2



# NEUE BANK

LIECHTENSTEINER PRIVATBANK

Gegründet 1992



## UNTERSCHRIFTENKARTE

Konto-/Depotinhaber                                          Kundennummer

__Commercial Capital Establishment__                        106.540

Ich (Wir) erteile (n) hiermit folgenden Personen Vollmacht und anerkenne (n) die unten angeführten Bestimmungen sowie die
Allgemeinen Geschäftsbedingungen, von denen ich (wir) eine Ausfertigung erhalten habe (n).
Im übrigen gilt das Depotreglement sowie die weiteren Reglemente und Bestimmungen der Bank.

| Name und Vorname | Geb.Datum | einzeln oder kollektiv | Unterschrift |
|---|---|---|---|
| McEnroe Gabriel | 28.2.1944 | ~~EINZELN~~ *zu zweit* kollektiv | |
| BRODER Max | 8.2.1937 | ~~EINZELN~~ *zu zweit* kollektiv | |
| Matt Walter | | kollektiv *zu zweit* | |

### Vollmachtsbestimmungen

Diese Unterschriftenregelung gilt für sämtliche gegenwärtigen und zukünftigen Geschäftsbeziehungen mit der Bank unter
Vorbehalt separater Regelung für bestimmte Konti/Depots. Soweit ein oder mehrere Bevollmächtigte ernannt werden, gilt die
Vollmacht sofort, ohne das Recht der Substitution und bis zu einem an die Bank gerichteten schriftlichen Widerruf.

Bevollmächtigte können alle Rechte ausser dem erwähnten Recht der Substitution ausüben, die dem Vollmachtgeber selbst
zustehen. Sie sind unter anderem auch befugt, deponierte Wertpapiere usw. für Rechnung des Vollmachtgebers, eines Dritten
oder zu eigenen Gunsten zu verpfänden oder zu verkaufen, Darlehen irgendwelcher Art aufzunehmen, Verträge irgendwelchen
Inhaltes abzuschliessen sowie irgendwelche Rechtsgeschäfte durch die Vermittlung der NEUE BANK AG zu tätigen.

Es wird ausdrücklich bestimmt, dass eine erteilte Vollmacht mit dem Tod oder dem allfälligen Verlust der Handlungsfähigkeit
des/der Vollmachtgeber (s) nicht erlischt, sondern bis zu einem an die Bank gerichteten schriftlichen Widerruf in Kraft bleibt.

Wenn verschiedene Personen die Unterschrift führen, ist ausdrücklich anzugeben, ob jede Unterschrift einzeln für sich oder je
mehrere zusammen als rechtsgültig zu betrachten sind. Ohne gegenteilige Weisung erachtet die NEUE BANK AG jede Person
als einzeln zur rechtsgültigen Zeichnung berechtigt. Alle Rechtsbeziehungen des Kunden mit der Bank unterstehen dem
Liechtensteinischen Recht.

Commercial Capital Establishment

Vaduz, 27.11.1996
Ort und Datum

Unterschrift (An) des/der Konto-/Depotinhaber (s)

M. Broder                                   W. Matt

Neue Bank AG
Kirchstrasse 8
Postfach
FL 9490 Vaduz
Fürstentum Liechtenstein
Tel (075) 236 08 08
Fax (075) 232 92 60

GOVERNMENT EXHIBIT
2

22.wpd

## CERTIFICATE OF TRANSLATION

I, Paul W. Merriam, certify that I am competent to translate this document, and that the translation is true and accurate, to the best of my abilities.

English Title: Neue Bank - Signature Card.  27 November 1996

German Title: Neue Bank - Unterschriftenkarte.  27. November 1996

I certify, under penalty of  perjury, pursuant to 28 U.S.C. §1746, that the  attached translation is true and correct.

Executed this      day
of June, 2003

_____
Paul W. Merriam
Certified Translator for the German Language

**ANTIQUARIAT LITERARY SERVICES, Inc.**
**Member of the American Translators Association and the National Association of Judiciary Interpreters and Translators**

22.wpd                                                                                                                Page 2

2



# NEUE BANK

**LIECHTENSTEIN  ER PRIVATBANK**
Gegrün  det 1992

[Seal] **Liechtenstein District Court**

### SIGNATURE CARD

Account/Securities Account Holder

                                                                                                    Customer number

Commercial Capita Establishment                                             106.540

I/we herewith grant power of attorney to the following persons and acknowledge the conditions listed below, as well as the Standard Terms and Conditions, a copy of which I/we have received.

In addition, the regulations for securities accounts as well as any other regulations and provisions of the bank are applicable.

| First and Last Names | Date of Birth | Single or Joint | Signature |
|---|---|---|---|
| McEnroe, Gabriel | 28 February 1944 | ~~SINGLE~~ *one of two joint* | [illegible signature] |
| BRODER, Max | 8 February 1937 | ~~SINGLE~~ *one of two joint* | [illegible signature] |
| *Matt, Walter* | | *one of two joint* | [illegible signature] |

### Conditions for Power of Attorney

This signature arrangement is applicable to all present and future business relations with the bank, excluding a separate arrangement for certain accounts/securities accounts.  If one or more attorneys in fact are designated, the power of attorney is effective immediately, without the right of substitution, and until such time as a written revocation is submitted to the bank.

Attorneys in fact may exercise all rights to which the principal himself is entitled, except for the right of substitution, as mentioned.  They are, among other things, also authorized to pledge or sell securities etc. belonging to a third party and deposited at the expense of the principal, or for his own benefit, to obtain loans of any kind, to enter into contracts of any kind, and to conduct legal business brokered by NEUE BANK AG.

It is expressly provided that a power of attorney granted does not expire at the time of death or loss of capacity on the part of the principal, but remains in effect until such time as a written revocation is submitted to the bank.

If various persons are signatories, it must be expressly stated whether each signature alone or several joint signatures can be deemed legally valid.   Unless otherwise instructed, NEUE BANK AG will consider each person as an individually authorized signatory.  **All of the client's legal relationships with the bank are subject to Liechtenstein law.**

                                                         Commercial Capital Establishment

                                                    X

Vaduz, 27 November 1996____                    [illegible signature]
Location and Date                                     Signature(s) of account/securities account holder(s)

                                                    M. Broder                    W. Matt

3

Neue Bank AG
Kirchstrasse 8
Postfach
FL 9490 Vaduz
Fürstentum Liechtenstein
Tel. (073) 236 08 08
Fax. (073) 232 92 60
VAT No. 50.290

# NEUE BANK

LIECHTENSTEINER PRIVATBANK
Gegründet 1992



## Feststellung wirtschaftlich Berechtigte

Kontoinhaber

**COMMERCIAL CAPITAL ESTABLISHMENT**

Kunden-Nr.

106.540

Der/Die Unterzeichnete erklärt hiermit dass an den Vermögenswerten letzlich wirtschaftlich berechtigt ist/sind:

1. Name / Vorname        *O'Mac Euroe   Gabriel Francis*

   Geburtsdatum          *28. 2. 1944*

   Wohnadresse           *feldli strasse    29a*

   PLZ / Ort             *CH - 9000    St. Gallen*

   Domizilland           *CH*

   Nationalität          *Irland*

   Beruf / Branche       *Jngenieur / Tätig Beratung Finanzdienst-*
                                                *Leistung*

2. Name / Vorname

   Geburtsdatum

   Wohnadresse

   PLZ / Ort

   Domizilland

   Nationalität

   Beruf / Branche

Der/Die Unterzeichnete verpflichtet sich, Änderungen der Bank von sich aus schriftlich mitzuteilen.

---

> **Dieses Dokument bzw. die Daten werden nicht elektronisch erfasst,**
> **sondern physisch durch die Geschäftsleitung aufbewahrt.**

---

*Vaduz   13. 12. 2001*                COMMERCIAL CAPITAL ESTABL.

| Unterschrift Kontrolliert | Saldo OK |
|---|---|

Ort und Datum                        Unterschrift/en

12/00

NEUE BANK AG, Kirchstrasse 8, Postfach 1533, FL-9490 Vaduz, Fürstentum Liechtenstein
Tel. +423/236 08 08, Fax: +423/232 92 60, E-Mail: info@neuebankag.li, Homepage: http://www.neuebankag.li

4

## CERTIFICATE OF TRANSLATION

I, Paul W. Merriam, certify that I am competent to translate this document, and that the translation is true and accurate, to the best of my abilities.

English Title: Neue Bank - Determination of Economic Beneficiaries. 13 December 2001

German Title: Neue Bank - Feststellung wirtschaftlich Berechtigte. 13. Dezember 2001

I certify, under penalty of  perjury, pursuant to 28 U.S.C. §1746, that the attached translation is true and correct.

Executed this      day
of June, 2003

_____

Paul W. Merriam
Certified Translator for the German Language

**ANTIQUARIAT LITERARY SERVICES, Inc.**
**Member   of   the   American   Translators**
**Association and the National Association of**
**Judiciary Interpreters and Translators**

22.wp

5



# NEUE BANK
### LIECHTENSTEIN ER PRIVATBANK
Gegrün det 1992

[Seal] **Liechtenstein District Court**

**Determination of Economic Beneficiaries**

Account Holder

Member Number

COMMERCIAL CAPITAL ESTABLISHMENT                    106.540___

The undersigned herewith declares that the following individual(s) is/are ultimately the economic beneficiaries:

| | | |
|---|---|---|
| 1. | Name/First Name | *Mac Enroe Gabriel Francis* |
| | DOB | *28 February 1944* |
| | Street Address | *Feldlistrase 29a* |
| | Postal Code/City | *CH - 9000 St. Gallen* |
| | Country of Domicile | *Switzerland* |
| | Nationality | *Ireland* |
| | Occupation/Business | *Engineer / working as financial consultant* |
| | | |
| 2. | Name/First Name | — |
| | DOB | — |
| | Street Address | —— |
| | Postal Code/City | —— |
| | Country of Domicile | |
| | Nationality | —— |
| | Occupation/Business | —— |

The undersigned agrees to voluntarily inform the bank of any changes in writing.

| **This document, and the data in it are not recorded electronically, but are physically kept by management.** |
|---|

COMMERCIAL CAPITAL ESTABLISHMENT

*Vaduz, 13 December 2001*                    [illegible signature]
Place/Date                                          Signature(s)

| Signature checked | Balance OK |
|---|---|
| [illegible initials] | |

12/00

6

NEUE BANK AG, Kirchstrasse 8, Postfach 1533, FL-9490 Vaduz, Principality of Liechtenstein
Telephone +423/236 08 08, Fax: + 423/232 92 60, E-Mail: info@neuebankag.li, Homepage: http://www.neuebank.li



**Schweizerischer Bankverein**
**Société de Banque Suisse**
**Società di Banca Svizzera**
**Swiss Bank Corporation**

Stamm-Nr.    | LO - 252220 |

Commercial Capital Fin. AG

# RECHTSVERBINDLICHE UNTERSCHRIFTEN

| | |
|---|---|
| Name (Firmenbezeichnung) | Commercial Capital Finance AG |
| Geschäftsart | Bank- und Vermittlungsgeschäfte aller Art |
| Wohnort | St. Gallen |
| Genaue Adresse | Postfach 1618, Zwinglistrasse 6, 9000 St. Gallen |

Namen und Vornamen der zeichnungsberechtigten Personen mit Angaben, in welcher Eigenschaft sie zeichnen (ob als Geschäftsinhaber, Verwaltungsrat, Direktor, Prokurist, Handlungsbevollmächtigter usw.) und welcher Art die Zeichnungsberechtigung ist (Einzel- oder Kollektivunterschrift). Falls die Zeichnungsbefugnis dieser Personen nicht bereits dem Handelsregistereintrag zu entnehmen ist, wird diese Befugnis Ihnen hiermit ausdrücklich erteilt.

Jede Einschränkung der Zeichnungsbefugnisse muss ausdrücklich erwähnt werden, widrigenfalls die aus dem vorliegenden Verzeichnis sich ergebenden Befugnisse unbeschränkt gültig sind.

Die Handlungsbevollmächtigten sind ausdrücklich zur Unterzeichnung von Wechselengagements und zur Aufnahme von Darlehen ermächtigt.* (*Wenn nicht zutreffend, bitte streichen.)

Unabhängig von anderslautenden oder fehlenden Eintragungen im Handelsregister sind die in diesem Verzeichnis angeführten Unterschriftsberechtigungen so lange gültig, als sie nicht durch ausdrückliche Mitteilung an die Bank widerrufen werden.

Die Bank ist berechtigt, aber nicht verpflichtet, den Nachweis der Unterschriftsberechtigung zu verlangen.

| Namen, Vornamen, Zeichnungseigenschaften und Wohnort | Art der Zeichnungsberechtigung (einzeln oder kollektiv zu zweit) | Unterschriften |
|---|---|---|
| Broder Max<br><br>zeichnet als | kollektiv | |
| Mac Enroe Gabriel<br><br>zeichnet als | kollektiv | |
| <br>zeichnet als | | |
| <br>zeichnet als | | |
| <br>zeichnet als | | |

Die Echtheit und Gültigkeit der vorstehenden Unterschriften sowie die daraus sich ergebenden Befugnisse werden hiermit bezeugt.

St. Gallen, 27.11.1996     RH2-ae

Ort/Datum

Firmaunterschrift

| |
|---|
| Durch Geschäftsinhaber bzw. bei Aktiengesellschaften durch den Präsidenten und/oder Delegierten des Verwaltungsrates rechtsgültig zu unterzeichnen (einzeln oder kollektiv, je nach Art der Zeichnungsberechtigung). |

Commercial Capital Finance AG

Nicht durch Kontoinhaber zu unterzeichnen; lediglich durch Dritte vorgesehen (falls verlangt).
Ich/Wir bestätige(n) die Echtheit der obigen Unterschrift(en) sowie die Zeichnungsberechtigung dieser Person(en) für die rubrizierte Firma.

Ort/Datum                                          Unterschrift

Seite 2/2                    Stamm-Nr. | LO - 252,220 |

Kontoinhaber    **Commercial Capital Finance AG**

---

**Rahmenermächtigung für Treuhandanlagen**    (falls nicht gewünscht, bitte den ganzen Abschnitt durchstreichen)

Wir ermächtigen die Bank hiermit, im Rahmen unserer jeweiligen Guthaben, Anlagen auf treuhänderischer Basis im Namen der Bank, jedoch auf unsere Rechnung und Gefahr zu tätigen. Die Bank kann nach freiem Ermessen Schuldner, Betrag, Währung und Laufzeit wählen, solange sie von uns nicht oder nicht rechtzeitig (d.h. mindestens fünf Tage vor Verfall der dannzumal laufenden Anlage) anderslautende Instruktionen erhalten hat. Diese Ermächtigung unterliegt schweizerischem Recht. Allfällige Massnahmen des Landes der Währung und der Anlage bleiben vorbehalten. Für Einzelfirmen gilt die Rahmenermächtigung auch über den Tod oder die Handlungsunfähigkeit des Firmeninhabers hinaus.

---

## Konto-/Depotinstruktionen (gewünschte Dienstleistungen bitte ankreuzen)

| | | |
|---|---|---|
| Kontokorrent(e) | [X] Schweizer Franken (CHF) | [ ] US-Dollar (USD) |
| | [ ] Deutsche Mark (DEM) | [ ] Britische Pfund (GBP) |
| | [ ] Französische Franken (FRF) | [ ] Niederländische Gulden (NLG) |
| | [ ] | [ ] |
| andere Konten | [ ] | [ ] |
| Kontoauszüge | [X] halbjährlich | |
| Depot/Metallkonto | [ ] Wertschriften-/Metalldepot | [ ] Metallkonto |

**Besondere Instruktionen**

Referenzwährung:    CHF

---

**Allgemeine Bestimmungen und Gerichtsstand**

Eingänge in einer Währung, für die kein entsprechendes Konto besteht, sind, im Ermessen der Bank, einem bestehenden Konto gutzuschreiben oder in Originalwährung zu belassen. Die Bank ist namentlich auch ermächtigt, zur Verbuchung von Fremdwährungseingängen zusätzliche Konti auf den Namen des Kontoinhabers zu eröffnen.

Auf diese Konto-/Depotbeziehung sind zudem die folgenden Reglemente/Bedingungen anwendbar:

* Allgemeine Geschäftsbedingungen    * Edelmetallreglement

Wir haben diese Reglemente/Bedingungen in Kopie erhalten, zur Kenntnis genommen und anerkennen diese für uns als verbindlich.

Diese Konto-/Depotbeziehung untersteht dem schweizerischen Recht. Erfüllungsort, Betreibungsort für Personen mit Wohnsitz im Ausland und Gerichtsstand für alle im Zusammenhang mit dieser Konto-/Depotbeziehung entstehenden Streitigkeiten ist **St. Gallen**

Der Schweizerische Bankverein ist jedoch befugt, seine Rechte auch am Domizil des Kunden oder vor jeder anderen zuständigen Behörde geltend zu machen, wobei schweizerisches Recht anwendbar bleibt.

Wir beauftragen den Schweizerischen Bankverein, eine Rechnung gemäss den obgenannten Angaben zu eröffnen. Die Zeichnungsberechtigung über diese Rechnung ergibt sich aus dem separaten Unterschriftenverzeichnis.

Commercial Capital Finance AG

Ort/Datum   St. Gallen, 21.10.96      **Firma und Unterschrift(en)**

**Nur für bankinterne Zwecke**

D 09998 N  **V1**    11.95   E3   Unterschrift(en) geprüft/In meiner Gegenwart unterzeichnet:

P. Auer
2112 - 295

3 0. Aug. 2001

# CERTIFICATE OF TRANSLATION

I, Paul W. Merriam, certify that I am competent to translate this document, and that the translation is true and accurate, to the best of my abilities.

English Title: Form for Legally Binding Signatures - Swiss Bank Corporation. 27 November 1996

German Title: Formular für Rechtsverbindliche Unterschriften - Schweizerischer Bankverein. 27. November 1996

I certify, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the attached translation is true and correct.

Executed this      day
of June, 2003

—————————————————
Paul W. Merriam
Certified Translator for the German Language

**ANTIQUARIAT LITERARY SERVICES, Inc.**
**Member of the American Translators Association and the**
**National Association of Judiciary Interpreters and**
**Translators**

2

**Schweizerischer Bankverein**
**Société de Banque Suisse**
**Societa di Banca Svizzera**                                                    LO - 252220
**Swiss Bank Corporation**                              Member Number

Commercial Capital Fin. AG

**LEGALLY BINDING SIGNATURES**

| | |
|---|---|
| Name (name of company) | Commercial Capital Finance AG |
| Type of Business | Banking and brokerage services of any type |
| Residence | St. Gallen |
| Exact Address | Postfach 1618, Zwinglistrasse 6, 9000 St. Gallen |

First and last names of signatory, specifying capacity in which signatory is signing (whether as business owner, member of board of directors, director, holder of general power of attorney, authorized business representative, etc.) and type of signatory authorization (sole or joint signature). If the signature authorization for these persons cannot be concluded from the commercial register, such authority is herewith expressly granted to them.

Any limitation of signature authorization must be expressly indicated, otherwise the authorizations evident from the list on this document are valid without limitation.

Authorized business representatives are expressly authorized to sign promissory notes and obtain loans.* (* If not applicable, please cross out.)

Independent of otherwise worded or missing entries in the commercial register, the signature authorities listed in this record are valid until revoked by express notification of the bank.

The bank is authorized, but not obligated, to require proof of signature authorization.

| Name, First Name, Signature Capacities and residence | Type of signature authorization (sole or one of two joint signatures) | Signatures |
|---|---|---|
| Broder Max<br>signing as | joint | [illegible signature] |
| Mac Enroe Gabriel<br>signing as | joint | [illegible signature] |
| signing as | | |
| signing as | | |
| signing as | | |
| signing as | | |

The authenticity and validity of above signatures, as well as the authorizations resulting therefrom are herewith confirmed.

St. Gallen, 27 November 1996        RH2-ae                Company Signature

Location/
Date

Commer
cial
Capital Finance AG

To be signed legally valid (individually or jointly, depending on type of signature authorization) by business owner, and, for stock corporations, by the president and/or the delegate of the board of directors

[illegible signatures]

3

Not to be signed by account holder; only intended for third parties (if required).

I/we are confirming the authenticity of the above signature(s) as well as the signature authorization of this/these person(s) for the company in the heading.

Location/Date                                    Signature

**Only for bank internal purposes**

                                                                                                **P. Auer**
D 27310 N            VD 06.95 E2         Signature(s)  examined/signed in my presence:_____ *P. Auer*   **RH2-295**

                                                                        **30 August 2001**

4

L0 - 252.220

page 2/2                              Member Number

Account holder     Commercial Capital Finance AG

**Outline authorization for Trust Investments** (if not desired, please cross out entire paragraph)
We herewith authorize the bank to execute investment transactions with our respective credit balances, on a trust basis, in the name of the bank but at our expense and our risk. The bank may, at its own discretion, choose the debtor, the amount, the currency and duration, as long as it has not been instructed by us otherwise or in a timely manner (i.e., at least five days prior to maturity of the current investment). This authorization is subject to Swiss law. Any possible measures by the country of the currency and investment chosen are reserved. For individual businesses, the outline authorization is valid even beyond the business owner's death or incapacity to act.

**Account/Securities Account Instructions** (please mark services requested)

Current account(s) ☒ Swiss Francs (CHF)          ☐ US-Dollar (USD)
                   ☐ German Mark (DEM)          ☐ British Pound (GBP)
                   ☐ French Franks (FRF)        ☐ Dutch Gilder (NLG)
                   ☐                            ☐
Other accounts     ☐                            ☐
Account statements         ☒ semi-annually
Securities/Metal account   ☐ Securities/Metal Securities      ☐ Metal account
                                Account

Special Instructions

Reference Currency:        CHF

**General Provisions and Place of Jurisdiction**
Deposits in a currency for which no specific account exists, shall, at the bank's discretion be credited to an existing account or left in the original currency. The bank is also expressly authorized to establish additional accounts in the name of the account holder for posting foreign currency deposits.

The following Regulations/Conditions are applicable to this account/securities account relationship:

      - General Terms and Conditions                - Precious Metal Regulations

We have received a copy of these regulations/conditions, have reviewed them and acknowledge them as binding.

This account/securities account relationship is subject to Swiss law. Place of fulfillment, place of operation for individuals with a foreign residence, and place of jurisdiction for all disputes arising in connection with this account/securities account relation is
St. Gallen
The Swiss Bank Corporation is, however, also authorized to exercise its rights at the client's domicile, or before any other appropriate authority, with Swiss law remaining applicable.

We are instructing the Swiss Bank Corporation to set up accounting in accordance with the information provided above. The signature authorization for this accounting is set forth in the separate signature record.

                              Commercial Capital Finance AG

5

[illegible signature]

Location/Date St. Gallen, 21 October 1996          Company and signature(s)

**For bank internal purposes only**

                                                                    P. Auer
D 09998 N          V1 11.95 E3        Signature(s) examined/signed in my presence:          *P. Auer*      **RH2-295**

                                                                    **30 August 2001**

# EXHIBIT 3

# COMMERCIAL CAPITAL FINANCE AG

Postfach
CH-9001 St. Gallen
Tel: +41 71 220 18 18   Fax: +41 71 220 18 19

26th June 2000

Yale Mortgage Corporation
777 Arthur Godfrey Road
Miami Beach
Florida 33140
USA

Attention Christine Ellingsworth

Reference Property address 7534 Estrella Circle
Boca Raton FL 33433 / Mrs. V. Morgenstern

Dear M/S Ellingsworth,

We have to-day Swift wired, to the coordinates as per your fax of June 23rd the sum of USD 348,007.81. This takes into account interest due or to become due up until close of business to-morrow 27th. Due to time differences this should be ample time for the Swift wire to arrive at your bank.

We will instruct a Florida attorney to file the appropriate documents registering our Security interest in the property. May we ask you, until we advise you whom we shall use that you hold all documents such as title deeds, insurance polices, etc. at your institution to our order in the meantime and to take instruction only from us in writing as to the holding of these documents.

If you have any queries with this please either fax or call us otherwise we will take it that you accept our instruction.

Yours sincerely

Gabriel MacEnroe

GOVERNMENT
EXHIBIT
3

# EXHIBIT 4

OR 12899 PJ 376

## PROMISSORY NOTE

$348,000.00

Boca Raton, Florida
August 5, 2000
SETTEMBER

    FOR VALUE RECEIVED the undersigned, Victoria Morganstern, as Maker, promises to pay to the order of Commercial Capital Finance AG, or the Payee or Holder hereof at Postfach CH – 19001, St. Gallen, Switzerland, the principal sum of Three Hundred Forty-Eight Thousand Dollars ($348,000.00) together with interest thereon at a rate equal to United States Libor as quoted London, England, second fixing plus two (2%) percent per annum.

    THIS IS A BALLOON NOTE AND FINAL PAYMENT OF THE BALANCE DUE ON MATURITY, BEING SEPTEMBER 28, 2000, IS $348,000.00 TOGETHER WITH ACCRUED INTEREST AND ALL ADVANCES MADE UNDER THE TERMS OF THIS PROMISSORY NOTE.

    This Note is secured by a Mortgage of even date with all such terms and provisions of said Mortgage being incorporated herein.

    All of the principal and interest due may be prepaid at any time without penalty, provided however, that all interest accrued and unpaid as of the date of such prepayment shall be due and payable and shall be paid at the time of and together with any such partial or full prepayment. Principal and/or interest not paid within ten (10) days of the due date as contained in this Note shall be subject to, and it is agreed Payee shall collect and therewith, a "late charge" in the amount of three percent (3%) per month for each such delinquent principal payment. Said "late charge" shall be immediately due and payable and should be paid by the Maker without notice or demand to Payee hereof.

    The happening of any of the following events shall constitute a default hereunder:

    1.    Failure of Makers to pay any principal or interest when due within thirty (30) days of the due date under the terms of this Note;

    2.    The filing of any petition under the Bankruptcy Code, or any similar federal or state statute, by or against any Maker;

    3.    Failure of Maker to perform any other agreement in this Note, or in the instrument securing this Note, being that certain Mortgage Agreement;

    4.    Any sale, transfer, conveyance or refinancing of the mortgage property securing this Note in violation of the terms and provisions as are contained in said Mortgage Agreement being paragraph 16 as contained in said Mortgage.



GOVERNMENT EXHIBIT

4

OR# 12888 Pg 377

If a default occurs in the payment of any principal or interest when due under this note then at the option of the Holder of this note, the entire principal sum then remaining unpaid and accrued interest shall immediately become due and payable without notice, time being of the essence; and said principal sum and accrued interest shall both bear interest from such date at the highest rate permitted by law until paid, it being agreed that interest not paid when due shall at the option of the Payee or Holder hereof be added to the principal and draw interest at the rate provided in this paragraph. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

Nothing herein contained nor any transaction related hereto shall be construed or so operate as to require the Maker or any person liable for repayment of the same to pay interest at a greater rate than is lawful in such case to contract for, or to make any payment or to do any act contrary to law. Such rate of interest shall never exceed the maximum legal rate of interest which shall be permitted under the laws of the State of Florida, as modified, enlarged or superseded by Federal law, rule or regulation; and if such rate of interest, computed in the amount hereinabove provided for, shall exceed the same maximum legal rate, then said rate of interest shall be automatically reduced to such maximum legal rate. Should any interest or other charges paid by the Maker or parties liable for the payment of this note in connection with the loan evidenced by this note result in the computation or earning of interest in excess of the maximum legal interest which is legally permitted under the laws of the State of Florida, as modified, enlarged or superseded by Federal law, rule or regulation, then any and all such excess shall be and the same is hereby waived by the Payee and any and all such excess shall be void automatically *ab initio* from the date of this note and the date of the payment credited against and in reduction of the principal balance due under this indebtedness and a portion of said excess which exceeds the balance due under this indebtedness shall be paid by the Payee to the Maker and parties liable for the payment of this note.

The Maker liable hereon hereby waives presentment, protest, notice of protest and notice of dishonor and agrees to pay all costs, including a reasonable attorney's fee, whether or not an action or suit be brought, for services of counsel employed by Payee after maturity or default, to collect on this note or any principal or interest due hereunder and Maker further agrees, if an action is brought, to pay all costs thereof, and further to pay all costs in and for the services of counsel employed on appeal.

Wherever used herein the terms Holder, Maker and Payee shall be construed in the singular and plural as the context may require or admit.

This note is executed under seal and constitutes a contract under the laws of the State of Florida and shall be enforceable in any court of competent jurisdiction in the State of Florida.

WITNESSES:

_(signatures)_

MAKER:

_(signature)_

VICTORIA MORGENSTERN

2

OR 12000 Pg 370
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing document was acknowledged before me on this 5 day of
September, 2000, by Victoria Morgenstern.

NOTARY PUBLIC
State of Florida

My Commission Expires:

_____ Personally known
__v__ Produced _Drivers License_ as identification



3

OR 12060 P, 370
Doc   344,002.00 Inc  1,516.00
Int   696.00

# MORTGAGE

THIS MORTGAGE made this 5TH day of SEPTEMBER , 2000, by and between David Alan Morgenstern and Victoria Morgenstern, husband and wife, hereinafter referred to collectively as "Mortgagor," and Commercial Capital Finance AG, hereinafter referred to as "Mortgagee;"

## WITNESSETH:

Mortgagor, in consideration of the aggregate sums named in the Promissory Note hereinafter described, does hereby grant, bargain, sell, convey, mortgage and encumber unto Mortgagee the following property situate in Palm Beach County, Florida:

Lot 94, of Estancia IV, of Via Verde, P.U.D. according to the plat thereof as recorded in Plat Book 35, Page 69 of the public records of Palm Beach County, Florida.

**MORTGAGOR HEREBY STATES UNDER OATH THAT THE ABOVE-DESCRIBED PROPETY IS THE LAWFUL HOMESTEAD PROPERTY OF THE MORTGAGOR AND THAT THEY PERMANENTLY RESIDE ON THE PROPERTY.**

Parcel ID No.: 00-42-47-16-13-000-0940
Property Location: 7534 Estrella Circle, Boca Raton, FL 33433

PROVIDED ALWAYS, that if Mortgagor shall promptly pay to Mortgagee the amount set forth in the Promissory Note, a copy of which is attached hereto and made a part hereof by reference as Exhibit "A", and if Mortgagor shall faithfully and promptly comply with and perform each and every covenant and provision hereof, then this Mortgage shall be void, but otherwise shall remain in full force and effect.

AND MORTGAGOR does hereby covenant and agree as follows:

1.    That Mortgagor is the owner of the mortgaged property with full power and right to mortgage same, and said property is free from all liens and encumbrances as of the date of this Mortgage. Mortgagor does hereby fully warrant the title to said property and will defend it against the lawful claims of all persons whomsoever.

2.    To pay the sums of money agreed by this Mortgage and said Promissory Note to be paid and any extensions or renewals thereof according to the true effect and meaning thereof and in conformity with all of the terms, provisions and conditions as agreed therein.

3.    To pay all taxes, assessments, levies, liabilities, liens, obligations and encumbrances of every kind and nature on the mortgaged property before delinquency. If Mortgagor fails to pay the same before delinquency, Mortgagee may pay the same and charge Mortgagor as provided in Paragraph 14 hereof.

4.    To keep the mortgaged property insured against loss or damage by fire and all perils insured against by an extended coverage endorsement, and such other risks and perils including, but

Prepared by and return to:  D. Jay Snyder, PA
6529 Central Avenue
St. Petersburg, Fl. 33710

not limited to hurricane, windstorm, water and flood damage, as Mortgagee in its discretion may require. The policy or policies of such insurance shall be in the form in general use from time to time in the locality in which the mortgaged property is situated, shall be in such amount as shall equal the full replacement value of the mortgaged property or as Mortgagee may reasonably require, shall be issued by a company or companies approved by Mortgagee, and shall contain a standard mortgagee clause with loss payable to Mortgagee. Whenever required by Mortgagee, such policies shall be delivered immediately to and held by Mortgagee. Any and all amounts received by Mortgagee under any of such policies may be applied by Mortgagee on the indebtedness secured hereby in such manner as Mortgagee may, in its sole discretion, elect or, at the option of Mortgagee, the entire amount so received or any part thereof may be released. Mortgagee hereby agrees that any and all proceeds received by Mortgagee or Mortgagee under said insurance Policy shall be delivered to Mortgagor provided Mortgagor shall rebuild and/or restore any and all damage to the mortgaged property within 90 days from receipt of the insurance proceeds. Neither the application nor the release of any such amounts shall cure or waive any default. Upon exercise of the power of sale given in this Mortgage or other acquisition of the mortgaged property or any part thereof by Mortgagee, such policies shall become the absolute property of Mortgagee. If Mortgagor shall fail to insure the mortgaged property as required under the terms of this Paragraph, Mortgagee may do so and charge Mortgagor as provided in Paragraph 14 hereof.

5.     That Mortgagor shall be in default under this Mortgage upon the happening of any of the following events or conditions:  (a) failure or omission to pay before delinquency the said Promissory Note in accordance with the terms thereof or default in the payment or performance of any obligations, covenant, agreement or liability contained or referred to herein; (b) any warranty, representation or statement made or furnished to Mortgagee for the purpose of inducing Mortgagee to accept this Mortgage or to make any extension of the obligations secured hereby, by or on behalf of Mortgagor (or any of them, if more than one), proves to have been false in any material respect when made or furnished. Upon the occurrence of any such default or at any time thereafter, Mortgagee may, at the option of Mortgagee, declare the whole amount of principal and interest provided for in and by the Promissory Note secured hereby, immediately due and payable without demand or notice of any kind to any person, and the same thereupon shall become immediately due, payable and collectible (by foreclosure or otherwise) at once and without notice to Mortgagor. Upon the happening of any default of this Agreement or default in the Promissory Note secured hereby, Mortgagor shall have 14 days to cure said default after receipt of written notice from Mortgagee prior to Mortgagee's enforcement of any remedies contained herein or in the Promissory Note secured hereby.

6.     To pay, in the event of a default under the terms of this Mortgage or the Promissory Note which it secures, or any renewals or extensions thereof, all costs, expenses (including but not limited to expenses of appraisals, expert witness fees and discovery costs) and reasonable attorney fees incurred in the collection hereof (whether by suit or otherwise), including those costs, expenses and reasonable attorney fees incurred in appellate proceedings.

7.     To keep the mortgaged property in good order and repair and to commit, permit and suffer neither strip nor waste of said property.  Upon failure of Mortgagor to keep said property in good order and repair, Mortgagee may, at the option of Mortgagee, procure the repairs to be made, otherwise restore the premises to good order, and charge Mortgagor with the costs and expenses incurred thereby, as provided in Paragraph 14 hereof.

2



8.     That in the event the mortgaged property or any part thereof be taken under the power of eminent domain, Mortgagee shall have the right, whether the value of Mortgagee's security be impaired by the taking or not, to demand and receive all sums awarded for the taking of or damages to said property (including but not limited to severance and business damages) up to the amount then unpaid on the obligations secured hereby and to apply the same upon the payments last due thereon. Failure by Mortgagor to cause delivery to Mortgagee of such sums, after demand by Mortgagee, shall constitute a default within the meaning of Paragraph 5 hereof.

9.     That in the event any suit is instituted upon this Mortgage, or to foreclosure or reform it, or to enforce payment of any claim hereunder, Mortgagee shall have the right to the appointment of a receiver, without notice, of the mortgaged property, including the rents, income, profits, issues and revenues thereof. Such receiver shall have all the powers in anywise entrusted by a court to a receiver. Such appointment shall be made by the court as an admitted equity and absolute right to Mortgagee, and without reference to the adequacy or inadequacy of the value of the mortgaged property or to the solvency or insolvency of the Mortgagor or of the other defendants, and said rents, profits, income, issues and revenues shall be applied to the debts secured hereby.

10.     As further and additional security for the performance of the terms and conditions of this Mortgage and for the payment of the Promissory Note and other obligations which this Mortgage secures, Mortgagor hereby agrees that in case of default in any of the payments stipulated in the said Promissory Note, and so long as such default continues or in the event Mortgagor be in default under any of the provisions, covenants and agreements of this Mortgage, Mortgagee is hereby authorized and empowered, by its servants, agents or attorneys, to enter on the mortgaged property and to collect and receive the rents and profits therefrom, and to apply the same to the payment of amounts due on the obligations secured hereby; and for this purpose, Mortgagor hereby assigns, transfers and sets over to Mortgagee the rents and profits accruing from the mortgaged property during the period of such default. The exercise of rights under this paragraph shall neither impair nor constitute a waiver of any other rights or remedies which Mortgagee may have under the terms of this Mortgage or otherwise, but the remedy hereby given shall be in addition to others which Mortgagee may have. Rental payments made pursuant to the provisions of this paragraph by a lessee of the mortgaged property to Mortgagee shall fully acquit the lessee to the extent of the payments so made.

11.     Mortgagor further agrees that no waiver by Mortgagee of any default shall operate as a waiver of any other default or of the same default on a future occasion; that the exchange, release, surrender or sale of all or any real property or collateral which may be given or may have been given to assure the repayment of the Note and other obligations secured hereby shall not release or discharge any Mortgagor.

12.     To pay immediately all costs, expenses (including but not limited to appraisal fees, expert witness and all costs of discovery) and reasonable attorney fees incurred (whether in legal proceedings or otherwise) by Mortgagee (including those costs, expenses and reasonable attorney fees incurred in appellate proceedings) by reason of the assertion or institution by any person other than Mortgagee of any claim, demand, action or proceeding concerning or affecting the mortgaged property or the lien created hereby. If Mortgagor shall fail to pay the sums required by this paragraph to be paid, Mortgagee may pay the same and charge Mortgagor as provided in Paragraph 14 hereof.

3



13.    That if Mortgagor defaults in any of the covenants or agreements contained herein or in said Promissory Note, Mortgagee may perform the same or procure their performance without waiving or affecting the option to foreclosure or any right hereunder, and all payments and expenditures (including reasonable attorney fees as herein provided) made by Mortgagee in so doing shall be charged to Mortgagor shall become immediately due and payable, shall bear interest at the highest rate allowed by law and together with interest and costs accrued thereon, shall be added to and become part of the obligations which this Mortgage secures.

14.    That this Mortgage secures the payment of said Promissory Note and obligation at the date hereof; that this Mortgage secures the payment of any other amount or amounts that may be added to the Mortgage obligations and indebtedness under the terms hereof and any amount or amounts due or to become due by reason of any extension or renewal of said Promissory Note.

15.    That time is of the essence hereof, Mortgagor waives all rights of homestead and other exemptions granted by the constitution and laws of Florida. The terms "Mortgagor" and "Mortgagee" as used herein shall include their respective heirs, devisees, personal representatives, grantees, successors and assigns. Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the use of any gender shall include all genders. The terms "person" and "party" shall include individuals, firms, associations, joint ventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations and all other groups or combinations. The term "Promissory Note" shall include that certain Promissory Note dated of even date herewith and all renewals thereof and any and all Promissory Notes which this Mortgage secures. The parties hereto agree that the term "fixtures" shall be deemed to include, but not be limited to, all heating, lighting, plumbing, ventilating, refrigerating, air conditioning and sprinkling apparatus, water and power systems, appliances, motors, ovens, ranges, cabinets, and water heaters.

16.    Upon any sale, transfer, conveyance or refinancing of either an equitable or a legal interest in the property described and set forth herein to any person, firm or corporation, Mortgagee or holder shall have the right to accelerate the maturity of this Mortgage and Promissory Note as though it were due and payable on the day of such transfer and to demand payment in full of the principal sum expressed in the Promissory Note, together with all other sums therein as well as herein provided for or secured hereby, and to exercise all the rights and remedies herein or by law reserved to Mortgagee the same as in any event or by default hereunder, anything in the Promissory Note or herein to the contrary notwithstanding. For the purposes of construing this paragraph, a sale, transfer or conveyance of property shall be deemed to include, but shall not be limited to, outright sale, agreement for deed, assignment of beneficial interest or wrap around mortgage. The refinancing of the property shall be deemed to include the execution of any Mortgage which encumbers the property set forth herein save and except the Mortgage and Promissory Note provided by this Agreement. Mortgagor acknowledges that the consideration to Mortgagee for the agreement to lend the sum evidenced by the Promissory Note and other sums secured hereby included and includes substantial inducements, the value of property and the financial statements of Mortgagor; and the personal moral and ethical integrity as well as the perceived innate ability of Mortgagor or the principals of Mortgagor. It is the purpose of this paragraph to grant to Mortgagee, at the time of such a sale, transfer or conveyance, the right to the return of all sums evidenced by the Promissory Note as well as other sums secured hereby.

4



ORB 12899 P; 374

17.    That in the event the ownership of the property or any part of it becomes vested in a person other than the Mortgagor, the Mortgagee, without notice to the Mortgagor, may deal with the successor or successors in interest with reference to this Mortgage and the debt secured hereby in the same manner as with the Mortgagor, and may forebear to sue or may extend time for payment of the debt secured, without discharging or in any way affecting the liability of the Mortgagor under this Mortgage or upon the debt secured.

18.    This Mortgage and the Promissory Note secured hereby shall be construed under Florida law.

19.    If any party desires to give notice to the other, or if any notice is required pursuant to the terms of this Agreement, such notice shall be in writing and be deemed given when hand delivered or deposited in the United States mail, postage pre-paid, certified mail, addressed to the Mortgagee at Commercial Capital Finance AG, c/o D. Jay Snyder, Esquire, 6529 Central Avenue, St. Petersburg, FL 33710, and to the Mortgagor at 7534 Estrella Circle, Boca Raton, FL 33433.

IN WITNESS WHEREOF, Mortgagors have signed and sealed this Mortgage the date above written.

In the presence of:

_____          _____
Anna Marie Rosser                          DAVID ALAN MORGENSTERN,
                                           Mortgagor

_____          _____
Margaret Antoon                            VICTORIA MORGENSTERN,
                                           Mortgagor

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing document was acknowledged before me on this  5  day of
September, 2000, by David Alan Morgenstern, who executed the same freely and voluntarily
for the purposes therein expressed.

_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

_____ Personally known
__✓__ Produced _Drivers License_ as identification

5

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing document was acknowledged before me on this 5 day of
September, 2000, by Victoria Morgenstern, who executed the same freely and voluntarily for
the purposes therein expressed.

_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

_____ Personally known
__✓__ Produced Drivers License as identification

6

# EXHIBIT 5

## RENEWAL PROMISSORY NOTE

$405,734.71

Pompano Beach, Florida
30 January 2001

FOR VALUE RECEIVED the undersigned, David Alan Morgenstern, as Maker, promises to pay to the order of Commercial Capital Finance AG, or the Payee or Holder hereof at Postfach CH - 19001, St. Gallen, Switzerland, the principal sum of Four Hundred Five Thousand Seven Hundred Thirty-Four Dollars and Seventy-One Cents ($405,734.71) together with interest thereon at a rate equal to United States Libor as quoted London, England, second fixing plus two (2%) percent per annum.

THIS IS A BALLOON NOTE AND FINAL PAYMENT OF THE BALANCE DUE ON MATURITY, BEING MARCH 28,2001, IS $405,734.71 TOGETHER WITH ACCRUED INTEREST AND ALL ADVANCES MADE UNDER THE TERMS OF THIS PROMISSORY NOTE.

This Note is secured by a Mortgage dated September 5, 2000, recorded in Official Records Book 12000, Page 370-378, Palm Beach County, Florida, with all such terms and provisions of said Mortgage being incorporated herein.

All of the principal and interest due may be prepaid at any time without penalty, provided however, that all interest accrued and unpaid as of the date of such prepayment shall be due and payable and shall be paid at the time of and together with any such partial or full prepayment. Principal and/or interest not paid within ten (10) days of the due date as contained in this Note shall be subject to, and it is agreed Payee shall collect and therewith, a "late charge" in the amount of three percent (3%) per month calculated only on the amount of such delinquent principal payment due that month. Said "late charge" shall be immediately due and payable and should be paid by the Maker without notice or demand to Payee hereof.

The happening of any of the following events shall constitute a default hereunder:

1.  Failure of Maker to pay any principal or interest when due within thirty (30) days of the due date under the terms of this Note;

2.  The filing of any petition under the Bankruptcy Code, or any similar federal or state statute, by or against any Maker;

3.  Failure of Maker to perform any other agreement in this Note, or in the instrument securing this Note, being that certain Mortgage Agreement;

4.  Any sale, transfer, conveyance or refinancing of the mortgage property securing this Note in violation of the terms and provisions as are contained in said Mortgage Agreement being paragraph 16 as contained in said Mortgage.

If a default occurs in the payment of any principal or interest when due under this note then at the option of the Holder of this note, the entire principal sum then remaining unpaid and accrued interest shall immediately become due and payable without notice, time being of the essence; and said principal sum and accrued interest shall both bear interest from such date at the highest rate permitted by law until paid, it being agreed that interest not paid when due shall at the option of the Payee or Holder hereof be added to the principal and draw interest at the rate provided in this paragraph. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

1



GOVERNMENT EXHIBIT
5

Nothing herein contained nor any transaction related hereto shall be construed or so operate as to require the Maker or any person liable for repayment of the same to pay interest at a greater rate than is lawful in such case to contract for, or to make any payment or to do any act contrary to law. Such rate of interest shall never exceed the maximum legal rate of interest, which shall be permitted under the laws of the State of Florida. As modified, enlarged or superseded by Federal law, rule or regulation; and if such rate of interest, computed in the amount hereinabove provided for, shall exceed the same maximum legal rate, then said rate of interest shall be automatically reduced to such maximum legal rate. Should any interest or other charges paid by the Maker or parties liable for the payment of this note in connection with the loan evidenced by this note result in the computation or earning of interest in excess of the maximum legal interest which is legally permitted under the laws of the State of Florida, as modified, enlarged or superseded by Federal law, rule or regulation, then any and all such excess shall be and the same is hereby waived by the Payee and any and all such excess shall be void automatically *ab initio* from the date of this note and the date of the payment credited against and in reduction of the principal balance due under this indebtedness and a portion of said excess which exceeds the balance due under this indebtedness shall be paid by the Payee to the Maker and parties liable for the payment of this note.

The Maker liable hereon hereby waives presentment, protest, notice of protest and notice of dishonor and agrees to pay all costs, including a reasonable attorney's fee, whether or not an action or suit be brought, for services of counsel employed by Payee after maturity or default, to collect on this note or any principal or interest due hereunder and Maker further agrees, if an action is brought, to pay all costs thereof, and further to pay all costs in and for the services of counsel employed on appeal.

Whenever used herein the terms Holder, Maker and Payee shall be construed in the singular and plural as the context may require or admit.

This note is executed under seal and constitutes a contract under the laws of the State of Florida and shall be enforceable in any court of competent jurisdiction in the State of Florida.

WITNESSES:                                    MAKER:

Witness: _Elena Pullina_

Witness: _Phyllis Graner_                   _____
                                            DAVID ALAN MORGENSTERN

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing document was acknowledged before me on this the 30th day of January 2001, where David Alan Morgenstern produced Florida Driver's License Number M625-161-48-388-0, as his identification.

_____
NOTARY PUBLIC
State of Florida
My Commission Expires:

DIANA K. FELTZ
COMMISSION # CC784477
EXPIRES NOV 01, 2002
BONDED THROUGH
ADVANTAGE NOTARY

2

# EXHIBIT 6

```
9000 ST.GALLEN            27.06.2000
TEL. 071/225 25 25
REF. ED84 179 ZE 8230286  RBC/GAK                                        61T
BUCHUNGSDATUM 27.06.00
                                    COMMERCIAL CAPITAL
                                    FINANCE AG
                                    POSTFACH
                                    9001 ST. GALLEN


BELASTUNGSANZEIGE



                                           KONTO NR.    254-L0252220.2

                                                          USD-KONTO

AUFTRAG                             VERGUETET DURCH
BEGUENSTIGTE(R)                     REP.NATIONAL BANK OF NEW YORK
5200006335                          US MIAMI BR.OFFICE
YALE MORTGAGE CORPORATION
777 ARTHUR GODFREY ROAD
MIAMI BEACH FLORIDA 33140


ZAHLUNGSGRUND
REF.7534 ESTRELLA CIRCLE BOCA
RATON FL.33433 MRS.V.MORGENSTERN
```

|  |  |  |
|---|---|---|
| SPESEN | USD | 15.37 |
| VAL. 27.06.00 | USD | **15.37 |

GOVERNMENT EXHIBIT 6

| VAL. 27.06.00 | USD | **98,007.81 |
|---|---|---|

# EXHIBIT 7

FÜRSTENTUM LIECHTENSTEIN
TEL. (075) 236 08 08    FAX (075) 232 92 60

*Commercial Capital Establishment*
*Vaduz*

(6 078)

**VERGUETUNGSAUFTRAG**
**PAYMENT ORDER**
**ORDRE DE PAIEMENT**

Kundennummer/Account number/Compte numéro

*00106540 - 00 · 00 - 333*

ERLEDIGT
26.6.00

Bitte vergüten Sie zu Lasten des Kontos Nr.
Please debit the account no.
Veuillez payer par le débit du compte no    *00106540 · 00 · 00 - 333*

| Währung/Betrag<br>Currency/Amount<br>Monnaie/Montant | Begünstigter<br>Beneficiary<br>Bénéficiaire | Bankverbindung oder Postchecknummer/Zahlungsgrund<br>Bank connection or postal giro number/Details of payment<br>Relation bancaire ou No CCP/motif du paiement |
|---|---|---|
| USD 250'000.- | *Vale Mortgage Corp*<br>*Miami Beach Florida* | *Republic National Bank of New York*<br>*US Miami Branch Office    BLICUS33* |
| *(zweihundert-*<br>*funfzig tausend*<br>*USD)* | | *Konto Nr. 52 00006335*<br>*Ref. 7534 Estrella Circle Boca Raton* |
| *Spm 6.50* | *Valuta 26.6 2000* | *Florida 33433/Mrs. V. Morgenstern* |
| *km 125.-* | *Zahlung per Swift* | *Routing Nr. 021004823* |

Beilage(n):    _____ Einzahlungsschein(e)
Enclosure(s):    _____ Pay-in slip(s)
Annexe(s):    _____ bulletin(s) de versement

Ort und Datum/Place and Date/Lieu et Date

Unterschrift/Signature

GOVERNMENT EXHIBIT
7

# EXHIBIT 8

# TRACING OF CHEMICAL TRUST INVESTOR FUNDS TO YALE MORTGAGE PAYMENTS
## FOR 7534 ESTRELLA CIRCLE PROPERTY BOCA RATON, FLORIDA



CHEMICAL TRUST
INVESTOR FUNDS

ALLIANCE TRUST
ADMIRALTY BANK AC# 300137656

$3.378 MILLION SEPT. 1999 – OCT. 1999

$2.8 MILLION AUGUST 10, 1999

AMERICAS FIDELITY ASSURANCE CO.
AMERICAS INTERNATIONAL BANK
BAHAMAS AC# 105500

$1.5 MILLION 10/11/99

$1.3 MILLION 10/18/99

SLATTOCKS INVEST S.A.
CANADIAN IMPERIAL BANK OF COMMERCE
SWITZERLAND AC# 21444

$1.437 MILLION 1/14/00

$1.425 MILLION 1/14/00

COMMERCIAL CAPITAL ESTABLISHMENT
NEUE BANK  LIECHTENSTEIN
AC# 00106540-00-00-333

COMMERCIAL CAPITAL FINANCE
UBS BANK  SWITZERLAND
AC# 254-L025220.2

$250,000  6/26/00

$98,008  6/28/00

PAYMENTS TO YALE MORTGAGE FOR
7534 ESTRELLA CIRCLE PROPERTY
BOCA RATON, FLORIDA



GOVERNMENT
EXHIBIT
8

**TRACING OF CHEMICAL TRUST INVESTOR FUNDS TO DOWN PAYMENT
ON 7534 ESTRELLA CIRCLE PROPERTY BOCA RATON, FLORIDA**



NOTE A: BALANCE IN AFCM ACCOUNT AT 9/16/99 WAS ($856,162).  $2.2 MILLION WAS TRANSFERRED INTO AFCM FROM AFAC IN DECEMBER 1999 TO ELIMINATE THE AFCM OVERDRAFT.

# EXHIBIT 9

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

**Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-7109, Nassau, New Providence, Bahamas
Tel. 242.326.6777 Fax. 242.326.8776**

**13 September 1999**

AMERICAS INTERNATIONAL BANK CORPORATION, LTD.
Mr. Gary W. Christie, Managing Director
Euro Canadian Centre, First Floor, Marlborough St. and Navy Lyon Road
Nassau, New Providence, Bahamas

BY FAX. 242.326.3980

Approd. *(signature)*

RE: TRANSFER OF FUNDS

| USD Amount | $280,830 | |
|---|---|---|
| TO: | | |
| Bank Name: | Banque Bruxelles Lambert | |
| Address: | Agence Aurore Avenue Louise 358 1050 Brussels, Belgium | |
| Account Name: | RICHARD LARUE IN TRUST 2 (DENIS BYRNE) | |
| Account No.: | 310-1255605-26 | SWIFT:   BBRU-BEBB-100 |
| Phone: | 011.32.2.627.1600 | Fax:     011.32.2.648.8315 |
| Account Officer: | Mr. Lucien Migeal | |

①

| USD Amount | $300,000 | |
|---|---|---|
| TO: | | |
| Bank Name: | Americas International Bank Corporation | |
| Address: | Nassau, Bahamas | |
| Account Name: | IFA HOLDINGS LTD. | |
| Account No.: | 621226022 | SWIFT:   N/A |
| Phone: | 1.242.326.3981 | Fax:     1.242.326.3980 |
| Account Officer: | Ms. Sandra Knowles | |

- **Also Note:** Mr. Taber should have received a total of $215,000 into his account since last August 1998. He believes he has received less than this amount. Could you please audit this situation to see how much more funds, if any, have to be extended into Mr. Taber's account, to make up the $215,000? Please inform me of this so that I may approve it.

- **Also Note:** Regarding the Hamilton Group, Ltd. (Mr. Juan Cabrera), his first two CDs of $266,875 each are to be redeemed on 15 September 1999. He is required to present the originals at your counters to retire them. Please prepare for this by taking the funds from AFCM, or its counterpart AFAC.

- **Also Note:** I require £50,000 pounds to be sent to Mr. Stewart Arnold, Esq. in London, ②
$150,000 restored to Commercial Holdings' (VLM) account, if it has not already been done, and the Chris Rice package out, if possible today.



GOVERNMENT
EXHIBIT
9

We are praying for you and the Islands as we are closely which Floyd. If there is any way to get the Barclays' letter out, do so when possible.

SO SEALED:
AMERICAS FIDELITY.
CAPITAL MANAGEMENT, LTD

David A. Morgenstern
Managing Director

SIGNED AND ACCEPTED:
AMERICAS INTERNATIONAL
BANK CORPORATION, LTD.

Gary W. Christie
Managing Director

CASH STATEMENT
FROM: 01 JUN 1999    TO: 18 JAN 1900

VICTORIA MORGENSTERN
CURRENCY: USD
A/C No. 101900

| POSTING DATE | DESCRIPTION | VALUE DATE | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|
| | OPENING BALANCE | | | | .00 |
| 5/09/99 | BALANCE AS AT 30/06/99 | 30/06/99 | | 10,082.96 | 10,082.96 |
| 13/10/99 | Transfer funds to V. Morgenstern/ Commercial Holdings from AFCM | 16/09/99 | | 150,000.00 | 160,082.96 |
| 30/09/99 | Call Interest to:- 1/10/99 | 30/09/99 | | 241.79 | 160,324.75 |
| 31/10/99 | Call Interest to:- 1/11/99 | 31/10/99 | | 500.45 | 160,825.20 |
| 30/11/99 | Call Interest to:- 1/12/99 | 30/11/99 | | 485.82 | 161,311.02 |

| PERIOD MOVEMENT AND BALANCE CARRIED FORWARD | | PAGE: 1 | .00 | 161,311.02 | 161,311.02 |

THIS STATEMENT IS CONSIDERED APPROVED UNLESS WE ARE NOTIFIED OF ANY OBJECTIONS WITHIN 15 DAYS

161,030.02

CASH STATEMENT
FROM: 01 JAN 2000    TO: 31 DEC 2000

Victoria Morgenstern
CURRENCY: USD
A/C NO. 101900

| POSTING DATE | DESCRIPTION | VALUE DATE | DEBIT | CREDIT | BALANCE |
|---|---|---|---|---|---|
| | OPENING BALANCE | | | | 161,536.74 |
| 31/12/99 | Payment to ACM Real Estate, Inc. -Escrow Account inst dd. 04.01.00 | 18/01/00 | 161,170.25 | | 366.49 |
| 31/12/99 | Transaction fee on $161,170.25. | 18/01/00 | 65.00 | | 301.49 |
| 19/01/00 | Wire cancelled to FACM Real inst. dd. 20.01.00. | 20/01/00 | | 161,170.25 | 161,471.74 |
| 19/01/00 | Transaction fee on $161,170.25 wire cancelled. | 20/01/00 | | 65.00 | 161,536.74 |
| 19/01/00 | Payment to Charles Jaffe Trust A/C. | 20/01/00 | 146,150.25 | | 15,386.49 |
| 19/01/00 | Transaction fee on $146,150.25 to Charles Jaffe Trust A/C. | 20/01/00 | 65.00 | | 15,321.49 |
| 31/01/00 | Cash out to Victoria Morgenstern to close out a/c. | 31/01/00 | 15,000.00 | | 321.49 |
| 31/01/00 | Transaction fee on $15,000.00. | 31/01/00 | 25.00 | | 296.49 |
| 9/03/00 | Closing account fees | 10/03/00 | 296.49 | | .00 |

| PERIOD MOVEMENT AND BALANCE CARRIED FORWARD | 322,771.99 | 161,235.25 | .00 |
|---|---|---|---|

THIS STATEMENT IS CONSIDERED APPROVED UNLESS WE ARE NOTIFIED OF ANY OBJECTIONS WITHIN 15 DAYS

PAGE: 1

**Lisa Nairn**

| | |
|---|---|
| **From:** | Gary Christie |
| **Sent:** | Thursday, January 20, 2000 12:45 PM |
| **To:** | John Bain |
| **Cc:** | Donna Topey; Lisa Nairn |
| **Subject:** | Victoria Morgenstern Account |

Please debit the captioned  account for the $146,000.00 bank draft, payable to Charles Jaffe Trust Account, obtained from the Bank of Bahamas today January 20, 2000.

Thanks & Regards

Gary W. Christie

**Bank of The Bahamas Limited**

SHIRLEY ST.

BRANCH

NY 223616

1-2/210

JANUARY 20th, 2000

DATE

Pay ******CHARLES JAFFE TRUST ACCOUNT********                    Or Order

The Sum of _____ ONE OF THE HUNDRED 146,000 00 _____

On Account of ****AMERICAS INTERNATIONAL BANK******

US$ *146,000.00***

for Bank of The Bahamas Limited

NUMBER
680.

NUMBER
542

To:
Chase Manhattan Bank, N.A.
1 Chase Manhattan Plaza
New York, N.Y. 10081

⑈223616⑈ ⑆021000021⑈ 001 1 188414⑈