

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

DAVID MORGENSTERN,             *
    Petitioner,           *
                          *
V.                             *   Case No. 00-6309-CR-WPD
                          *
UNITED STATES OF AMERICA,      *
    Respondant.           *

## MOTION FOR RECUSAL

### INTRODUCTION

COMES NOW, David Morgenstern, the petitioner in the above captioned case, proceeding pro-se, and moves for the disqualification and recusal of United States District Judge William P. Dimitrouleas pursuant to Title 28, United States Code, Section 455. For the reasons stated herein, the impartiality of Judge Dimitrouleas, whether actual or perceived, is seriously in question. Therefore the petitioner seeks recusal of Judge Dimitrouleas so that the petitioner's as yet unfiled motion under Title 28, United States Code, Section 2255 may be heard by an impartial party.

### DISCUSSION

Under 28 U.S.C. § 455(a) "[a]ny justice, judge, or magistrate of the United States <u>shall</u> disqualify himself in <u>any</u> proceeding in which his impartiality might reasonably be questioned." (emphasis added). Such is the case at bar.

During the pendency of the petitioner's criminal prosecution, several serious

-1-

fact-supported allegations were raised before Judge Dimitrouleas regarding the denial of the petitioner's Sixth Amendment right to the effective assistance of counsel.  For example, petitioner's defense counsel, Scott Sakin, failed to secure significant discovery materials, failed to prepare for trial, and failed to adequately confer and consult with the petitioner.  The petitioner filed a pro-se emergency motion for discovery (Appendix A) addressing counsel's ineffectiveness. Apparently Mr. Sakin was too busy to deal with the petitioner's case, nearly missing a court appearance as a result.  (Appendix B, pages 2-3).

Mr. Sakin himself realized that his performance had fallen short and moved the court for a continuance, citing his own lack of trial preparation, on January 24, 2002 (Appendix C).[1]  Three months later, Mr. Sakin was still not prepared for the fast approaching trial date, and filed yet another motion for continuance, once again citing his complete lack of preparation (Appendix D).  Mr. Sakin, by his own admission, had done nothing in three months time to prepare for the trial. The petitioner's pro-se emergency motion for discovery followed Mr. Sakin's second motion for continuance by two days, and while Judge Dimitrouleas scheduled a hearing for the motions for April 30, 2002, on May 1, 2002, Judge Dimitrouleas struck the petitioner's pro-se motions.  By doing so, Judge Dimitrouleas failed to investigate the petitioner's Sixth Amendment claims of ineffective assistance and did nothing to either substantiate or dispell the petitioner's claims.

The petitioner continued to bring counsel's countless deficiencies before Judge Dimitrouleas in a subsequent pro-se motion for appointment of new counsel

---

1. Filed before Judge Seitz but transferred along with entire case to Judge Dimitrouleas.

(Appendix E) in which the petitioner cites a 19 page memorandum (Appendix F) directed to Mr. Sakin. While this memorandum and the petitioner's pro-se motion described Mr. Sakin's ineffectiveness in great detail, no action was taken by Judge Dimitrouleas.

The petitioner is now faced with a claim of ineffective assistance of counsel as well as the court's failure to investigate such, both of which will be brought in a motion to vacate pursuant to 28 U.S.C. § 2255. However, for Judge Dimitrouleas to sit in judgment for or against himself, as he will preside over the § 2255 motion, lends an air of partiality to the proceedings. It is important to note that recusal is required both where partiality is actually present and also where only the appearance of partiality is present. Smith v. Pepsico, Inc., 434 F.Supp. 524 (D.C.FL. 1977).

The standard for determining recusal is whether a reasonable person knowing all the circumstances would conclude that the judge's impartiality may be questioned. Id. Also, Parker v. Conners Steel Co., 855 F2d 1510 (11th Cir. 1988); Liljeberg v. Health Services Aquisition Corp., 100 LEd2d 855 (1988). Clearly, no reasonable person could view sitting in judgment of one's own actions to be impartial.

CONCLUSION

For the foregoing reasons it is respectfully prayed that this Honorable Court order the recusal of Judge William P. Dimitrouleas, and disqualify him from hearing the petitioner's as yet unfiled § 2255 motion. It is further prayed that a party other than Judge Dimitrouleas be assigned to hear the instant motion to recuse

-3-

for the same reasons stated above.

Respectfully Submitted,

David Morgenstern

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent, via prepaid first class mail, to: United States Attorney, Southern District of Florida, 299 East Broward Boulevard, 7th Floor, Fort Lauderdale, FL 33301 on this 30 day of November, 2004.

David Morgenstern

-4-

<u>A</u> <u>P</u> <u>P</u> <u>E</u> <u>N</u> <u>D</u> <u>I</u> <u>X</u>   <u>A</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION 02 APR 25 PM 2: 34

CASE Nº 00-6309-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

     *Plaintiff,*

VS.

DAVID MORGENSTERN,

     *Defendant.*

_____/

## DEFENDANT DAVID MORGENSTERN'S
## EMERGENCY MOTION FOR DISCOVERY

Defendant, **DAVID MORGENSTERN,** *pro se,* hereby moves this Honorable

Court, pursuant to Rule 16 of the Federal Rules of Criminal Procedure for an order requiring

the United States, through Assistant U.S. Attorney's Diane Fernandez and Brian

McCormick, Esq. to copy, release and thus make immediately available to the Defendant, the

following evidence in the possession or control of the United States:

   1.   The approximate eleven boxes of materials of importance to the Defense, separated

by the Defendant from a "room full" of evidence brought down from the U.S. District

Court in Greenville, South Carolina, which is being kept in the "Igloo" room at the Ft.

Lauderdale, Florida Courthouse. As the Defendant's CJA Counsel apparently never

returned to examine these documents, or made any request for copies to be released to the

Defense from the government, the Defendant is filing this Motion in order to receive these

vital documents now.

2.   These "carved out" documents are extremely important to the Defense. They need to be reviewed by the Defendant and CJA Counsel. The Defendant believes these documents show conclusively that he is not mentioned in the South Carolina investment fraud. They contain omissions concluding that David Morgenstern had no knowledge, involvement or participation with the South Carolina investment fraud.

3.   The Defendant wrote a letter and faxed it on April 25, 2002, attached hereto as Exhibit "A," to the Assistant U.S. Attorney's Ms. Diane Fernandez and Mr. Brian McCormick, requesting this discovery. The request remains unanswered. Accordingly, the Defendant prays that this court will compel them to cause this discovery to be copied, at the expense of the United States, immediately, and thus be made available to the Defendant, as the Defendant is court-acknowledged indigent and cannot pay for the timely and court-mandated organizing of such copying for himself.

4.   Further, in accordance with Exhibit "B" from the "Index"of the "First Production of Discovery," provided to CJA Counsel on January 31, 2002, the Defendant instructed CJA Counsel to acquire other essential discovery, as notated by Mr. Scott W. Sakin, Esq. in the right hand margin of the index in his own handwriting, indicated by the word "NEED." It is the Defendant's belief and understanding that CJA Counsel has never requested copies of this essential discovery. For further clarity, the list of this discovery as shown in Exhibit "B" attached hereto is recanted in Table 1 on the following page.

**TABLE 1 – Clarification Of Discovery Requested To Be Released
To The Defense In Accordance With This Motion.**

"John Mamone, et al.
Discovery Items Submitted"

| Box No. | Bate Stamp | Description of Evidence | Detailed Description of Evidence | Witness/Remarks |
|---|---|---|---|---|
| 13 | 130001 through 130202 | FBI, Police Reports, Seizure Documents. | FBI & Police Reports of Interviews w/ Defendants; Documents seized from Defendants. | FBI/Local |
| 25 | 250001 through 250012 | Merrill Lynch Records of J.M. & Sons Enterprises & Check Cashing Unlimited | | Merrill Lynch |
| 25 | 250013 through 250124 | BankAtlantic Records of Premier Tickets. | | Bank Atlantic |
| 25 | 250125 through 250246 | Corporate tax returns, Bank records and Merrill Lynch Records of J.M. & Sons Enterprises, | | Custodian of Records, J.M. & Sons. |
| 25 | 250247 through 250249 | Copies of Various IMC Checks. | | Irving Weiss |
| 25 | 250250 through 250259 | First Union Bank Records of Doreen Russo reflecting Deposits of $100,000 and $30,000. | | First Union |
| 25 | 250260 through 250268 | Twenty-One Chemical Trust Checks Provided to Akel's Market. | | Al Polito |
| 25 | 250269 through 250363 | Cashiers Checks purchased by Irving Weiss. | | Republic Security Bank |
| 25 | 250364 through 250722 | Evidence Secured During Clay Arrest | | * |
| 26 | 261 through 262742 | Financial Records obtained from South Carolina | | |
| 28 | 2801581 through 2801718 | Florida Department of Banking files for I.H. Weiss, Inc., Check Cashing Unlimited, and Gold Coast Check Cashing | | Florida Department of Banking & Finance |
| 28 | 2800001 through 2800583 | Transcripts of Consensually Monitored Conversations from S.C. (South Carolina) | Transcripts of Consensually Monitored Conversations with Fred Morgenstern, David Morgenstern & Joe Silvestri from S.C. (South Carolina) | |

Note: even though AIB-0001 through AIB 1374 are marked "NEED" they have in fact been received by the Defense, they have not been examined or reviewed by CJA Counsel to this date.

5.  The Defendant asks that this court compel the Assistant U.S. Attorney's to cause the discovery as enumerated in Table 1 above also to be immediately copied, at the expense of the United States, and thus be made available to the Defendant. The Defendant is court-acknowledged indigent and cannot pay for the timely and court-mandated, organizing of such copying for himself.

6.  This motion is made in good faith and not for purpose of delay.

**WHEREFORE,** the Defendant respectfully prays that this Honorable Court will grant the relief sought herein.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished to Assistant United States Attorneys Diana Fernandez and Brian McCormick, via fax and U.S. Mail, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33394, Scott W. Sakin, Esquire, Attorney for David Morgenstern, 1411 N.W. North River Drive, Miami, Florida 33125, William Norris, Esquire, Attorney for Fred Morgenstern, 7685 Southwest 104th Street, Suite 104, Miami, Florida 33156, and Emanuel Perez, Esquire, Attorney for Joseph Silvestri, 2121 Ponce de Leon Boulevard, Suite 920, Coral Gables, Florida 33144, and Philip Horowitz, Esquire, Attorney for Mark Weiss, 12651 South Dixie Highway, Suite 328, Miami, Florida 33156, on this 26th day of April, 2002.

Respectfully submitted,

David A. Morgenstern, *pro se*
7534 Estrella Circle
Boca Raton, FL 33433

By: _____
David A. Morgenstern

4

Exhibit "A" – Defendant's Letter to
Assistant US Attorneys Requesting Discovery

# David A. Morgenstern

7534 Estrella Circle •Boca Raton, FL •33433
Tel/Fax: 561.883.1164

Assistant US Attorneys
Diane Fernandez and Brian McCormick
500 East Broward Blvd.
Suite 700
Ft. Lauderdale, Florida 33394

April 25, 2002

BY FAX ONLY: 954.356.7336
Tel: 954.356.7255

Re:   Request for Compliance under Rule 16 - Federal Rules of Criminal Procedure
      Case No: 00-6309-CR-DIMITROULEAS
      David A. Morgenstern, Defendant, *pro se*

Dear Ms. Fernandez and Mr. McCormick:

There are approximately 11 boxes of evidence that were tagged and separated out by me, of
the multitude of boxes that came from South Carolina. I had requested Mr. Sakin to examine,
inspect and copy them, but I understand he never mentioned this requirement for the defense
to you or your good offices.

As a Defendant, I require copies of those separated documents. If necessary, I will come
down today at your request in order to make clear what copies I immediately need.

I can be reached at 561.883.1164, regarding this request through to 1PM today. After that, I
am required to meet with another attorney on a matter entirely unrelated to case.

I ask that I hear from you before I have to leave at 1PM. If I do not, I will file a emergency
motion before the court for an order, pursuant to Rule 16 of the Federal Rules of Criminal
Procedure, requiring the United States to provide these documents to me, at its expense, due
to my court-acknowledged indigence.

Please forgive the form of this letter, as I am not an attorney, and there may be unintended
imperfections. Nevertheless, I feel compelled to act today, as I have not heard from Mr Sakin,
my CJA Counsel, following the filing of my *pro se* Motion for Continuance. I thus write you
with my best understanding of the need to protect my own Constitutional Rights in this matter.

I remain,
Sincerely,

David A. Morgenstern, *pro se*

cc: Scott W. Sakin, Esq. (by FAX ONLY) – 305.325.0331 (Tel: 305.545.0007)
    The Honorable Judge Dimitrouleas (BY FAX ONLY) – 954.769.5656 (Tel: 954.769.5650)

**HP OfficeJet G Series G85**
**Personal Printer/Fax/Copier/Scanner**

**Fax-History Report for**

561.883.3959
Apr 25 2002 8:00am

_____

## Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Apr 25 | 7:59am | Sent | 19543567336 | 0:30 | 1 | OK |

_EOT_   _8:29am_

_____

Result:
  OK - black and white fax
  Okay color - color fax

Exhibit "B" – Index" of the "First Production of Discovery,"
Provided to CJA Counsel by Assistant U.S. Attorney
on January 31, 2002

Note: Those pages of this Index not bearing the word "NEED"
As inscribed by CJA Counsel are not included in this Exhibit.

**MAHONE, ET. AL.**
**JURY ITEMS SUBMITTED**

| Item No. | DATE STAMP No. | DESCRIPTION OF EVIDENCE | DETAILED DESCRIPTION OF EVIDENCE | WITNESS/REMARKS |
|---|---|---|---|---|
| 7 | 702042 through 702088 | Miscellaneous Bank Records | (10) Bank Records, Safe Deposit Records, etc. for Steve & Carmella Raffa | Bank of America |
| 8 | 800001 through 801390 | Miscellaneous Check Cashing Records | Bank Records, Deposit Slips, Deposited Checks, Daily Summaries, Etc. for Check Cashing Unlimited, II | Irving Wells |
| 9 | 951359 through 901737 | Miscellaneous Bank Records | (1) Bank Records for The Americas Resource Corp. | Citibank |
| 9 | 801738 through 902352 | Miscellaneous Bank Records | (2) Bank Records for The Americas Resource Corp., Escrow Account for Chemical Trust | Citibank |
| 9 | 902608 through 903012 | Miscellaneous Bank Records | (3) Bank Records for Prestige Accounting | Pointe Bank |
| 9 | 800001 through 900625 | Miscellaneous Bank Records | (4) Bank Records for Gold Client Check Cashing | Turnbank |
| 9 | 603366 through 902005 | Miscellaneous Brokerage Records | (5) Brokerage Records for Check Cashing Unlimited, J M & Sons Enterprise, Inc., Gateway Transportation, etc. | Merrill Lynch |
| 9 | 900626 through 901300, and 903013 through 903583 | Miscellaneous Bank Records | (6,7) Miscellaneous Bank Records Obtained From SEC | Admiralty Bank |
| 3 | 903964 through 903750 | Injunctions, Court Orders | (8) SEC Injunctions & Court Orders | Public Records |
| 0 | 100001 through 1001467 | Business records, bank records | Daily reports/ledgers and bank records for Sanjo, Inc., Cash 96, and Oakland Check Cashing | Custodian of Records, Sanjo, Cash 96 & Oakland Check Cashing |
| | no date stamp | Video Tapes | Video tapes from pole camera at Cash 96 | FBI |
| | no date stamp | Photographs, Audio Tape | Video surveillance photographs of Raffa, Mamone, Bellito, Fred Morgenstern, etc.; Audio tape with Louis Malone | FBI |
| 3 | 13001 through 13202 | FBI, Police Reports, Seized Documents | FBI & Police Reports of interviews with defendants; Documents seized from defendants | FBI/Local |

NEG5

NAROSH, ET AL.,
ITEMS SUBMITTED

| No. | STAMP No. | DESCRIPTION OF EVIDENCE | DETAILED DESCRIPTION OF EVIDENCE | WITNESS/REMARKS |
|---|---|---|---|---|
| 2 | 22 | Court Order dated 2/2000 and related affidavit, application, tapes, and transcripts. | Court Order dated and related affidavit, application, tapes, and transcripts relating to cellular telephones of John Mannone and Fred Morgenstern. | FBI |
| 3 | 23 | Affidavit and Search Warrant | Affidavit and Search Warrant for residences of MASSARO & GAZIE & for Check Cashing Unlimited II | |
| 4 | 24/001 through 24/021, 903751, 903887 | IGT, IMC Checks Deposited by I. H. Weiss, Inc. | IGT, IMC Checks Deposited by I. H. Weiss, inc. | Pointe Bank, Republic Security |
| | 903751 / 903887 | MERRILL LYNCH RECORDS OF J. M. & SONS ENTERPRISES & CHECK CASHING UNLIMITED | | Merrill Lynch |
| 5 | 250001 through 250012 | MERRILL LYNCH RECORDS OF J. M. & SONS ENTERPRISES | | Merrill Lynch |
| 5 | 250013 THROUGH 250124 | BANK ATLANTIC RECORDS OF PREMIER TICKETS CORPORATE TAX RETURNS, BANK RECORDS, AND MERRILL LYNCH RECORDS OF J. M. & SONS ENTERPRISES | | BANK ATLANTIC |
| 5 | 250126 THROUGH 250245 | | | CUSTODIAN OF RECORDS, J. M. & SONS |
| 5 | 250247 THROUGH 250249 | COPIES OF VARIOUS IMC CHECKS | | IRVING WEISS |
| 5 | 250250 THROUGH 250259 | FIRST UNION BANK RECORDS OF DOREEN RUSSO REFLECTING DEPOSITS OF $100,000 & $50,000 | | FIRST UNION |
| 6 | 250260 THROUGH 250269 | TWENTY ONE CHEMICAL TRUST CHECKS PROVIDED TO AXEL'S MARKET | | AL POLITO |
| 5 | 250269 THROUGH 250383 | CASHIERS CHECKS PURCHASED BY IRVING WEISS | | Republic Security Bank |
| 5 | 250384 THROUGH 250722 | EVIDENCE SECURED DURING CLAY ARREST | | |
| 5 | 261 THROUGH 202742 | FINANCIAL RECORDS OBTAINED FROM SOUTH CAROLINA | | |

**MAHONE ET AL**
**EVERY ITEMS SUBMITTED**

| It No. | DATE STAMP No. | DESCRIPTION OF EVIDENCE | DETAILED DESCRIPTION OF EVIDENCE | WITNESS/REMARKS |
|---|---|---|---|---|
| 28 | 2601661 through 2601716 | Florida Dept. of Banking and Finance files for L.H. Weiss, Inc., Check Cashing Unlimited, and Gold Coast Check Cashing | | Florida Dept. of Banking & Finance |
| 28 | 2601977 through 2602055 | Records of Gateway Transportation obtained from Len Brisman, Asset Forfeiture Officer including certified copy of tax return | | Custodian of Records, Gateway Transportation |
| 28 | 2602066 through 2602124 | Records of Royal Bank of Scotland for Gateway Management | | Royal Bank of Scotland |
| 28 | 2602125 through 2602297 | Records of Investec (Benjamin & Jerold Brokerage) for Triumph Capital and Doreen Russo | | Investec |
| 28 | 2601921 through 2601976 | Men Financial Brokerage Records of JOSEPH & DOREEN RUSSO | | Men Financial |
| 28 | 2602298 through 2602371 | Purchase Documents for Units 1601 & 1702, Grove Ocean Condominiums | | Custodian of Records, Grove Ocean Condominiums (Darlene Sereno) |
| 28 | 2602372 through 2602441 | Purchase Documents for Units 1101 & 1102, Grove Ocean Condominiums | | Custodian of Records, Grove Ocean Condominiums (Darlene Sereno) |
| 29 | 2602442 through 2602838 | Bank Account Information Pertaining to Various Klinger Accounts | Account Information for Anson Klinger, Miami Land Holdings, LLC; Grove Allen, LLC; Ocean Grove Entertainment, LLC; Grove Business Management, LLC; Grove Infernal Properties, LLC; & Ocean Grove Estate, LLC | Commercial Bank of Florida |
| 29 | 2602839 through 2603810 | Bank Atlantic Records of Various Mamone Accounts | Home Equity Loan file for JOHN & GRACE MAMONE; Savings Account for GRACE MAMONE, Custodian for JOHN MAMONE; Mortgage File for GRACE MAMONE Condominium; Checking Account for CARGO TRANSPORTATION SERVICES; Checking Account Information for GRACE MAMONE; & GRACE MAMONE, DAVID MAMONE, JOHN MAMONE. | Bank Atlantic |

MAMONE, ET AL.
(KEY ITEMS SUBMITTED)

| L.NO. | DATE STAMP No. | DESCRIPTION OF EVIDENCE | DETAILED DESCRIPTION OF EVIDENCE | WITNESS/REMARKS |
|---|---|---|---|---|
| 18 | 2000001 through 2000503 AIB-0061 THROUGH AIB1374 | Transcripts of Consensually Monitored Conversations from S. C.  [RECORDS OBTAINED FROM AIBC, NASSAU, BAHAMAS.] | Transcripts of Consensually Monitored Conversations with FRED MORGENSTERN, DAVID MORGENSTERN, & JOE SYLVESTRI from S. C.  AMERICAS INTERNATIONAL BANK CORP, | 7/6/3  7/6/3 |

<u>A P P E N D I X   B</u>

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,   )  CASE NO. 00-6309-CR-WPD
                     )
        Plaintiff,  )
                     )
      -v-           )
                     )
FRED MORGENSTERN,      )
DAVID MORGENSTERN,     )
JOSEPH SILVESTRI,      )
                     )  Fort Lauderdale, Florida
      Defendants.  )  May 21, 2002
                     )  9:02 a.m.


TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

U.S. DISTRICT JUDGE

APPEARANCES:

                 J. BRIAN MCCORMICK, ESQ.
                 DIANA FERNANDEZ, ESQ.
                 JAMES R. PAVLOCK, ESQ.
                 Assistant U.S. Attorneys
                 Appearing on behalf of the Plaintiff

                 WILLIAM NORRIS, ESQ.
                 Appearing on behalf of Defendant
                 Fred Morgenstern

                 SCOTT SAKIN, ESQ.
                 Appearing on behalf of Defendant
                 David Morgenstern

                 RICHARD SHARPSTEIN, ESQ.
                 Appearing on behalf of Defendant
                 Joseph Silvestri

Reporter          ROBERT A. RYCKOFF
                 Official Court Reporter
                 299 East Broward Boulevard
                 Fort Lauderdale, Florida 33301
                 954-769-5657

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE

<u>A P P E N D I X   C</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE № 00-6309-CR-SEITZ

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

DAVID MORGENSTERN,

*Defendant.*

_____/

## DEFENDANT DAVID MORGENSTERN'S
## UNOPPOSED MOTION FOR CONTINUANCE

Defendant, **DAVID MORGENSTERN,** by and through undersigned counsel, hereby moves this Honorable Court to continue the trial date which is currently set for February 11, 2002, and in support thereof states the following:

1.    Undersigned counsel has conferred with Assistant United States Attorney Brian McCormick. Mr. McCormick states that the government has no objection to the Court granting a reasonable continuance.

2.    The Defendant is currently set for trial in a fifty-five-count indictment wherein the Defendant is charged in approximately thirty-one counts. This is a complex indictment charging RICO, money laundering, wire fraud and mail fraud. There are other counts charging other defendants with other crimes, which this Defendant is not involved.

1

3.    The Defendant was arrested October 30, 2000. Sometime in December 2000 Defendant was appointed CJA counsel. As this Court is well aware, there were problems with discovery, copies of documents, and problems among the various attorneys representing some of the defendants.

4.    On November 6, 2001, Defendant's original CJA counsel withdrew from further representation of the Defendant. Undersigned counsel was appointed thereafter to represent the Defendant and was advised this case was set for trial for February 11, 2002. Shortly after being appointed, undersigned counsel conferred with original CJA counsel. Counsel further requested that the file be provided to the undersigned forthwith. It was not until December 13, 2001 that the original CJA counsel made the file available.

5.    This discovery consisted of approximately 20,000 documents. Some of the documents include pleadings but the majority of the documents are documents relating to the underlying charges of the RICO, money laundering, wire fraud and mail fraud.

6.    Approximately one third of the documents were organized in a fashion so that documents could be properly examined. However,

(a)    The majority of the documents still have to be cataloged, organized and fully examined to be able to be used in preparing the defense for the Defendant;

(b)    No index of the documents was provided. In sum, the 20,000 documents have few labels and no direction to determine which count of the indictment various documents apply to;

(c)    There is a plethora of Rule 404(b) evidence the government intends to use at this trial. These documents are mixed with other discovery. Thus, the defense needs to

2

examine all these documents to determine which documents are part of the government's case in chief and which documents the government intends to use as 404(b) evidence.

7.    Many of the discovery documents consist of checks, the daily recordings, and depository receipts of check cashing stores in relation to their various banking depositories. We have reviewed only a faction of these documents to date.

8.    There are also wiretap transcripts. Undersigned counsel has not had an opportunity to determine whether the government complied with the necessary minimization requirements to determine whether there should be litigation over whether the wiretaps should be admissible. This is absolutely critical to the Defendant's defense and must be done in order to render effective representation. Undersigned counsel has not had sufficient time to listen to the wiretaps, review the wiretap transcripts to determine the reliability of the transcripts or if all CD ROMS have been in fact transcribed. The review of the wiretaps and the related materials has not yet begun.

9.    The review of documents relating to the money laundering and RICO is very time consuming. Counsel has worked almost every day on this case, and the Defendant, David Morgenstern, has been extremely cooperative, helping in every way possible. Nevertheless, undersigned counsel has reviewed only approximately 8,000 pages of discovery thus far.

10.    Assistant United States Attorney Brian McCormick informed undersigned counsel during the week of January 14, 2002 that there is new discovery in this case that the government intends to use which originates from the Bahamas. Although counsel timely ordered these documents from International Legal Imprints, counsel is still waiting for them to be made available. Assistant United States Attorney Brian McCormick

indicated that these 1,337 documents are devastating to the Defendant's case. There may be two additional volumes containing unknown number of pages, which has not been released. Thus, it is unknown as to the relevancy of any of these documents to the government's case or to the Defendant's defense.

11.    As this Court is also well aware there are at least seventy boxes of documents and perhaps more from the so-called "South Carolina investment fraud." It is believed that these documents will assist the Defendant in presenting his defense. These documents need to be reviewed by the Defendant and counsel. In light of the fact that we have been spending our time reviewing the documents that we received in discovery this has not yet been done. It is believed these documents may benefit the Defendant by showing Defendant is not mentioned in the South Carolina investment fraud. Furthermore, it is believed that these documents contain omissions concluding that David Morgenstern had no knowledge, involvement or participation with the South Carolina investment fraud. These documents must be reviewed, and for now, they must be reviewed at the Federal courthouse in Fort Lauderdale. Copies are not available. Obviously, the government is not advising which of the documents may be helpful to the Defendant. Thus it is the Defendant's obligation to review these documents where they are presently located. Time is necessary so this may be done in a competent manner on behalf of the Defendant.

12.    The defense needs additional time to assess which expert witnesses are necessary for the presentation of the defense. The Defendant intends to present a defense in this case. The Defendant wishes to present testimony and evidence that support his belief that his business fell within ordinary and customary practices permissible abroad.

The defense must engage these expert witnesses who are in the area of management of offshore international, trust and business undertakings, as well as certain inter- and intra-jurisdictional issues, since the Defendant did little business in the U.S. but operated throughout Europe and elsewhere. Expert testimony is necessary to opine on corporate matters which permit taking advantage of opportunities while still being in compliance with the business, banking and accounting laws of a diverse set of nations. In sum, expert testimony is necessary to determine the following:

a)    Whether any of the corporations, whether formed by the Defendant or not, which operated under the laws of other nations, in fact did so in full compliance with the laws of that land.

b)    Whether there is any conflict between foreign laws and the laws of the U.S. and if these corporations in fact operated in compliance with the laws of the country of formation, how such rightful operation could be wrongly interpreted under U.S. laws.

c)    Whether the Defendant and these certain foreign corporations followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and thus further complied with governing law associated with their business.

d)    Whether the diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from U.S. States laws and whether compliance by non-U.S. entities as required under the laws of these foreign nations may be in opposition to U.S. laws.

e) Whether the Defendant's actions in non-U.S. entities was consistent with banking, trading, investment, fiduciary and trustee practices in each country including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

13. Again, after reviewing approximately 8,000 documents we have not yet found any documents that correspond to particular aspects of the indictment. Moreover, it is impossible to prepare a defense at this point before examining all documents to determine which documents are relevant to various allegations in the indictment. Although counsel has had the file for six weeks, it is impossible to have reviewed all the documents to determine which documents apply to which allegation in the indictment. Moreover, it has also been impossible to determine how some documents are relevant before going through all of the documents.

14. Again, many documents involve check-cashing stores. These stores appear to have been legally permissible state-licensed check accepting and cash or cash equivalent, meaning money orders, cashier's checks and wire transfers, tendering   depositories acting "as banks" for thousands of clients over the course of many years, at least back into 1996. Expert testimony is necessary to determine the usual course and conduct of check cashing stores. It appears that from the documents reviewed thus far, these check-cashing stores were conducting legitimate business activities. However, without reviewing all the documents it is impossible to make a final conclusion. If there is discovery contrary to these facts, then the defense has not yet reached this discovery as yet in the limited amount of time we have had to examine the discovery.

15.   Again, with respect to the RICO allegations, regarding the Defendant, in the limited amount of discovery we have examined, we find thus far that the Defendant relied upon the receipt of funds duly and legally processed through FDIC-insured, Federal Reserve-licensed banks, always receiving the funds in the form of Federal Reserve-generated wire transfers and never in the form of any checks for deposit. This appears to be a legal action. We have not yet seen documents that reflect any illegality with respect to this matter.

16.   Documents have not been fully examined by a defense forensic accounting expert and cannot be until we review all the documents to determine which documents need to be reviewed by an expert witness. Moreover, CJA approval is necessary before the hiring of an expert witness.

17.   The following must be done to render effective representation of the Defendant:

a)   There are foreign documents located in several countries, which need to be examined. This is a particularly sensitive request from the defense. The defense requests an opportunity to address the court in-camera regarding these matters. While the Defendant is not in possession of these documents, he is prepared to advise the Court in-camera of the documents requested, the last known location of these documents and the relevance they have to this case.

b)   There are actual witnesses that the defense needs time to assemble including expert witnesses and witnesses to refute allegations brought forth by the government. Many of these potential witnesses are outside the United States. Additional

time is necessary to contact these witnesses, interview these witnesses and determine whether these witnesses are willing to return to the United States to testify. These witnesses, in addition to some located in the United States, some in foreign countries. The defense requests to present to the court in-camera a list of these witnesses along with their proposed testimony and why their testimony is relevant to the defense.

c)   Additional time is necessary so that counsel can confer with the Defendant to determine which of the specific witnesses need to interviewed versus which will be actually called at the trial to testify. Counsel has not had an adequate opportunity to confer with any of these witnesses as the primary emphasis has been placed on reviewing documents to determine which documents apply to which counts of the indictment and to prepare and understand how the government is going to prove the various counts of the indictment.

18.   This motion is made in good faith and not for purpose of delay.

19.   The Defendant moves the court to set a status conference so the parties may discuss these issues with the court.

**WHEREFORE,** the Defendant respectfully prays that this Honorable Court will grant the relief sought herein.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished to Assistant United States Attorneys Diana Fernandez and Brian McCormick, via fax and U.S. Mail, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33394, William Norris, Esquire, Attorney for Fred Morgenstern, 7685 Southwest 104th Street, Suite 104,

Miami, Florida 33156, Emanuel Perez, Esquire, Attorney for Joseph Silvestri, 2121 Ponce de

Leon Boulevard, Suite 920, Coral Gables, Florida 33144, David Tarlow, Esquire, Attorney for

Frederick Scarola, 801 Brickell Avenue, Suite 1901, Miami, Florida 33132, Jon May,

Esquire, Attorney for Charles Clay, 200 East Broward Boulevard, Suite 1210, Fort

Lauderdale, Florida 33301 , Philip Horowitz, Esquire, Attorney for Mark Weiss, 12651 South

Dixie Highway, Suite 328, Miami, Florida 33156, on this 24th day of January, 2002.


Respectfully submitted,

SCOTT W. SAKIN, P .A.
CJA Counsel for Defendant
1411 N.W. North River Drive
Miami, Florida 33125
Tel: (305) 545-0007

By: _____
      SCOTT W. SAKIN
      Florida Bar N⁰ 349089

<u>A</u> <u>P</u> <u>P</u> <u>E</u> <u>N</u> <u>D</u> I <u>X</u>    <u>D</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE Nº  00-6309-CR-DIMETREIOUS

UNITED STATES OF AMERICA,

      *Plaintiff,*

VS.

DAVID MORGENSTERN,

      *Defendant.*

                              /

## DEFENDANT DAVID MORGENSTERN'S
## UNOPPOSED MOTION FOR CONTINUANCE

Defendant, **DAVID MORGENSTERN,** by and through undersigned counsel, hereby moves this Honorable Court to continue the trial date which is currently set for May 6, 2002, and in support thereof states the following:

1.    Undersigned counsel has conferred with Assistant United States Attorney Brian McCormick. Mr. McCormick states that the government has no objection to the Court granting a reasonable continuance.

2.    The Defendant is currently set for trial in a fifty-five-count indictment wherein the Defendant is charged in approximately thirty-one counts. This is a complex indictment charging RICO, money laundering, wire fraud and mail fraud. There are other counts charging other defendants with other crimes, which this Defendant is not involved.

3.    The Defendant was arrested October 30, 2000. Sometime in December 2000 Defendant was appointed CJA counsel. As the court is aware, problems developed with regard to certain discovery, copies of documents, and among the various attorneys representing some of the defendants.

4.    On November 6, 2001, Defendant's original CJA counsel withdrew from further representation of the Defendant. Undersigned counsel was appointed thereafter to represent the Defendant and was advised this case was set for trial for February 11, 2002. Shortly after being appointed, undersigned counsel conferred with original CJA counsel. Counsel further requested that the file be provided to the undersigned forthwith. It was not until December 13, 2001 that the original CJA counsel made the file available.

5.    This discovery consisted of approximately 20,000 documents. Some of the documents include pleadings but the majority of the documents are documents relating to the underlying charges of the RICO, money laundering, wire fraud and mail fraud.

6.    Approximately one third of the documents were organized in a fashion so that documents could be properly examined. Since December 13, 2001, the Defense has:

(a)    Cataloged and organized all of these documents such that they can now be fully examined for use in preparing the defense for the Defendant;

(b)    Indexed and labeled these documents, so as to determine which count(s) of the indictment to which these groups of documents may apply;

(c)    Separated Rule 404(b) evidence that the government intends to use at this trial that was originally mixed with other discovery. The Defense needs additional time to examine all these documents to determine which documents are part of the government's case in chief and which documents the government intends to use as 404(b) evidence.

7.    Many of the discovery documents consist of checks, the daily recordings, and depository receipts of check cashing stores in relation to their various banking depositories. We still have reviewed only a faction of these documents to date.

8.    There are also wiretap transcripts. Undersigned counsel has not had an opportunity to determine whether the government complied with the necessary minimization requirements to determine whether there should be litigation over whether the wiretaps should be admissible. This is absolutely critical to the Defendant's defense and must be done in order to render effective representation. Undersigned counsel has not had sufficient time to listen to the wiretaps, review the wiretap transcripts to determine the reliability of the transcripts or if all CD ROMS have been in fact transcribed. The review of the wiretaps and the related materials has not yet begun.

10.    Assistant United States Attorney Brian McCormick informed undersigned counsel during the week of January 14, 2002 that there is new discovery in this case that the government intends to use which originates from the Bahamas. This material was received by undersigned Counsel on February 8, 2002. Additional discovery was received through to the middle of March 2002. Assistant United States Attorney Brian McCormick indicated that these documents are devastating to the Defendant's case. Counsel has been unable to review any of these documents with the Defendant. Thus, it is unknown as to the relevancy of any of these documents to the government's case or to the Defendant's defense.

9.    The review of documents relating to the money laundering and RICO is very time consuming. Up until January 25, 2002, Counsel worked almost every day on this case, and the Defendant, David Morgenstern, had been extremely cooperative,

helping in every way possible, and reviewed with Counsel approximately 8,000 pages. But on January 25, 2002, the Defendant was admitted to West Boca Medical Center, Boca Raton, Florida for emergency surgery, relating to an infection in a massive blood clot that had formed as the result of an attempt to repair a left shoulder separation on January 10, 2002. The infection led to him contracting Septicemia, a dangerous infection of the blood, a type of blood poisoning caused by pathogenic microorganisms. It causes immune system deficiency, internal bleeding without warning, and other serious complications, including potential damage to, or failure of, vital organs. The Defendant was hospitalized from January 25 through February 1, 2002, then again, February 8 through February 11, 2002, then again April 4 through April 11, 2002. In addition, between these dates, and through to April 17, 2002, the Defendant was an outpatient at North Broward Medical Center for infusion of intravenous antibiotics seven days every week, a process taking anywhere from three to seven hours each day. For clarity, the Defense has attached "Exhibit A – Inpatient and Outpatient Schedule for Patient David A. Morgenstern" in order to illustrate the unavailability of the Defendant to continue to work on this case with Undersigned Counsel as he did prior to January 25, 2002.

10.        The government has been kept fully informed about the Defendant health issues, both by the Defendant's doctors and by the undersigned attorney. The Defendant is still undergoing post-operative care and infectious disease therapy as the result of the unsuccessful surgical repair of a separated left shoulder.  He is lethargic and in chronic pain. He requires precise, time-consuming therapy in order to have the opportunity to overcome this disease, including testing his own ability to withstand infection during periods where he is not under medication. Since contracting the disease, the

4

Defendant became ill during his first "test" period beginning March 27, 2002, and relapsed eight days later on April 4, 2002.

11.     On March 26, 2002, the U.S. District Court, Civil Division, in Greenville, South Carolina required the Defendant to attend a "Motion For Show Cause Hearing On Civil Contempt, To Repatriate Funds, For Corporate Records And Other Relief," (the "Motion") in difference to medical advice presented to that Court in a motion to continue the hearing signed by his physician that he was too ill to travel. The motion was denied. The Defendant traveled to South Carolina and met with Prosecutor David Stephens, Mr. Marvin Harrison, special expert witness who will give testimony for the government in the matter before this court, Mr. James R. Pavlock, Trial Attorney, U.S. Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, Washington, DC, and Mr. Paul Jacobs, Special Agent, FBI, under proffer, as opposed to going to the civil contempt hearing, in an attempt to resolve matters out of court, as the Defendant is also indicted in a criminal case in that District. The Defendant sustained over 20 hours of interrogation over the period of only two and half days. On March 29, 2002, he then returned to South Florida where he met with Prosecutor Brian McCormick, and Mr. McCormick's team of five other interrogators on April 2 and 3, 2002. The Defendant was having difficulty in the interview on April 3, 2002, both understanding the questions, and responding to them in a way that was satisfying and apologized openly for his lack of mental acuity. The Defendant then asked if he could excuse himself from the proffer until such time as the GI bleeding, lethargy and chronic pain that was plaguing him could be abated. Thus, during the nine days from March 27 through April 4, 2002, where the Defendant was supposed to be resting and thus strengthening his immune system and ability

to fight his disease without the infusion of IV antibiotics he spent two days traveling, four days in proffers, and three days at rest. During the early morning hours of April 4, 2002, the Defendant relapsed into another sepsis episode and was re-admitted to North Broward Medical Center. When a sepsis patient relapses, the only available treatment is a progressively stronger intravenous antibiotic that is inherently more toxic. These therapies tend to make the patient actually sicker, weaker and mentally depressed for a while, similar to chemotherapy in cancer patients. The Defendant is in the middle of this treatment regimen. While he is currently in a cycle of no antibiotic medication at this date, he is not cured. He is very susceptible to relapse. He remains physically exhausted and mentally despaired. The Defense has attached Exhibit "B" - Doctor's Letters Concerning David A. Morgenstern's Current Health Condition," all of which has been made available to Assistant United States Attorney Brian McCormick for verification. The Defense simply has not had the time in the last three months due to the Defendant's medical circumstances, to materially work on this case more than only a few hours, and the work completed has thus been predominantly clerical matters.

11.    The Court is well aware there are at least seventy boxes of documents and perhaps more from the so-called "South Carolina investment fraud." Undersigned Counsel and the Defendant did have the opportunity to separate from these boxes at the Ft. Lauderdale, FL Courthouse. Approximately eleven boxes of materials are of importance to the Defense. Undersigned Counsel has never able to return to examine these documents with the Defendant sufficient to request copies from the government due to the Defendant's medical condition. These documents need to be reviewed by the Defendant and counsel. It is believed these documents may benefit the Defendant,

including the fact that the Defendant is not mentioned in the South Carolina investment fraud. Furthermore, it is believed that these documents contain omissions concluding that David Morgenstern had no knowledge, involvement or participation with the South Carolina investment fraud. These documents as divided out by the Defense must be copied and properly examined. Time is necessary so this may be done in a competent manner on behalf of the Defendant.

12.  Due to the Defendant's illness, the Defense needs additional time to assess which expert witnesses are necessary for the presentation of the defense. The Defendant intends to present a defense in this case. The Defendant wishes to present testimony and evidence that support his belief that his business fell within ordinary and customary practices permissible abroad. The defense must engage these expert witnesses who are in the area of management of offshore international, trust and business undertakings, as well as certain inter- and intra-jurisdictional issues, since the Defendant did little business in the U.S. but operated throughout Europe and elsewhere. Expert testimony is necessary to opine on corporate matters which permit taking advantage of opportunities while still being in compliance with the business, banking and accounting laws of a diverse set of nations. In sum, expert testimony is necessary to determine the following:

a)  Whether any of the corporations, whether formed by the Defendant or not, which operated under the laws of other nations, in fact did so in full compliance with the laws of that land.

b)  Whether there is any conflict between foreign laws and the laws of the U.S. and if these corporations in fact operated in compliance with the laws of the country of formation, how such rightful operation could be wrongly interpreted under U.S. laws.

c)   Whether the Defendant and these certain foreign corporations followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and thus further complied with governing law associated with their business.

d)   Whether the diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from U.S. States laws and whether compliance by non-U.S. entities as required under the laws of these foreign nations may be in opposition to U.S. laws.

e)   Whether the Defendant's actions in non-U.S. entities was consistent with banking, trading, investment, fiduciary and trustee practices in each country including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

13. It is impossible to prepare a defense at this point before examining all documents of discovery in this case, in order to determine which documents are relevant to various allegations in the indictment. Counsel has had part of the file for approximately four months, but other parts of the discovery have been available for only a few weeks. It has been impossible to review all the documents to determine which documents apply to which allegation in the indictment without the input of the Defendant. Moreover, it has also been impossible to determine how some documents are relevant before going through all of the documents.

14. Again, many documents involve check-cashing stores. These stores appear to have been legally permissible state-licensed check accepting and cash or cash equivalent, meaning money orders, cashier's checks and wire transfers, tendering depositories acting "as banks" for thousands of clients over the course of many years, at least back into 1996. Expert testimony is necessary to determine the usual course and conduct of check cashing stores. It appears that from the documents reviewed thus far, these check-cashing stores were conducting legitimate business activities. However, without reviewing all the documents it is impossible to make a final conclusion. If there is discovery contrary to these facts, then the defense has not yet reached this discovery as yet in the limited amount of time we have had to examine the discovery.

15. Again, with respect to the RICO allegations, regarding the Defendant, in the limited amount of discovery we have examined, we find thus far that the Defendant relied upon the receipt of funds duly and legally processed through FDIC-insured, Federal Reserve-licensed banks, always receiving the funds in the form of Federal Reserve-generated wire transfers and never in the form of any checks for deposit. This appears to be a legal action. We have not yet seen documents that reflect any illegality with respect to this matter.

16. Documents have not been fully examined by a defense forensic accounting expert and cannot be until we review all the documents to determine which documents need to be reviewed by an expert witness. Moreover, CJA approval is necessary before the hiring of an expert witness.

17. The following must be done to render effective representation of the Defendant:

a)    There are foreign documents from several countries that need to be examined. This is a particularly sensitive request from the defense. The defense requests an opportunity to address the court in-camera regarding these matters. While the Defendant is now in possession of these documents, none of them have been examined by undersigned Counsel. The Defense is prepared to advise the Court in-camera of these documents requested and the relevance they have to this case.

b)    There are actual witnesses that the defense needs time to assemble including expert witnesses and witnesses to refute allegations brought forth by the government.  Many of these potential witnesses are outside the United States. Additional time is necessary to contact these witnesses, interview these witnesses and determine whether these witnesses are willing to return to the United States to testify. These witnesses, in addition to some located in the United States, some in foreign countries. The defense requests to present to the court in-camera a list of these witnesses along with their proposed testimony and why their testimony is relevant to the defense.

c)    Additional time is necessary so that counsel can confer with the Defendant to determine which of the specific witnesses need to interviewed versus which will be actually called at the trial to testify. Counsel has not had an adequate opportunity to confer with any of these witnesses as the primary emphasis has been placed on reviewing documents to determine which documents apply to which counts of the indictment and to prepare and understand how the government is going to prove the various counts of the indictment.

18.    This motion is made in good faith and not for purpose of delay.

19.    The Defendant moves the court to set a status conference so the parties may discuss these issues with the court.

**WHEREFORE,** the Defendant respectfully prays that this Honorable Court will grant the relief sought herein.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished to Assistant United States Attorneys Diana Fernandez and Brian McCormick, via fax and U.S. Mail, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, Florida 33394, William Norris, Esquire, Attorney for Fred Morgenstern, 7685 Southwest 104th Street, Suite 104, Miami, Florida 33156, and Emanuel Perez, Esquire, Attorney for Joseph Silvestri, 2121 Ponce de Leon Boulevard, Suite 920, Coral Gables, Florida 33144, and David Tarlow, Esquire, Attorney for Frederick Scarola, 801 Brickell Avenue, Suite 1901, Miami, Florida 33132, on this 23th day of April, 2002.

Respectfully submitted,

SCOTT W. SAKIN, P.A.
CJA Counsel for Defendant
1411 N.W. North River Drive
Miami, Florida 33125
Tel: (305) 545-0007

By: _____
            SCOTT W. SAKIN
            Florida Bar N° 349089

11

# David A. Morgenstern

7534 Estrella Circle •Boca Raton, FL •33433
Tel/Fax: 561.883.1164

Mr. Scott W. Sakin, Esq.
1411 N.W. North River Drive
Miami, Florida 33125

April 24, 2002

BY FAX ONLY: 305.325.0331

Re: Pro se Filing

Dear Scott:

Yesterday afternoon, when you called, I was at the courthouse in Ft. Lauderdale filing the attached "Motion for Continuance." The Exhibits are the same.

Please re-visit, my "Memorandum" of January 25, 2002, styled "*Re: United States District Court, Southern District Of Florida Case No. 00-6309-Cr-Seitz (S)(S) And Notes Referencing Inadequacy Of Counsel, Should The 24 Jan 02-Filed Unopposed Motion For Continuance Be Denied.*"

As you may recall, with your support and acquiescence, I composed the "Memorandum" for the express purpose of memorializing reasons why I felt that if the trial went forward on February 11, 2002, that I would be entitled to use it to challenge the government and you, as Defendant's counsel, under my Sixth Amendment rights, including issues relevant to the inadequacy of your capacity to prepare for trial.

Given my health issues, little is different from January 25, 2002. We met twice in the three months. The file is organized, notated and analyzed, as you will see. I know the evidence quite well for both jurisdictions, but I'm not the lawyer.

Why were so reluctant to file a truthful motion? Put simply, you are not prepared to defend this case and I'm too sick to stand trial. It is not at all the truth that I'm "just too sick."

Sincerely,

David A. Morgenstern

<u>A</u> <u>P</u> <u>P</u> <u>E</u> <u>N</u> <u>D</u> <u>I</u> <u>X</u>   <u>E</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
    Plaintiff,

                              CASE NO.  00-6309-CR-DIMITROULEAS

vs.

FRED MORGENSTERN and
DAVID MORGENSTERN,
    Defendants.
_____/

### SUPPLEMENT IN SUPPORT OF DEFENDANTS' *PRO SE* MOTION AS FILED JANUARY 30, 2003, REQUESTING THE APPOINTMENT OF NEW CJA COUNSEL

This supplement will serve to continue statements made by Defendant David Morgenstern as required by this Honorable Court at the Status Conference on January 31, 2003. The subject of that conference was the return of Case Number 8:02-CR-713, formerly 00-6309-CR, to this District from the District of South Carolina, Anderson Division, which accepted it from this Court under a Rule 20 procedure. That process began in late May 2002 and was finalized by that District's acceptance around mid-July, 2002.

The return of this case to this Court is confusing, as I said last Friday, a statement not overlooked by this Honorable Court, as was so concurred from the bench. The return of this case is not a refusal or even a rejection of one District objecting to the transfer. The Judge has reversed his earlier acceptance of the case to return it after previously agreeing that his District would thereafter proceed.

It appears that the prime reason for this reversal, at least according to the context of the South Carolina prosecutor, Mr. David Stephens' *ex parte* letter to address to Judge G. Ross Anderson, where this letter was accepted in its full form to be the finding of fact, was the concern of Mr. Stephens over judicial economy. This would seem to imply that Judge Anderson reversed himself because David Stephens thought that it is better to spend the government's time and money in the District of South Florida with regards to concluding this case rather than it is to spend the same government's time and money in the District of South Carolina.

It is especially eerie to me to have heard in Friday's hearing that this Court may have judicial economy issues about granting my request to have new CJA Counsel appointed. I say this statement under the risk of being entirely out of place. I am not a lawyer so I limited in my understanding, as to the formalities of this proceeding, as well as to any remedies that may be open to me regarding it or those open to this Honorable Court. I am speaking today without the benefit of counsel, but then, it may be that silence and the inherent misunderstandings that accompany it, have governed this case for far too long. I request new CJA Counsel be appointed as opposed to me being required to accept reappointment of my former counsel Mr. Scott W. Sakin. There are specific reasons as to why I ask this. I believe that the appointment of new CJA Counsel is imperative and fundamental. There are certain situations that occurred in his representation that unseat any predispositions to the contrary.

The first one is regarding how Scott W. Sakin became my CJA Counsel in the very first place. It was Judge Garber that concluded a significant conflict of interest existed between Ms. Ana Jhones and myself in the September to November timeframe 2001. It involved in part, the Government filing a motion to object to Mr. John Howes continuing as Fred Morgenstern's CJA Counsel at the time. There was a tremendous misunderstanding over Mr. Howes requesting copies of certain exculpatory and therefore *Brady* material that the defense felt it was otherwise entitled to receive. These documents were part of the *US vs. Womack* evidence gained through search warrants in both Seneca, South Carolina, in South Florida and perhaps elsewhere, evidence examined in Greenville, South Carolina by Mr. Howes, Fred Morgenstern and myself and carefully tagged over some number of hours as to their significance to be copied. Ms. Jhones and I had words over the value of this material, as did Ms. Jhones and Mr. Howes on more than one occasion – so much so that Judge Seitz appointed an attorney, Mr. Horowitz, to be a mediator for communication between the two of them.

It was the Government's position that unless Fred waived the potential conflict of interest that could arise from the copying incident, that it was not appropriate for Mr. Howes to continue as Fred's counsel. On 10 October 2001, there was a status hearing in Judge Seitz's court. Mr. Howes, Mr. Horowitz and Mr. Rothman had a sidebar meeting with Ms. Jhones and the Judge over the copying incident. Disagreements were so fierce in that meeting, Ms, Jhones offered to withdraw as my attorney. Also at that conference, Ms. Jhones made it clear that Mr. McCormick was pressing to have her removed as my counsel. Since it was also her desire to withdraw, she informed the Court of her intentions. Efforts were made to reconnect our relationship, but her effective aid in the preparation and trial of the case and that the government may have interfered that with representation, not necessarily through the manner of her appointment but perhaps through the imposition of restrictions, like the appointment of a mediator, may have impeded her ability to fairly provide a defense. This led to Scott W. Sakin being appointed CJA Counsel.

The second situation of significance to be raised with regard to why new CJA Counsel should be appointed, is was my Memorandum written to Mr. Sakin dated January 25, 2002 regarding this case when at the time it was styled as Case No. 00-6309-CR-SEITZ (S)(S). The Memorandum was entitled "*Notes Referencing Inadequacy Of Counsel, Should The 24 Jan 02-Filed Unopposed Motion For Continuance Be Denied.*" It had certain other specificities in it but most of it paralleled if not in form certainly in substance the language used in the Unopposed Motion. I composed the Memorandum in its entirety as the Defendant in the above styled case. It was for the express purpose of memorializing reasons why the Defendant and Mr. Sakin felt that if the trial was to go forward on February 11, 2002, the Defendant would use the Memorandum, with Mr. Sakin's blessing, to challenge the government and Mr. Sakin under Defendant's Sixth Amendment rights, including issues regarding inadequacy of counsel's capacity to prepare for trial.

The significance of this Memorandum needs to be examined by new CJA counsel for the Defendant for inadequacy of Counsel claims, as it set forth the foundation for conditions that would lead to such an inadequacy of counsel motion with Mr. Sakin's full acquiescence. In it, Mr. Sakin, merely by accepting without protest, admitted that he was in no way prepared for trial in this case on January 25, 2002. Of particular significance in the Memorandum was the discussion concerning Count 14, from which under it was the USC Code Section 1957 portion the Defendant's guilty plea was derived. It was Mr. Sakin's position that with regard to the discovery he had examined through January 25, 2002, it did not show that the Defendant engaged in money laundering. This was of course a very preliminary conclusion drawn on little examination. The Memorandum goes on to state the conclusions drawn. Then there is a section where it says "Mr. Sakin has not filed motions as yet to uncover in advance of trial the government's prejudice," where I say: " I hope he will, as soon as time permits him to do so, among other motions to remain undisclosed at this time." There was also a significant witness list therein describing the kind of collaborative testimony expected, stating who the people were, what we believed they would say, and how this is relevant to our defense. There was an approximate 36 persons on that list - Mr. Sakin never contacted any of them.

We did get the continuance for trial, reset for May 6, 2002. But the next Situation of Significance occurred that very day, January 25, 2002, when I was rushed to the hospital for Emergency surgery. I was the last day I would ever spend prior to May 23, 2002, the day of the guilty plea with Scott W. Sakin. It would be April 17th 2002 before I was free of being in the hospital near every single day. It is that fact that brings to bear the greatest reasons why I seek to have this court appoint new CJA Counsel as opposed to re-appointing Mr. Sakin since it has led to much of the confusion associated with the situation of returning this case to this District.

It was still in April 2002 that I filed a pro se motion to move this Honorable Court to continue the then-set trial date from May 6, 2002 forward into time. I filed the *pro se* motion for both to underscore my protracted medical condition that led to me being unable to gain effective representation, and in order to notify the court of the ineffectiveness of CJA counsel. It is unfortunate that perhaps that Motion was set aside by Mr. Sakin by this Court in the fashion that it was. I filed it pro se because Mr. Sakin on April 23, 2002, refused to file it in the form that it was. He wanted to file one that edited out all references that would challenge his own effectiveness. That editing process was prejudiced and it compromised my Sixth Amendment rights, including what should have been his honest and earnest disclosure that he was entirely unprepared for my trial. While I said as much throughout my motion for a continuance, that Motion was accepted by this Court but not heard. Mr. Sakin could not possibly have become prepared for trial in the twelve calendar days that remained prior to the trial date of May 6, 2002 and it is equally true that the two-week continuance this Court gave him in that hearing was equally insufficient.

It was that *pro se* motion that stated fairly the facts and they were not heard, yet they are in that motion to this day, and motion not denied by this Court. That motion memorializes that up to January 25, 2002, I worked almost every day on this case from mid-December 2001 when Mr. Sakin got the first production evidence from Ms. Jhones. But in the afternoon of January 25, 2002, I was admitted to West Boca Medical Center, Boca Raton, Florida for emergency surgery, relating to an infection in a massive blood clot that had formed as the result of an attempt to repair a left shoulder separation on January 10, 2002. That infection led to him contracting Septicemia, a dangerous infection of the blood, a type of blood poisoning caused by pathogenic microorganisms.

Septicemia causes immune system deficiency, internal bleeding without warning, and other serious complications, including potential damage to, or failure of, vital organs. The Defendant was hospitalized from January 25 through February 1, 2002, then again, February 8 through February 11, 2002, then again April 4 through April 11, 2002. In addition, between these dates, and through to April 17, 2002, the Defendant was an outpatient at North Broward Medical Center for infusion of intravenous antibiotics seven days every week, a process taking anywhere from three to seven hours each day. I was simply unavailabile to work on this case and Mr. Sakin did not and could not – since the majority of evidence and discovery had been moved from his offices to my home in February 2002.

The government was kept fully informed about my health issues, both by full access to my doctors and presumably by Mr. Sakin. Yet it was on March 26, 2002, the U.S. District Court, Civil Division, in Greenville, South Carolina required me, in difference to the absolute medical advice to the contrary, to fly to Greenville and be present at a "Motion For Show Cause Hearing On Civil Contempt, To Repatriate Funds, For Corporate Records And Other Relief," even though that Court was presented with a motion to continue the hearing as signed by his physician, that I was too ill to travel. That motion was denied. That document, that letter, an Exhibit to the Motion, from Dr. Sortino, my physician, to the South Carolina Court is especially poignant today, now that the result of that Court's denial of my motion was: I quote:

*"I understand from my Patient, David Morgenstern, who has had an office visit today, that there is a matter before your honorable court in Greenville, South Carolina requiring his appearance on March 28, 2002. He has also told me that Mr. Steven W. Sumner is his attorney representing him, and that Mr. Sumner, requires him to be in South Carolina beginning Saturday, March 23, 2002, in order to prepare adequately for this hearing.*

*Mr. Morgenstern is undergoing post-operative care and infectious disease therapy as the result of an unsuccessful surgical repair of a separated left shoulder. He is lethargic, with little energy and in chronic pain. Today's office visit was to prescribe a blood test, that will be done today at North Broward Medical Center, Pompano Beach, Florida, which is in addition to his weekly blood test taken each Monday that monitors his progress towards defeating both a condition of anemia caused by internal bleeding in the GI tract, and sepsis, a severe infection of the blood.*

*The additional tests include a blood culture, a routine procedure at this point in his therapy, in order to determine the progress and the effectiveness to date of his daily intravenous antibiotics treatment that have been underway since February 1, 2002. It will be determined as to whether the date of March 26, 2002 will in fact be the last day of his IV therapy, which cannot be abated or interrupted prior to that date. For this reason alone, and there are others, as I have said in my last letter (attached), he cannot travel on March 22 or 23, 2002 to meet with his attorney in Greenville, South Carolina. In addition, the Patient is also actively GI bleeding from an unknown source. He is scheduled to undergo upper and lower endoscopies with Dr. Harold Rosen, a GI specialist. Until the source of bleeding is known, it is not medically safe for him to travel.*

*I have made it clear in my past letter (attached) to Mr. Scott W. Sakin, Esq. who asked me to prepare a letter for the court in South Florida, that this Patient is not able to travel until after March 26, 2002, and I now add, not immediately after as he must be monitored for at least 48 hours thereafter for any fever. Later this week, after we receive the results of his tests as discussed above.*

*I will endeavor to provide a date certain for Mr. Morgenstern to be able to travel as soon as I can, but such travel dates will not be the 22nd, 23rd, or the 27th of March, 2002. I would ask the Court to respect the imperative orders I have given for this Patient as a licensed physician. I cannot endorse any action where Mr. Morgenstern, as a Patient acts, or is required to act, outside of my recommended Standard of Care."*

The Court, in difference to violating my physician's standard of care, denied my motion. I traveled to South Carolina and met with Prosecutor David Stephens, Mr. Marvin Harrison, special expert witness who will give testimony for the government in the matter before this court, Mr. James R. Pavlock, Trial Attorney, U.S. Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, Washington, DC, and Mr. Paul Jacobs, Special Agent, FBI, under proffer, as opposed to going to the civil contempt hearing, in an attempt to resolve matters out of court. I sustained over 20 hours of interrogation, and this over the period of only two and half days.

On March 29, 2002, I returned to South Florida where he met with Prosecutor Brian McCormick, and Mr. McCormick's team of five other interrogators on April 2 and 3, 2002. I told Mr. Sakin the first day I was difficulty understanding, staying mentally acute. On April 3, 2002, I then told this in the forum of my attorney and the investigators, that I was having difficult both understanding the questions, and responding to them in a way that was satisfying. I apologized openly for this. I then asked if I could excuse myself from the proffer until such time as the GI bleeding, lethargy and chronic pain that was obviously plaguing me could be abated.

Thus, it was during the nine days from March 27 through April 4, 2002, when I was supposed to be resting and strengthening my immune system and gaining abilities to fight my disease without the infusion of IV antibiotics, that at the Court's beckoning, I spent two days traveling, four days in proffers, and only a fraction of the time having any rest. I felt very sick, tired and mentally unsound. I was running a temperature again and I began to feel dizzy and weak. It was during the early morning hours of April 4, 2002, I relapsed into another sepsis episode and was re-admitted to North Broward Medical Center.

I said in my motion for continuance that the Defense simply had not had the time in the last three months due to my medical circumstances, to materially work on this case more than only a few hours, and even then, the work completed has been predominantly clerical matters. For the record, when a sepsis patient relapses, the only available treatment is a progressively stronger intravenous antibiotic that is inherently more toxic. On April 19, 2002, again wrote Dr. Sortino, MD wrote the Honorable G. Ross Anderson again, as well as to Mr. Sakin and Mr. Sumner, my then CJA counsel in South Carolina:

*"Mr. Morgenstern is undergoing post-operative care and infectious disease therapy as the result of an unsuccessful surgical repair of a separated left shoulder. He was re-admitted to North Broward Medical Center on April 4 through April 11, 2002, for a septicemia (sepsis) episode, his third since January 25, 2002. Further, intravenous (IV) antibiotic therapy, requiring up to seven hours per day was required after his discharge on an outpatient basis through to April 17, 2002. Septicemia is a dangerous infection of the blood, a type of blood poisoning caused by pathogenic microorganisms. Statistically, two-thirds of those that contract this disease are unable to survive its symptoms.*

*It causes immune system deficiency, internal bleeding without warning, and other serious complications, including potential damage to, or failure of, vital organs. Mr. Morgenstern is lethargic and in chronic pain. He is mentally depressed and distracted by the infusion of a battery of very strong medications. He is facing the reality of a life-changing health condition. He requires precise, time-consuming therapy in order to have the opportunity to overcome this disease, including testing the patient's own ability to withstand infection during periods when he is not under medication. This is the only way to determine if a permanent cure has been found.*

*This Patient became ill during his first "test" such period beginning March 27, 2002, since contracting the disease, and he relapsed eight days later on April 4, 2002. When a sepsis patient relapses, the only available treatment is a progressively stronger intravenous antibiotic that is inherently more toxic. These therapies tend to make the patient actually sicker, weaker and mentally depressed for a while, similar to chemotherapy in cancer patients. Mr. Morgenstern is in the middle of this treatment regimen. While he is currently in a cycle of no antibiotic medication, he is not cured. He is very susceptible to relapse. Mr. Morgenstern remains physically exhausted and mentally despaired, particularly since the start of this ordeal was a routine outpatient surgery on January 10, 2002. His current health is now a daily battle between aspects of nausea, chronic pain and fatigue versus only the hope that perhaps someday he will have a renewed vigor. This is gravely different from when he went to the hospital for a same-day surgery January 10, 2002."*

In my motion, I pointed out that from the seventy boxes of documents from South Carolina that Mr. Howes had copied, I separated approximately eleven boxes of materials of importance to the Defense. But Mr. Sakin never returned to me to examine these documents. They were of primary important to my defense. They showed conclusively that I was not involved in the South Carolina investment fraud. They contained omissions concluding that David Morgenstern had no knowledge, involvement or participation with that fraud. In spite of my efforts, Mr. Sakin never examined any of those documents.

At the hearing concerning this request for a continuance, when I stood in this Court and I said that it was not so much Mr. Sakin that I had difficult with, but it was the time to prepare a defense for my case. When this Honorable court heard that, I was told in effect to sit down and to say not another word Well, Mr. Sakin did speak, but he not certainly did not represent the contents of my Motion. Accepted a two-week continuance without any objection knowing full well that the same kind of extension as the same content Motion January 2002 was what would be required. That was a grievous error. The time from January to May might as well have never happened as far a preparation for this case was concerned, due to my sick days alone. Nothing had changed from January 25, 2002, as to the readiness for trial and it was now May. I needed that continuance. Mr. Sakin said nothing about that great need. He didn't even try. He never stated his own unprepared-ness, that to be prepared in two weeks was impossible, especially since he was in the middle of a capital murder trial. He never was even able to materially meet with me before the trial date.

Due to my extreme health issues, Mr. Sakin should have presented himself the way Mr. Norris did this past Friday in this court - Completely deficient as to my representation. We were beaten by the clock.

In May 2002 I was still extremely sick. When Mr. Sakin failed me; I lost all hope for a trial. I sought out Mr. Stephens and Mr. Pavlock because I knew I had no attorney and at the time, I didn't have any deal down in South Florida either, although I had been under proffer since March in South Carolina. Those discussions during those two weeks with the prosecution – not Mr. McCormick at any time by the way, proved productive - but then the worst occurred. When the prosecution came to this Court and said that a guilty plea was imminent the day before trial and the trial should therefore be continued, you said to both sides – It's not happening – the trial would start in the morning. You gave Mr. McCormick and Mr. Pavlock, 2 and half hours to prepare the guilty plea and then you gave us 15 minutes to agree to it. It was then we entered into the colloquy.

Under commentary that discusses Sixth Amendment rights, it states that the trial judge must not only refrain from creating a situation of ineffective assistance, but it may well be obligated under certain circumstances to inquire whether defendant's counsel, because of a possible conflict of interest or otherwise, is rendering or may render ineffective assistance. There are two components to the test: deficient attorney performance and resulting prejudice to the defense is so serious as to bring the outcome of the proceeding into question. Although the gauge of effective attorney performance is an objective standard of reasonableness, the judicial scrutiny of counsel's performance must be highly deferential. Strategic choices made after thorough investigation of relevant law and facts are "virtually unchallengeable," as are "reasonable" decisions making investigation unnecessary.

In order to establish prejudice resulting from attorney error, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." I may be that this test is best refined by the appointment of new CJA Counsel, a test to require that not only would a different result have been probable because of attorney performance, but that the result which did occur was fundamentally unfair or unreliable.

I have the aftershock of sepsis. It is often life threatening, especially in people with a weakened immune system or other medical illnesses. The death rate can be as high as 60% for people with underlying medical problems. Perhaps the most consistent clinical feature in sepsis is an alteration in mental function. It may be as subtle and nonspecific as fatigue or malaise. Mild disorientation or confusion is especially common; with more severe manifestations include apprehension, anxiety, and agitation. The cause of these mental function abnormalities is unknown, but altered amino acid metabolism has been proposed as one of the causes.

Another situation of significant is of course the content of Mr. Stephens letter accepted as statement of fact in returning this case to this Court. The letter has material differences from another statement accepted by that court in the form of my Motion to have new CJA counsel appointed by Judge Anderson as the result of the incident as described in the letter between Mr. Jacobs and myself and other aspects of my proffer. Only one example is the misstatement of fact in the letter about when Mr. Stephens And Mr. Jacobs began to interview him under a proffer agreement, which he says began after I was sentenced. That just simply is not true. I signed my proffer with him in March 2002 not in May and has I have already said in here, the evidence is ample that Judge Anderson awarded the return of this case not on statement of fact but on misstatements of events that in fact occurred. And there are many others, in addition to material omissions that Judge Anderson relied upon in the ex parte presentation. Another one is that the South Carolina Court will either have to bear the expense for transportation of the appointed lawyer from Florida or pay the expense of local counsel who will need a good deal of time to become familiar with the details of the Florida case. This is false. This same Court had already approved and appointed me not one but two CJA counsels in connection with these cases who have done substantial work towards resolving potential conflicts.

The Court in South Carolina appointed new counsel and discharged my old CJA Counsel, Mr. Sumner as the result of ineffective of counsel because as was said in my motion, and thus accept as statement of fact by the Court, he was ambivalent with respect to the complexity of the matters before that court, but also with regard to the Defendant's Proffer with the US Government where he has provided, and wants to continue to provide, substantial assistance to authorities for the Court to consider a downward departure in his sentencing guidelines, upon a motion from the government, pursuant to § 5K1.1, and was signed on March 28, 2002, the day I entered into that Proffer with the US Government through The Honorable David Stephens, US Attorney's Office Greenville, South Carolina. After approximately one hour of attending the Proffer session on March 28, 2002, Mr. Sumner excused himself from the meetings and never attended another such session at any time, such that the Defendant had no further legal representation. On August 30, 2002, in the morning, when I tried to meet with Mr. Sumner to understand why the Government suddenly shifted their posture from having the Defendant cooperate to the Defendant having to immediately plead guilty, Mr. Sumner gave the Defendant "60 seconds" to sign one or the other of the two documents by telling me that I was due in Court in 10 minutes to plea or to not plea, implying that it was that Honorable Court sourcing the documents, when in fact this Honorable Court did not source either of them. The Honorable Court granted my motion seeking relief to adequately protect my Sixth Amendment rights under the US Constitution, and among US statues, concerning the issue of inadequate representation of a person accused in a criminal prosecution and who is under Proffer with the Government. And I was obviously giving testimony about this case and for my benefit as much as any of the others.

While this report is not complete, I have delivered it in a prepared and written form. In order to make a sensible conclusion, in the context of the question posed to me by the Court, I am still a Defendant in a criminal case not adequately represented by counsel. There are many other issues here but time has run out for me again to put all of them on the record.

But it may be that now, the Court may have to determine whether Mr. Sakin's performance when he was my CJA Counsel was deficient, or whether certain of his actions, or inactions, may have prejudiced my defense, or perhaps whether there was a fundamental, misstatement by Mr. Stephens, Mr. McCormick, or some misunderstanding amongst Mr. Pavlock and myself, or others among the prosecutors, the investigators or attorneys for the Defense. We may have here what is an involuntary plea of guilty. These events as discussed here must be tested, and if not here, then where – to see if they, or even other acts, were the result of attorney error. This could give rise to ineffective counsel claim. This is sobering and it is serious. A claim of this sort, of misconduct, cannot stand, it must not stand on a blank record, nor can the record be peppered with cavalier diatribes, or some disconnected set of unsupported allegations. This Court, appointing new CJA counsel to represent me, would certainly best resolve this matter distinctly and for the best.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of this Motion was filed Clerk of

Courts, and hand-delivered to Brian McCormick, Esq., and if appropriate, to

Judge William J. Dimitrouleas, on this the 4th day of February 2003.


Respectfully Submitted,

February 4, 2002

Fort Lauderdale, Florida


_____

David Morgenstern, Pro Se

7534 Estrella Circle

Boca Raton, Fl. 33433

<u>A</u> <u>P</u> <u>P</u> <u>E</u> N <u>D</u> <u>I</u> <u>X</u>    <u>F</u>

# MEMORANDUM

**TO:    SCOTT W. SAKIN, ESQ.**
**FROM: DAVID A. MORGENSTERN**
**DATE: January 25, 2002**
**RE:    UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 00-6309-CR-SEITZ (S)(S)**
***And***
**NOTES REFERENCING INADEQUACY OF COUNSEL, SHOULD THE**
**24 JAN 02-FILED UNOPPOSED MOTION FOR CONTINUANCE BE DENIED**

THIS MEMORANDUM dated 25 January 2002 has been composed in its entirety by the undersigned, David a. Morgenstern, as "Defendant" in the above styled case. It is for the express purpose of memorializing reasons why the Defendant feels that if the trial goes forward on February 11, 2002, the Defendant will use this MEMORANDUM to challenge the government and Defendant's counsel, Scott W. Sakin, Esq., under Defendant's Sixth Amendment rights, including issues regarding inadequacy of counsel's capacity to prepare for trial.

**Background.**
Scott W. Sakin, Esq. was appointed on November 6, 2001 as CJA Counsel for David A. Morgenstern, a Defendant in the above styled case, and received "First Production Discovery" materials (and only these) from Ms. Ana Jones, Esq. Mr. Morgenstern's former counsel on December 13, 2001. Given the December-January holidays, and his court schedule, Mr. Sakin has had a very limited amount of time to review even these "limited" discovery materials in spite of working every day with the Defendant on the discovery through to this date. Further, there is still other discovery that is available, from South Carolina, as well as discovery not yet available, all necessary to examine, because of omissions in this discovery in favor of the defense. Mr. Sakin and the Defendant have not begun to examine this other discovery.

Further, the allegations, as well as the number of defendants, as recited in the Second Superceding Indictment has changed considerably from the earlier, preceding indictments. The cause of these changes has not been examined. The Defendant believes that very recently a shift has occurred in the case from a document-based case for both the defense and the government, to a document-based case for the defense that requires several expert witnesses, while the government's case had become more witness-based, certainly made up of former co-defendants and witnesses from "other" indictments. There are co-defendants missing in the second superseding indictment that were in the previous indictments, and certain defendants and government informants ("sources") that were present in the indictment U.S. v. Wolmack, et al, which are believed to become government witnesses in this case. This would include co-defendants that are in the second superseding indictment that have entered into, or are about to enter into, plea agreements with the government, and those who have entered into plea agreements in U.S. v. Wolmack, and thus may also now become witnesses in this case. Little, or virtually none, of these developments have been provided to the defense, either in writing or in the form of new discovery.

1

**<u>Other Matters Regarding Discovery</u>**

This case contains a myriad of complex and interrelated allegations where the discovery is expected and required to shed sufficient clarity. This discovery requires time to examine, analyze and fully interpret. While Mr. Sakin has preliminarily reviewed some 8,000 pages of discovery provided to him by Ms. Jhones, (received on 13 December, 2001) this is only part of the contents of only 7 boxes received. There are at least 72 other boxes of discovery to examine in this case, perhaps many more.

This is not the entire discovery in this case either, as Mr. Sakin was informed the week of January 14, 2002 that there is new discovery that is going to be used by the government, originating from the Bahamas, that Mr. Sakin has yet to receive. Volume 1, or 1337 pages" has been ordered from International Legal Imprints, a copy center, but this has not been received and there are possibly two additional volumes (containing an unknown number of pages) are yet to be released.

The Defendant also understands that the government is intending to interpret some of the discovery as either 404(b) material or as "intrinsically integrated" material, where they have yet to inform the defense as to the extent, choice, scope or finality of these decisions. This material is mixed into the discovery without any identity as to it, as no index was provided to Mr. Sakin from Ana Jhones. At this date, Mr. Sakin has very little understanding as to how to interpret this discovery as chief to the case or as 404(b) this evidence.

The 404(b) materials appears seem to cover the Defendant's other business undertakings not mentioned in the indictment, going back to the fall of 1995 and forward to the present. Such material is at best incomplete, since the government certainly does not have full files in the discovery as provided thus far. This is all new material. Any decisions by the government to use this material will cause the defense to provide additional materials as evidence for the defense. The Defendant does not know where the government stands on these critical issues. The Defendant also does not know if other discovery, as provided by the government or subsequent thereto, by the Defendant for that matter, or any co-defendant, relevant to these matters, could or should be presented at trial.

To conclude the issue of review of this entire discovery - perhaps 225,000 to 250,000 or more pages – which would add up to hundreds of boxes, not just the 6 or 7 boxes as provided to Mr. Sakin by Ms. Jhones, the defense simply has not had anywhere near sufficient time to mount a defense based upon these vital documents. In order to build a proper defense, these materials must be examined, indexed and cataloged first as each part of the discovery applies to each count in the Indictment and then in a fashion that these expert witnesses can understand and opine on them.

2

CJA needs time to gain approval to hire expert witnesses while at the same time the Defendant has the right to call such witnesses. This is particularly important in the areas, as said, in forensic accounting, but also what is defined as ordinary, customary international banking, finance, investment and business practices undertaken by the Defendant, especially concerning monetary issues, as well as the common procedural management and handling of funds and the records under which such financial transactions were undertaken, by the defendant, among others, can opine on these matters which are under accusation by the government as levied against the defendant in the indictment.

## Regarding the Importance of Witnesses

The Defendant intends to call witnesses and expert witnesses, all of who have to be located and deposed over some reasonable period of time. In the one month since the defense has had access to the discovery and files of the case, there has been only enough time to examine a fraction of the discovery.

While the Defendant includes hereunder, persons expected to be available as witnesses for the defense, and profiles for expert witnesses that are required to call at trial, and although a list and discussion of what each of these persons can likely contribute, there has been no time to follow through on scheduling or identifying these witnesses, nor has CJA counsel applied for the costs to pay for this undertaking. This notwithstanding, all of these persons who were engaged in various aspects of the defendant's businesses, either directly or indirectly, are critical to the defense and time must be granted to engage them.

The defense must engage certain expert witnesses, which have been profiled below, in order to testify to the authenticity of the defendant's "ordinary and customary" business practices. Certainly the primary witness for the defendant would be a person or persons that are expert in the management of offshore and international business undertakings, as well as certain inter-, and intra-jurisdictional issues, since the defendant did little business in the United States, but operated in other countries, including the Bahamas, Brazil, Portugal, England and Switzerland, and potentially others.

Since the majority of business occurred outside the United States, an expert must be able to opine on how a corporate undertaking would best take advantage of opportunities and still being in compliance with the business, banking and accounting laws of a diverse set of nations. Expert testimony is obviously required for the following:

- Whether any of the corporations, whether formed by the defendant or not, to operate under the laws of other nations in fact did so in full compliance with the laws of that land.

3

- Whether there is any conflict between these legitimate operative guidelines and the guidelines of U.S. laws, and if these corporations in fact operated in compliance with laws in their countries of formation, how this could potentially by considered wrongly interpreted under U.S. law.

- Whether there is the possibility that while the defendant is a US citizen, he did not operate any US corporations in association with the indictment. These corporations may not thus be subject to US law at all; especially in the way the government is interpreting these corporations's are merely alter egos of the defendant, which can never be the case legitimately under law. This is especially critical in the differentiation between the laws of the United States versus such foreign laws, as they exist in these other countries, since the defendant never acted as an individual or personally in any capacity whatsoever, but only as the bone fide representative of various non-US, fully formed and legitimate corporations.

- Whether the defendant, acting as representative of these financial intermediary corporations, undertook to follow generally accepted accounting practices in full force and effect in these countries for these corporations, and whether these corporations justly followed such practices, never concealment of ownership or location of proceeds, never taking any steps necessary to avoid detection by law enforcement, to the contrary always applying principles of inter-jurisdictional debiting and crediting of assets and or funds, always respecting the lawful and fungible nature of transferring US Dollars worldwide.

- Whether the defendant and certain financial intermediary companies followed generally accepted accounting practices in their respective countries of operation, as well as cross-jurisdictionally into other foreign countries, and as such, complied with all governing law associated with business undertakings thereby.

- Whether the diverse bank secrecy laws, fraud and money laundering statues, of these respective foreign jurisdictions vary materially from the United States law, and whether even if the Defendant and these certain financial intermediary companies complied in every way with those laws, how this compliance effects the issues of the Defendant's intent this case.

- Whether the defendant's action in non-US corporations was consistent with banking, trading, investment, fiduciary and trustee practices in each country, including whether he fulfilled his obligations and responsibilities for such an operation under the confines of prevailing law.

- Whether any of these non-US practices that operated fully out of the United States violated any of RICO, money laundering or fraud statutes as cited in the indictment.

4

The Defendant now draws attention to the Second Superseding Indictment (the "Indictment"):

## RICO

In Count 1, the Defendant is accused of being a full agreed, knowing and willing participant in a racketeering enterprise, as defined in Title 18, United States Code 1961(4), the alleged purpose of which was to at least enrich its members through various criminal activities. Specific to the Defendant, merely by limitation of counts attributed to him in the Indictment, he is accused of money laundering and the conspiracy to do so, mail and wire fraud, under Title 18 United States Code, Section 1952, 1956, 1957, 1341 and 1343, for the enterprise.

RICO is an exceedingly complex allegation where research is both convoluted and ambiguous. Mr. Sakin has thus far not even been able to decipher which part of the discovery applies to this Count, or for any of the other Counts in which the Defendant is charged for that matter. Because all elements of RICO must be proved (the Defendant assumes) from the recitation heading "Pattern of Racketeering," this must be very careful analyzed to see whether these are merely "routine fraud" matters or in fact contributions to an enterprise. From what the Defendant has researched, is also unusual for an indictment to state the "Acts" attributed to each defendant in such an undefined form. In RICO indictments researched by the Defendant, they typically cite which two "acts" (as "RICO Act 1 and RICO Act 2") that are attributable to each of the defendants, because it is imperative to cite which "Acts" the defendants each in fact allegedly agreed "in advance" to contribute to the enterprise.

This said, whatever the undefined "two acts" are as they apply to the Defendant, the assumption is that they might be money laundering, mail and wire fraud, none of which are, in and of themselves, RICO Acts when taken out of the context of RICO. Nevertheless, the burden of the government is that these "two acts" *must be agreed to be done* by the Defendant *in advance of their occurrence* with *at least one other proven (under the same measures) member* of the enterprise. If this can in fact be proved, then and only then do these "two acts" become his "contribution" to the "enrichment of the enterprise."

Mr. Sakin has had no time to decipher these important distinctions from the discovery examined thus far. The Defendant must be part of this "enterprise," or a "group of individuals associated in fact" through these "two acts" where the Defendant acted in a manner to complete these "two acts" for *a specifically identified premeditated purpose*. In the case of the Defendant, the indictment seems to point to fact that he would have had to promote the so-called "South Carolina investment fraud scheme" (the "SC fraud") in some way while concealing the location of its criminally derived proceeds, while also taking all steps necessary to prevent the detection by law enforcement of its criminal activities, and all this, while traveling to promote the enterprise, all for the benefit of the enterprise.

5

Mr. Sakin has had no time to ascertain from a mere fraction of the discovery whether any of these proofs are materially exposed in the discovery, nor has any witness list as the result of plea agreements been provided by the government sufficient to ascertain the veracity of any of accusations. More specifically, the defense has not found in any of the discovery examined over this past month any nexus for the charge of RICO with regard to the defendant. Since he is charged, we can only surmise that whatever evidence establishes this nexus is either non-existent or is still unknown to us. Either way, defense counsel cannot claim that it could be effective counsel by February 11, 2002, regarding RICO.

Further, the Defendant remains confused by the way the government seems to have collapsed two separate cases into one in the Indictment, for what appears to be the sole reason to put the Defendant under a RICO charge. The Defendant is not even charged in the so-called "organized crime" counts, the collection of unlawful debt, unlawful gambling, and obstruction of justice. Then there is the alleged "South Carolina investment fraud scheme" counts. By Mr. Sakin's own admission, he has not been able to find any nexus between these two groups of counts through to RICO as an "enterprise."

Yes, a portion of the funds from the alleged South Carolina investment fraud scheme, were processed as accounts receivable through certain licensed by the State of Florida "fringe bank-styled check-cashing" stores. But from the discovery examined, these "stores" appear to have been legally permissible (state-licensed) "check accepting and cash or cash equivalent, or money orders, cashier's checks and wire transfer, tendering" depositories acting for hundreds if not thousands of clients from the general public over the course of many years, at least back into 1996. The fact that they also accepted checks from Chemical Trust, et. al. albeit in higher dollar volumes than "ordinary citizen" checks," did not change their internal control procedures as required under law for all such items or checks.

What the Defendant is saying is that regardless whose third party check it was, these "stores" acted in a same or similar, if not practically identical fashion for clearing checks at their respective US Federal Reserve qualified, FDIC-insured banking institutions. For instance, practically all of the "South Carolina investment fraud checks" were payable to Chemical Trust under endorsement guarantees and indemnities signed by Chemical Trust's assumed formulator, Virgil Wolmack, the alleged perpetrator of the South Carolina investment fraud scheme. These were in the possession of the check-cashing stores. If there is discovery contrary to these facts the defense can not claim to have reached such discovery as yet in the limited of time it has had to examine such discovery. Certainly the government has built the theory of its case beyond the barriers of what THE defendant cites above to have created such serious charges against the Defendant.

Thus again, and to the contrary of the RICO allegations from in the indictment, regarding the

Defendant, in the limited amount of discovery Mr. Sakin has examined, the Defendant absolutely relied upon the receipt of "cleared funds," duly and legally processed through FDIC-insured Federal Reserve-licensed banks, always receiving them in the form of Federal Reserve-generated wire transfers and never in the form of any checks for deposit at all. These wire transfers were always received from bank accounts styled as "for the benefit of, and/or in the name of, Chemical Trust," as the sole owner of these said funds and then with regard to the sender of these said funds to the Defendant, the Defendant was instructed to place these funds into bank accounts and to invest them "for the benefit of, and/or in the name of, Chemical Trust," as the sole owner of these funds and thus the solely responsible sender.

The Defendant, in accordance with minimum amount of discovery examined, never agreed anywhere to anyone that any of such Chemical Trust funds were to be contributed or conveyed to "an enterprise," never claimed that such funds as were to be received by corporation controlled by him or not, were to enrich "an enterprise," or the members of such enterprise, and never did he exchange Chemical Trust's rights of ownership to these funds for any enrichment of "an enterprise." It appears, again from very preliminary examination of materials associated with this case, whether in discovery, or to be presented as evidence for the defense, that Chemical Trust was ever concealed as the owner of these funds, or that any such proceeds or any asset subsequently acquired thereby was somehow concealed by conveyance to enrich "an enterprise."

There may in fact be more complex issues than these levied against our defendant regarding RICO, but even these as stated above have not been fully examined by the defense since forensic accounting experts have not even been retained to examine the finality of these matters, as third party proofs. With so little of the discovery examined, we can find no evidence yet that firmly establishes or refutes what accusations the government has made.

### Money Laundering

Any discussion on Count 2 through 13, and 15, has been omitted since the Defendant is not in these counts. At Count 14, there is the allegation that "from in or about July 1999, and continuing thereafter up to and including in or about November 2000, at Broward County, in the Southern District of Florida and elsewhere, the Defendant did *knowingly and intentionally conspire, confederate, and agree with the other defendants mentioned in this count and with other persons known and unknown to the Grand Jury to commit offenses against the United States,* that is, to violate Title 18, United States Code, Sections 1956 (a) (1) (A) (i) and (B) (i) and 1957, or "money laundering."

This is a vast issue. The discovery examined thus far does not show that the Defendant engaged in money laundering. This is a very preliminary conclusion drawn on little examination. There are also other documents that the Defendant intends to provide as evidence, as well as testimony of witnesses and expert witnesses.

The Defendant believes that even if the entire discovery were examined, the only nexus to money laundering with regard to the Defendant will be Fred Morgenstern, the Defendant's brother. Actually, more things will point away from money laundering than to it, meaning:

- There is a paper trail that follows the South Carolina investment fraud proceeds through a series of what appears to be legitimate on-shore, off-shore and other-national corporations conducting legally permissible transactions, most of them under specific two-party contractual rights to so do, through Chemical Trust's (Wolmack's) signed agreements which authorize the forward transfer and investment of such Chemical Trust's funds, under the accords of a consulting agreement and a trustee appointment letter, among perhaps other specified and implied rights.

- The conduct of the defendant was inconsistent with any concealment, because any efforts at concealment were disingenuous when evaluated against his entire course of conduct, including the return of approximately $17 million of these specific "fraud proceeds" to the appointed receiver for Chemical Trust, almost a full 9 months before he was ever indicted. This is evidence of intent by the defendant to always return the Chemical Trust funds to the investors, among other proofs, appears to be conveniently left out of the discovery that we have examined thus far, and we doubt that the grand jury was informed of this fact when it was held to bring forth the indictment against the defendant.

- It also suffices to say here that the Defendant does not believe the grand jury was informed that substantially all of the funds styled in Counts 16-45 of the indictment were returned in full by Falcon Trust Company, London, England, under the defendant signatory authority and control - and at his insistence WITHOUT ANY "DEAL" FROM THE GOVERNMENT (this was accomplished with Jim, Fred and Victoria Morgenstern, the defendant's wife), all completed a full 9 months before this indictment was returned, (31 January 2000 versus 30 October 2000) and prior to any Freeze Order or Repatriation Order being issued in any jurisdiction requiring him to so do (that being done on 30 March 2000).

- The Defendant believes that this "Return of the funds" factor being left out of any proceeding is an extraordinary lapse of disclosure of material fact when bringing forth these kinds of serious charges against any defendant.

- The Defendant believes the government knew all along that it was the Defendant's intent in all matters of Womack, to return funds. This is in stark contrast to the allegations of RICO, money laundering and fraud, made against the Defendant in the indictment.

- Nothing in the discovery shows the Defendant undertaking "all steps necessary" to avoid detection by law enforcement of the ownership or location of any of these South Carolina investment proceeds. In fact, by simply seizing the records, which is the presumed paper trail for these funds, it appears that the government knew exactly where such funds were located and could discern the exact material fact that Chemical Trust has always owned them or they could not allege they were the proceeds of the "South Carolina investment fraud scheme." If there are attempts on the part of the Defendant to conceal this material fact, or there is some claim by him that they were not Wolmack's funds, then such conclusions lie elsewhere in the unexamined discovery.

- Typical money laundering involves financial transactions that are separate from the underlying crime of fraud, i.e. meaning at least this action must be separate from the "South Carolina investment fraud scheme." Yet in the discovery examined, the government fails to put the defendant into this South Carolina scheme in any material way whatsoever. We believe missing this point in the discovery is particularly telling since it is being in this scheme that must become the defendant's primary contribution to the RICO enterprise.

- If the Defendant's brother introduced Chemical Trust to depository banks (FDIC-insured and Federal Reserve licensed) and fringe banks (Florida State licensed check cashing stores) and thereafter managed Chemical Trust's receivables, and the defendant in fact received Federal Reserve wire transfers from Chemical Trust directly or indirectly, but only Chemical Trust, never an investor, certainly these actions in and of themselves do not "put the defendant in" Wolmack's routine fraud scheme.

- The Defendant never promoted the raising of funds by Wolmack (or any of this multiple identity personages) from any "agents" or investors; the defendant was never was known to any of these people in any manner at all; none of the government's four confidential informant sources inside Wolmack's business ever mentioned the defendant in their respective FBI 302s, never spoke to the defendant calling into Wolmack's offices, none of these agents, investors or confidential informants ever met the defendant or did any agent or investor ever rely on him for making an investment in anyway whatsoever (as evidenced from their FBI 302s), or engaged in any business undertaking with the defendant before or since, thus we wonder how the government is construing the defendant's "involvement" with the South Carolina investment fraud scheme. If there is evidence that shows he was involved in this scheme, then this discovery outside the scope of the discovery already examined.

9

- Accepting and investing funds (however successful or unsuccessful these investments were) for Chemical Trust was never designed to make "illegally obtained funds appear legitimate" as this accusation is not even within the four corners indictment - that the defendant obtained funds from Chemical Trust illegally. The Defendant did not conceal the source of even some of the funds from anyone - all deposits, were made to the benefit of Chemical Trust irrespective on where they were made.

## Mail and Wire Fraud

Under the heading "The Purpose And Objects Of The Conspiracy" Number 1 has been omitted for irrelevancy to Defendant, but in Number 2, supposedly the Defendant's purpose and object of the conspiracy was to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, where such acts were "the cashing of checks obtained from a South Carolina based investment fraud, which involved the proceeds of specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341.

What cannot be found in the discovery examined thus far is any involvement whatsoever of the Defendant in cashing checks at anytime or anywhere. Further, significantly, the Defendant's brother cleared most of the Chemical Trust funds, through Chemical Trust (for "the benefit of Chemical Trust" accounts, with Wolmack being the signatory or person authorized to approve any wire transfers, etc., in the form of *"deposits into banks not the cashing of checks"* at all.

This makes "concealment" and "all steps necessary," the key elements of money laundering, incidental and disingenuous if it exists at all, and certainly not relevant to the Defendant, these actions being entirely unrelated to him. Mr. Sakin has examined very little of the discovery and at this date cannot build a reasonable defense to this count unless and until he sees evidence, if any, that the government has that would put the Defendant client into the action of cashing checks, or even if possible, whether such actions are legal or not legal. This cannot be done without significant more time.

The Defendant is also charged in wire fraud, in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of the "said specified unlawful activities." Whether these "unlawful activities" are his alleged participation in the South Carolina investment fraud, and/or, in the cashing of checks, neither of these is proven to be "unlawful activity" in any of the discovery we have examined. Mr. Sakin does understand that there are hundreds of boxes of discovery from South Carolina, which may or may not contain evidence to the contrary of the discovery already examined.

10

Thus far, there is no discovery examined that has the Defendant having anything to do with either of these areas of alleged unlawful activity, or any evidence that might suggest that he engaged in any financial transactions that were designed implicitly in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the said "specified unlawful activities." Further, no discovery examined has the Defendant knowing that the property involved was proceeds of some form of unlawful activity. Needless to say, the accusation that the Defendant also held as a purpose and object of the alleged conspiracy, to knowingly and willfully engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, which was derived from specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, whereby such property was obtained from a South Carolina based investment fraud, is entirely unknown, and thus unproven, in the discovery examined.

### Returned Proceeds in Counts 16 through 45

The Defendant has already spoken to Counts 16 through 45. The Defendant would like to see several motions filed to find out whether the government revealed to the grand jury, among other parties, that the return of the proceeds enumerated in these counts were returned to the duly-appointed Chemical Trust Receiver, a full nine (9) months prior to the initial indictment and two (2) months prior to the issuance of a Freeze and Repatriation Order requiring him to do so. It is material to this case that if fact were deliberately left undisclosed regarding the intent of the defendant, this would show incredible prejudice and disregard for the positive actions of the defendant to do the right thing.  Only a full, expert forensic accounting of all this matters is acceptable to the defense, and obviously, we have had no time to direct or begin this process.

### Additional Evidence not yet available

Given the government's silence regarding the defendant's efforts to return all funds in Counts 16 through 45 to the Receiver, Mr. Beattie Ashmore, Esq., in Greenville, South Carolina, a full nine months prior to the initial indictment in the case, there is other evidence "from the Bahamas" that has not been made available to the defense that, in the opinion of Mr. Brian McCormick, the prosecutor in this case, "is devastating" to the defendant. While we have no idea what this material is, we do know that the defendant was served on January 18, 2002, with a civil "Order to Show Cause Hearing" notice to give reasons as to why he and his brother, who is also a defendant in this case, should not be found in contempt of court, and of a certain Asset Freeze and Repatriation Order, in the District Court of the United States for the District of South Carolina, Greenville Division, where I believe such Asset Freeze and Repatriation Order is been entered in parody in this the Southern District of Florida as well, where is Order has in it some references to some banking documents from the Bahamas. Obviously, these are complex issues still again, since the government has not provided us to date, with this discovery.

The Defendant believes that there is a general failure on the part of the government to acknowledge that the Defendant operated businesses in at least four or more countries other than the Bahamas. The Defense believes that whatever the government has from the Bahamas, it certainly remains unexamined, and that any documents from only one country's banks or other sources, would be vastly incomplete in accounting for any funds, including the Wolmack funds, has such funds flowed on a debit-credit basis across multi-jurisdictional borders, all outside the United States. The defense needs to present in clear, charted formats, all accounting and cash flows following the examination of all the corporate and banking records, once they reach the hands of the defense. This process must be directed by experts in international banking, multi-jurisdictional business operations, and most importantly, forensic accountants. This continuance is for this matter of "new evidence" alone should thus be granted.

The Defendant wants to say that he has listened to only a few conversations that are part of the discovery in the South Carolina indictment, and all reveal his intent to work diligently to recover as much of the Wolmack funds as possible, even if it took time, even if restitution included the paying of an investment return. One of these documents happens to be evidence in both the defendant's second Indictment, the result of a reverse sting perpetrated by the government, in South Carolina Greenville District, and in the civil Order to show Cause" as noted above, dated 23 September 2000, prior to him being indicted in either district.

About Thirty-three (33) days on the one side, and about Forty (40) days on the other, after the defendant wrote this Memo entitled "Settlements," the government indicted him not once but twice. In this Memo, which the government has as evidence, the Defendant's intentions are clearly shown, well in advance of ever being indicted. The defendant wanted to continue to aid the Receiver in the recovery of additional Chemical Trust funds in the "approximate amount of $17.3 million." While this amount is clearly stated, we must have insufficient time to interpret it. Obviously the government believes it to be truthful or they wouldn't keep using it. We believe it could represent both a return of principal and some calculated investment income return. If it does, and if the government failed to inform the grand juries of the Defendant's successful efforts to aid the Receiver in recovering funds – which incidentally occurred a full two months prior to any Freeze and Repatriation Orders were issued against the defendant, if the government acted prejudicially, and thus too swiftly to limit the defendant's ability to protect these assets or funds, to thus continue to aid in the recovery of Chemical Trust Funds, and if the government has subsequently frustrated every attempt of the defendant to do everything relevant to protecting Chemical Trust funds, and where any of these assets or funds have now lost value due to prevailing market conditions since September 23, 2000, (since even the NASDAQ has lost in this time frame over 70% of its value as well as losses sustained by every other stock market around the world since that time, or in fact for any other reason beyond the control of the Defendant given his circumstance, then these developments could be "devastating" to the government's case against our client.

The Defendant believes Mr. Sakin needs time to exhaust all materials that can be assembled as to why this hallmark memo was written, why the Defendant believed beyond a shadow of a doubt, so much so he put it in writing to someone else follow a meeting to discuss these figures, that these funds could be recoverable effective 23 September 2000, and how in spite of continued earnest on the part of the Defendant to help the Receiver, prosecutors in two different Federal District indicted him days apart, less than 40 days later. Where is the government's evidence that the Defendant was not sincere? Why was nothing said anywhere in any proceeding about the return of $16.7 million from one account alone? Or was it that the Defendant is an easy target because he was so much help so early that the government relentlessly penalized him for being so forthright? Mr. Sakin needs to take the time to find out.

Further, Mr. Sakin has not filed motions as yet to uncover in advance of trial the government's prejudice in these grand jury testimonies; I hope he will, as soon as time permits to do so, among other motions to remain undisclosed at this time. If in fact neither of these grand juries were fully informed of the circumstances under which the approximately sums of $20 million was recovered for the benefit of Chemical Trust and its defrauded investors, and if the Receiver withheld this information, we believe this would show incredible prejudice. These matters of course remain to be seen. The Defendant needs to find out these in advance of trial.

**Counts 46 through 55 have been omitted in this discussion for irrelevancy to Defendant.**
**Other Matters**

- **Accounting:** We have pointed out some of the reasons why this subset of our request for a continuance is critical to the defense. More reasons include that the government has had the benefit of an "interpretative accounting" only of an array of businesses and banking transactions which thus far is far out of the defense's reach. Much of this is not in the discovery and must be acquired from offshore and other-nation corporations which are in the custody of these entities. The defendant resides in a halfway house and even prior to this, he is not permitted to leave the United States. While cooperation with these entities that are legally situated in four or more foreign countries is expected, it is not completed in any fashion. The defense must have accountants and analysts review the materials and determined whether there are missing elements and provide subpoenas to receive such missing elements in order to effectively overcome the allegations of concealment while also demonstrating that the defendants took all steps necessary to provide a seamless paper trail regarding the ownership and location of the alleged proceeds of a South Carolina criminal investment fraud. We believe there will be much discovered by the defense in this process that is contrary to the governments allegations.

13

- **Charts:** Again, this matter is complex and requires a reduction to simplicity for the benefit of the Judge and Jury. Few things accomplish this better than charts. The Defendant will require 30 to 50 of such charts to fully illustrate all matters in this case. These cannot be prepared until the entire discovery is obtained including the review of the accounting and gathering of expert testimony.

- **SC Indictment:** Work related to this includes an analysis of the discovery; the authenticity of the business of the defendants. Review of the videotapes in particular is required to assess the penetration of the defense camp and the testimony that verifies the Defendant's intent to return funds and to do the right thing.

- **Other Defendants Pleas Agreements:** Study of these is critical to the defense. These include pleas agreements and bargains of the defendants in this case and the South Carolina Womack Case and perhaps Georgia as well, plus other expected evidence. These have not been received yet and once obtained. It is expected that depositions of individuals related to these individuals will be also be vigorously sought.

- **Actual Witnesses:** The defense needs time to assemble witnesses, some we enumerate here, but also expert witnesses, to refute witnesses brought forth by the government. The Defendant needs time to substantiate our defense through these persons, and of course, to impeach the government's accusations through their testimony. The Defendant cannot permit the jury to set aside the testimony of his witnesses merely because Mr. Sakin hasn't had the time to present them, or to have time to mount vigorous impeachment of the government's witnesses merely due to lack of preparation.

## POSSIBLE WITNESS – COLLABORATIVE TESTIMONY

### Richard DeMerritt – Camp David, Cable Beach, Nassau, Bahamas:

- **Who He Is:** DeMerritt is a chartered accountant, formerly an Ambassador to Great Britain for the Commonwealth of the Bahamas, and formerly its Accountant General and Member of Parliament. He was a member of the Board of Directors of Americas International Bank Corporation, Ltd. ("AIBC"), which is mentioned in the indictment. He formed IBC companies for me and my clients, and introduced me to many of what would become my business associates in the Bahamas, most notably Gary Christie, Managing Director of AIBC, Perry Christie, the PLP Leader, a former Member of Parliament, also an attorney for Christie, Davis & Co., trust attorneys for AIBC, and Goes Damaio and Barry Denison, who were the capital trustees and thus shareholders of AIBC and also members of the AIBC Board. Calvin Knowles and Fred Murphy, the primary shareholders of The Falcon Trust Company, Ltd.

- **What we believe he will say:** As a WITNESS, That my undertakings in the Bahamas and in Brasil, as he is aware of my work there with Barry and Goes, was always forthright and legitimate, and that I had the backing of very significant people and politics in the Bahamas. Also, that the purchase of AIBC, Falcon Trust Company, Ltd. the attempted purchase of the Cat Island Real Estate Project, the Nassau Office and Housing Project, as well as Regent Providence Insurance Company, Ltd., were all legitimate and that all were irreparably damaged by Wolmack's arrest and subsequent events there from – and from nothing else, among other important commentary about business in the Bahamas, my integrity, and the accomplishments I set in motion to complete there.

- **How this is relevant to our defense,** in the matter legitimacy and achievement of business structures in the Bahamas and trust among the persons in political influence there. .

**Koed Smith – Nassau, Bahamas**
- **Who He Is:** Koed Smith is the Attorney of record for David Morgenstern, AFCM, and AFAC in the Bahamas.  He is as aware my business operation. He knows Gary Christie. Perry Christie, He is also familiar with the settlements of Gateway and indemnities signed concerning that transaction. And also 5-Star, among some other clients who had accounts at AIBC, as well as the accounts on AFCM and AFAC. He is also an expect on what it takes under Bahamian law to get evidence out of the Bahamas that can thus become legally permissible to use in the US Courts.

- **What we believe he will say:** As a COLLABORATOR, That my undertakings in the Bahamas were forthright and legitimate, and had the backing of very significant people and politics therein. That AIBC, Falcon Trust Company, Ltd. and Regent Providence Insurance Company, Ltd., were irreparably damaged by Wolmack's arrest and subsequent events there from. He can also explain what he knows about MacEnroe, how he went to Switzerland to meet him on different occasions, and how my relationship was developed with MacEnroe.

- **How this is relevant to our defense:** His comments may shed light on the actions of myself and AIBC, AFCM, AFAC, Falcon and Regents, were legal under Bahamian Law. That since my companies did no business in the US, what this may mean in terms of the law under which they as entities are governed. Also, he may be able to contribute as to why bank records obtained from a secrecy jurisdiction were done so and how. If this was done without legal authority, then it may not be admissible.

**Gary Christie – Nassau, Bahamas**
- **Who He Is:** Gary Christie is the Managing Director of AIBC in the Bahamas, the bank where my accounts, Vickie's, AFAC, AFAC, and all client accounts were housed. Gary was the conduit under which almost all business was accomplished in the Bahamas. His wife is the Chief Prosecutor in the Commonwealth, who I know personally. He also met, both separate from me, and with me, Mr. MacEnroe many times, even in Switzerland. He knows that connection and made his own assessment about the business viability of MacEnroe, the Bahamas business operations, my relationship with Perry Christie, the PLP Leader, a former Member of Parliament, also an attorney for Christie, Davis & Co., trust attorneys for AIBC, and Calvin Knowles and Fred Murphy, the primary shareholders of The Falcon Trust Company, Ltd. He is also familiar with the settlements of Gateway and of 5-Star, among some other clients that were satisfied out of funds in AIBC, in the accounts on AFCM and AFAC.

- **What we believe he will say:** That my undertakings in the Bahamas were forthright and legitimate, although many people took advantage of my situation, that is, me being in London instead of on the Bahamas, and that I had the backing of very significant people and politics therein. That AIBC, Falcon Trust Company, Ltd. and Regent Providence Insurance Company, Ltd., were irreparably damaged by Wolmack's arrest and subsequent events there from. He can also explain what he knows about MacEnroe, how he went to Switzerland to meet him on different occasions, and how my relationship was developed with MacEnroe.

- **How this is relevant to our defense:** His comments may shed light on how his actions were in concert with mine, and that I always wanted the best for the my the actions of myself and AIBC, AFCM, AFAC, Falcon, were forthright under Bahamian Law in a manner that I have acted correctly thus far.

**Stewart Arnold – London, England:**
- **Who He Is:** Arnold is a English Solicitor who served as my attorney and confidant. He was my attorney in purchase attempt of 21 Curzon Street in London, the Lord Guernsey civil matter ($2,500,000 returned to this client), along with David Lord, a barrister, and on the Young & Co., Solicitors' matter, where this law firm stole approximately $600,000 from me in concert with an associate of mine, a Mr. Gerry Lim. Also, he met many times with Jonathan Ogden, the "insurance guy" who was introduced to me by Joe Silvestri, and brought me into the failed Walker deal.

- **What we believe he will say:** As a COLLABORATOR, that my asset management undertakings in the Europe were forthright and legitimate, and as such, my relationship with MacEnroe was authenticated by Arnold in London, in Frankfurt, Germany and in St. Gallen, Switzerland. There were many meetings that he attended with MacEnroe.

- **How this is relevant to our defense,** in the matter legitimacy and achievement of business stature and trust in England and Switzerland.

**Jonathan Ogden – Bath, England:**

- **Who He Is:** Ogden is an English citizen who was a close confident of mine. He is a consultant of sorts, mostly to the hospitality business, but also has knowledge of insurance and project financing. A hyper-vigilant researcher, he introduced me to MacEnroe actually, and prior to that, separately, to the Walker deal, through Silvestri and a guy from Miami named Ed Reisen. This deal turned out to be bogus – and it cost me millions of dollars, and also to Urs Schol and Walker Schumacher in Zurich.

- **What we believe he will say:** As a WITNESS, he can validate that I was a legitimate asset manager seeking appropriate investments for clients, making every attempt to do the right thing. He also handled the Wolfensburger deal, and the Staybridge Hotel development plan with Bill Borregard and James Morgenstern in Orlando Florida, and Regents Providence Insurance Company, Ltd., application in the Bahamas, with Alan Mildenhall, a member of Lloyd's Brokers. Ogden also traveled with me to meetings in the Bahamas, in London, in Frankfurt, Germany and in Zurich and St. Gallen, Switzerland with MacEnroe and other clients, like James Anthony and Victor Lynas (separate deals) but both from Australia. There were many meetings that he attended with MacEnroe and Wolfensberger, among others.

- **How this is relevant to our defense:** In the matter legitimacy and achievement of business stature and trust in England and Switzerland.

**Alan Mildenhall – London, England**

- **Who He Is:** Mildenhall is an English citizen who was a close confidant of mine. He is a Lloyd's broker, having floor (bidder) status on the London Insurance Exchange. He and I designed and got approved by several re-insurers in London, an insurance indemnity for financial contracts, to be issued by Regents Providence Insurance Company, Ltd., ("RPIC") a to-be-formed insurance company in the Bahamas that gained approval for the indemnity and as an issuer, from the Insurance Commission in the Bahamas subject to a $6 million capitalization.

- **What we believe he will say:** He can validate that I was a legitimate asset manager with MacEnroe seeking appropriate investments for my clients, making every attempt to do the right thing. Regarding RPIC's application in the Bahamas, he can also validate that this opportunity was viable and authentic, but ruined by Wolmack. There were many meetings that he attended with MacEnroe and Ogden.

- **How this is relevant to our defense:**  In the matter legitimacy and achievement of business stature and trust in the Bahamas, England and Switzerland.

- **Walter Schumacher – prominent attorney in Zurich – met on Walker deal; formed Slattocks.Can confirmed legitimacy of my business and MacEnroe's.**

- **Urs Schol – bonds trader – SC discovery**
- **Max Broder – swiss trustee – vouched for MacEnroe**
- **James Wittahakker – CIBC banker for Slattocks**
- **Richard Scheidner – CIBC banker for Slattocks**
- **Balz Wolfensberger – client, I brought to MacEnroe – deal made.**

- **Laurie Bolch – attorney , Amquest**
- **Don Clark – attorney, knows of MacEnroe and business**
- **Scott Rein – attorney, Standard Atlantic**
- **Bruce Udolf - attorney, my former**
- **Jim Morgenstern – attorney, trustee, Barclay's money**

- **Tom Vialpando – knows everything  - VERY IMPORTANT witness.**
- **Bill Borregard –  Staybridge Hotel deal, visited Bahamas, MacEnroe, England operations.**
- **Perry Christie –  Bahamas Politician**
- **Ron Armbrister – AFCM Director, day to day operator.**
- **Tim Davidson – accountant for all Bahamian companies, expenditures. VERY IMPORTANT**
- **Carlos Fuerntes – paid organizer (fund raiser) as a formal broker, knows  high yield business.**
- **Ralph King  -  head of Standard Atlantic. Knows MacEnroe, says Mc is responsible not me, for all investments**
- **Robbie Stevens – paid organizer  for Standard Atlantic.**
- **John McKee  - Staybridge Hotel deal – from Maryland, knows MacEnroe's family, business dealings.**

- **Jim Taber** – client, owe him money, fully acknowledged by name in Sept. 23, 2000 memo.
- **Ed Reison** – Walker deal originator (Can explain how I believed I was getting paid in this deal.
- **Juan Cabrera** – successful managed fund deal conclusion
- **Denis Berne** – successful managed fund deal conclusion
- **5-Star Global** – successful deal managed fund deal conclusion – Koed managed the return to investors of funds plus interest. Wisconsin SEC found I vicariously raised these funds - Turner and Augustine will say I did not.
- **Carl Lovell** – attorney for trusts – evaluated Wolmack's deal prior to me accepting it.
- **David Tedder** – seminars in foreign security trusts – may be an expert witness on this subject.
- **Victor Lynas** – unsuccessful deal, but we did work with the authorities to close it up.
- **James Anthony** – successful introduction to MacEnroe – good witness for authenticity of MacEnroe.
- **Richard Collins** – successful deal completion – Gateway, but this deal is under SEC investigation of larger problems than me paying all the money back to them.
- **John Ruston** – paid investigator, knows high yield business, told us late in the game - Collins
- **Goes Damiao** – Brasilian Diplomat and Trustee for stock AIBC in the Bahamas
- **Edginho Bez** – Brasilian Congressman from Santa Catanina who supported my visit and speaking to the Brasilian National Congress. He is the Realtor (or writer of all Federal legislation in Brasil.
- **Danillo de Castro** – President Special Commission for the Reform of the Financial System
- **Head of the Department of Agriculture**
- **Barry Denison** – US citizen, resides in Israel. Business associate of mine, Goes Damaio, and Trustee for stock AIBC in the Bahamas. Was my translator in front of Brasilian Congress

**Respectfully submitted, this the 25th day of January 2002, given personally to Mr. Scott W. Sakin, Esq., at his offices 1411 NW North River Rd. Miami, Florida 33124. 305.545.0007.**

Sincerely,

David A. Morgenstern, Defendant